John A. Treptow, ABA #7605059
Wendy E. Leukuma, ABA #0211048
DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, Alaska 99501-5907
Telephone: (907) 276-4557
Facsimile: (907) 276-4152

Attorneys for Inlet Fisheries, Inc.
 and Inlet Fish Producers, Inc.



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON, SUBSCRIBING TO CERTIFICATE OF INSURANCE OP01 0025, through Puget Sound Underwriters, Inc., <br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>INLET FISHERIES, INC., an Alaska corporation, and INLET FISH PRODUCERS, INC., an Alaska corporation,<br><br>　　　　　Defendants and Third-Party Plaintiffs,<br><br>vs.<br><br>TOTEM AGENCIES, INC., a Washington corporation,<br><br>　　　　　Third-Party Defendant. | Case No. A04-0058 CV (JWS)<br><br>**INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## I.　INTRODUCTION

In August 2000, Totem Agencies, Inc. ("Totem") completed and submitted an application for marine pollution insurance for Inlet Fisheries, Inc. ("IFI") and Inlet Fish

**ORIGINAL LOCATED IN FOLDER
BEHIND FILE**

Producers, Inc. ("IFPI") (collectively "Inlet" or "Inlet entities"). Recently, this Court declared the policy secured by Totem void for failure to disclose facts material to the insurance risk. Because the undisputed facts of this case demonstrate that Totem failed to exercise reasonable care, skill, and diligence in completing Inlet's application for insurance and is responsible for the omissions therein, Inlet respectfully moves for entry of an order granting Inlet summary judgment on its breach of contract and negligence claims.

## II.  STATEMENT OF THE FACTS

On or about August 26, 2002, the QANIRTUUQ PRINCESS ("QP"), a vessel owned by the Inlet entities, sank while moored in Steamboat Slough. At that time, Inlet believed that the vessel was covered under a marine pollution insurance policy initially secured by Totem in August of 2000. Much to Inlet's dismay, however, Lloyds declined coverage under its policy and initiated this action to declare the policy void *ab initio* under the doctrine of *uberrimae fidei*, or utmost good faith, alleging that Inlet failed to disclose material facts in its application. Ultimately, this Court agreed and declared the policy void, finding that Inlet's application failed to disclose facts material to the insurance risk. The remaining dispute centers on whether Totem is liable to Inlet as a result of Inlet's newfound lack of coverage.

### A.  Inlet's Relationship With Totem

IFI was formed in 1987, and IFPI in 1989. (Goddard Dep., p. 8, attached hereto as Ex. A) Both were in the fish processing business and had plants in Bethel, Naknek, Kenai, and Seward at various times from 1987 through 2003. (Klier Dep., p. 18, attached hereto as Ex. B) The Inlet entities operated barges, tender vessels, and a processing vessel during that time. (Klier Dep., p. 17, Ex. B hereto) IFI went into Chapter 11 liquidation in October 2001. Its assets were sold by the spring of 2004 and it emerged

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

from Chapter 11 in the spring of 2005. (Goddard Dep., pp. 13, 14, Ex. A hereto) IFI purchased the QP in 1987, and was its owner in 2002. (Goddard Dep., pp. 16, 67, Ex. A hereto)

Totem became IFI's insurance broker in late 1987 or early 1988. (Goddard Dep., p. 74, Ex. A hereto) After becoming IFI's controller in 1988, Patrick Klier was in charge of securing and negotiating insurance coverage for the Inlet entities. (Klier Dep., p. 16, Ex. B hereto) He handled those duties until he left the company in 2001. (Klier Dep., p. 16, Ex. B hereto) Mr. Klier had no experience with marine insurance and relied on Totem for those insurance needs. (Klier Dep., pp. 112, 142, Ex. B hereto) The Inlet entities dealt exclusively with Totem from 1988 up to the present. (Goddard Dep., p. 74, Ex. A hereto)

Eric Parthemer of Totem was the individual with whom Inlet dealt on insurance needs. (Klier Dep., p. 28, Ex. B hereto) Parthemer, currently Vice President of Totem, was the lead person at Totem on the Inlet account from 1988 on. (Totem 30(b)(6) Dep., p. 51, attached hereto as Ex. C) Mr. Parthemer had limited experience with marine insurance. (Parthemer Dep., p. 10, attached hereto as Ex. D) He was not familiar with the Oil Pollution Act of 1990 ("OPA 90") or CERCLA. (Parthemer Dep., pp. 23, 24, Ex. D hereto) Mr. Parthemer knew only that vessel pollution insurance covers "generically water pollution liability." (Parthemer Dep., p. 24, Ex. D hereto) When Totem submitted the application to Lloyds in August 2000, Totem was not aware of (1) the marine insurance doctrine of *uberrimae fidei*, (2) the doctrine of utmost good faith, or (3) the requirement by vessel pollution insurers that it was the insured's duty to disclose all information that the insurer thought was material to the risk before the risk was underwritten. (Parthemer Dep., pp. 82, 83, Ex. D hereto)

The "bread and butter" of Totem's business is personal lines, commercial packages, general liability, property, automobile, and workers' compensation.

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

(Parthemer Dep., p. 13, Ex. D hereto) Marine insurance represents less than five percent of Totem's business. (Parthemer Dep., p. 10, Ex. D hereto)

On a yearly basis, Totem would obtain the following types of insurance coverage for the Inlet entities:

(1)  Property
(2)  General liability
(3)  Business interruption
(4)  Boiler and machinery
(5)  Automobile
(6)  Inland marine
(7)  Umbrella
(8)  Workers' compensation
(9)  Marine insurance, including hull and machinery and Protection and Indemnity ("P & I") insurance.

(Klier Dep. Ex. 2, Ex. B hereto)

### B. Vessel Pollution Insurance for IFI/IFPI, 1992 – 1999

Among the vessels owned and operated by IFI and IFPI were the MAREN I and the QP. (Goddard Dep., pp. 16, 17, Ex. A hereto) Both vessels were used as support facilities for onshore operations in Bethel, provided lodging for workers, and were used for offloading fishing boats and tenders onto the Bethel city dock. (Goddard Dep., pp. 17, 18, Ex. A hereto) The vessels were non-tank vessels and did not move under their own power. (Parthemer Dep., p. 75, Ex. D hereto) The propellers and shafts of the vessels had been removed. (IFI Rule 30(b)(6) Dep., p. 34, attached hereto as Ex. E)

Although pollution insurance for these vessels was not mandatory, Inlet decided to secure "stand-alone" vessel pollution insurance in 1992. (Klier Dep., pp. 47-48, Ex. B hereto) Inlet wanted the MAREN I and the QP specifically insured for marine pollution

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

because those vessels operated solely on the inland waters of Alaska, principally the Kuskokwim River, and did not "go to sea." Inlet's president, Vince Goddard, realized that Inlet's liability for pollution damage was far greater in a river system than at sea. (IFI Rule 30(b)(6) Dep., p. 52, Ex. E hereto)

Mr. Parthemer initially placed vessel pollution insurance for the MAREN I and the QP with Water Quality Insurance Syndicate ("WQIS") in 1992. (Parthemer Dep., p. 18, Ex. D hereto; WQIS Rule 30(b)(6) Dep. Ex. 23, attached hereto as Ex. F) Mr. Parthemer simply sent a fax to WQIS and stated (1) the name of the insured (Inlet Fisheries, Inc.), (2) the names of the vessels and their gross tonnage (the MAREN I – 96 Gross Tons; QP – 276 Gross Tons), and (3) "both non-motorized barges operating port risk in Bethel, Alaska. Please advise." (WQIS Rule 30(b)(6) Dep. Ex. 23, Ex. F hereto) This was Mr. Parthemer's first experience with vessel pollution insurance. (Parthemer Dep., p. 20, Ex. D hereto)

WQIS replied by fax dated June 15, 1992, as follows: "We confirm binding coverage for the following barges under OPA to a limit of $500,000 each vessel effective June 12, 1992-93; 77-2 MAREN I GRT-96; OPA $5000 - $130.00; 72 – QANIRTUUQ PRINCESS GRT-276; $219.00." (WQIS Rule 30(b)(6) Dep. Ex. 24, Ex. F hereto)

After this initial placement, WQIS automatically renewed the vessel pollution insurance on the MAREN I and the QP for the policy years 1993-94, 1994-95, and 1995-96. (Parthemer Dep., p. 30, Dep. Exs. 6, 7, 8, Ex. D hereto) In 1997 and 1999, Inlet requested that Totem add vessels to the WQIS policy and to increase the policy limits to $1 million. (Parthemer Dep., p. 33, Dep. Ex. 4, p. TOT1395, Ex. D hereto)

From 1992 through April 2000, WQIS never requested, and accordingly Totem never forwarded, any information on (1) IFI's pollution loss history, (2) the vessels' pollution loss history, (3) the condition of the vessels, or (4) what other insurance IFI carried on the vessels. (WQIS Rule 30(b)(6) Dep., pp. 56-61, Ex. F hereto)

### C. Surveys of IFI/IFPI Vessels

In March 1988, Inlet's P&I and hull and machinery insurer reduced Inlet's premiums for the coming policy year by 7.5% "for continued good loss experience on this fleet." (Klier Dep. Ex. 18, Ex. B hereto)  In addition, the broker for the insurers on Inlet's P&I and H&M policies requested "new condition and valuation" surveys on the Inlet vessels. (Klier Dep. Ex. 15, Ex. B hereto)  The broker already had surveys on five of Inlet's vessels, but wanted new surveys. (Klier Dep. Ex. 15, Ex. B hereto)  Totem advised Inlet of the need for surveys on its vessels. (Klier Dep., pp. 89, 91, Dep. Exs. 17, 18, Ex. B hereto)

Inlet immediately responded to this request. The HARVESTER BARGE was surveyed on April 24, 1998. (Klier Dep. Ex. 25, Ex. B hereto)  The QP was surveyed on May 30 and 31, 1998; the YUKON II on July 20, 1998; the MAREN I on May 30, 1998; SHANKS ARK on May 31, 1998; and the FORT YUKON on August 3, 1998. The HARVESTER BARGE survey (Klier Dep. Ex. 26, Ex. B hereto) was forwarded to Mr. Parthemer on August 13, 1998 (Klier Dep. Ex. 22, Ex. B hereto), and the other surveys went to Totem on September 4, 1998. (Klier Dep. Ex. 26, Ex. B hereto)

With respect to each vessel insured under the WQIS policy, the surveyor found that the vessel "appears to be of good design, material and workmanship. Except where noted, it appears to be in satisfactory condition and suitable for [Inlet's] intended use." (Klier Dep. Exs. 25, 26, 27, Ex. B hereto)

Each survey contained a section designated "Recommendations List" in which the surveyor recommended that certain repairs be made to the vessels. (Klier Dep. Ex. 25, p. TOT3192; Dep. Ex. 26, p. TOT2633; Dep. Ex. 26, p. SALV ASSOC 7576, Ex. B hereto)  Subsequent to those surveys being done, the P&I and H&M insurer's broker sought follow-up information on "the status of recommendation compliance." On April 22, 1999, Inlet responded by letter, indicating that all applicable recommendations were completed or scheduled to be completed by the end of June. (Inlet indicated that

certain recommendations were "not applicable", such as radio equipment, as the vessels did not go to sea.) (Klier Dep. Ex. 20, pp. TOT2613, TOT2616, TOT2617, Ex. B hereto)

### D.  WQIS Renewal in April 2000 and the MAREN I Spill in May 2000

On April 27, 2000, WQIS renewed its policy covering the four Inlet barges for the policy period June 12, 2000 through June 12, 2001, effective June 12, 2000. (Parthemer Dep., p. 45, Dep. Ex. 2, Ex. D hereto) The policy number was 30-16459. (Totem Rule 30(b)(6) Dep. Ex. 2, Ex. C hereto) As in past years, WQIS did not request vessel surveys or any other information prior to the renewal. (Parthemer Dep., pp. 44, 53, 55, Ex. D hereto)

After WQIS renewed its coverage, Inlet learned of an oil spill by the MAREN I in May. Both Totem and WQIS were immediately made aware of the MAREN I spill. (Klier Dep., pp. 114-116, Dep. Exs. 13, 23, Ex. B hereto) A description of the incident was immediately forwarded to Totem. (Klier Dep. Ex. 13, Ex. B hereto)

On May 18, Mr. Klier talked with Edward Travers, a marine surveyor appointed by WQIS to monitor the spill.[1] (Klier Dep., pp. 115, 116, Ex. B hereto) Mr. Travers had traveled to Bethel. (Klier Dep. Ex. 23, Ex. B hereto) Mr. Klier filled out a number of reports including a situation status report, an incident action plan, an MPRG incident report, and a U.S.C.G. Marine Safety Office pollution incident questionnaire, and sent them to Mr. Travers. (Klier Dep. p. 116, Dep. Ex. 23, Ex. B hereto) Mr. Travers apparently recommended to WQIS that Inlet's vessels be surveyed as a result of the spill.

---

[1] WQIS ended up spending approximately $89,000 on the MAREN I cleanup spill. This figure does not include the scuttling of the MAREN I, which was handled by Magone Marine on contract. WQIS paid some of those expenses directly, and reimbursed Arctic Salmon, Inc. for other incurred expenses. (WQIS Rule 30(b)(6) Dep. Ex. 26, p. WQIS7, Ex. F hereto) Arctic Salmon, Inc. was the operator of the MAREN I and an additional insured under WQIS Policy No. 29-15297. (Goddard Dep., p. 92, Ex. A hereto; Totem Rule 30(b)(6) Dep. Ex. 3, p. TOT1170, Ex. C hereto)

INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al*, Case No. A04-0058 CV (JWS)    Page 7 of 19

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

### E. WQIS's Cancellation of Policy No. 30-16459

On June 1, 2000, less than three weeks after receiving notice of the MAREN I spill, WQIS contacted Totem and indicated that it was considering canceling Inlet's policy. (Townsend Dep. Ex. 7, attached hereto as Ex. G) At that time, WQIS indicated that it would not cancel Inlet's insurance if Inlet had the vessels surveyed by a surveyor of WQIS' choice. (Townsend Dep., pp. 23-24, 35, Dep. Ex. 7, Ex. G hereto)

On June 6, Totem advised Inlet that WQIS had no information on the condition of Inlet's four vessels, and that it wanted to send a cancellation notice on Inlet's policy because of the age and condition of Inlet's vessels. (Townsend Dep. Ex. 8, Ex. G hereto) Totem further advised Inlet that Totem was:

> willing to rescind the cancellation provided you get your vessel surveyed at your expense and are willing to adhere and comply with the surveyor's recommendations. Short-term recommendations will need to be completed immediately. Only long-term recommendations, or Water Quality Insurance Syndicate is willing to work with you on getting resolved in a reasonable manner. They do require that you go through a Alexander, Gowe & Company surveyor. The contact name is Andrew Gowe, and his phone number is (206) 285-0520.

(Klier Dep. Ex. 5, Ex. B hereto; Townsend Dep., p. 23, Dep. Ex. 8, Ex. G hereto)

In June 2000, Inlet did not have the ability to do the surveys in the time frame mandated by WQIS. (Goddard Dep., p. 37, Ex. A hereto) The only places to do out-of-water surveys were Kodiak or Seward. (Goddard Dep., p. 57, Ex. A hereto) The vessels would have to be towed there since they did not have engines. Inlet was willing to do the surveys at the end of the fishing season. (Parthemer Dep. Ex. 1, Ex. D hereto; Klier Dep., p. 64, Ex. B hereto) Whether this information was communicated to WQIS is uncertain. One thing is clear, however, Totem never advised WQIS that the four vessels had been surveyed in 1998 and that repairs had subsequently been made. (Parthemer Dep., pp. 43, 53, 55, 74, 75, Ex. D hereto)

On June 21, 2000, WQIS advised that it was issuing a 30-day notice of cancellation of the Inlet policy "in accordance with section H of the above-mentioned policy. This cancellation is effective July 20, 2000." (Townsend Dep., p. 35, Dep. Ex. 10, Ex. G hereto) It was Totem's understanding that WQIS was canceling the policy because Inlet failed to contact Alexander Gowe. (Townsend Dep., pp. 37, 38, Ex. G hereto)

Subsequently, on August 7, 2000, Andrew Garger, Vice President, Legal, of WQIS wrote to IFI and stated,

> Based on our review of our file for Inlet Fisheries, Inc., it appears that policy premiums have not been paid for the current policy period or the previous policy period. Moreover, Inlet Fisheries has failed to comply with WQIS's demands that its vessels be surveyed (which would allow WQIS to confirm exposure) and adhere to any recommendations by the surveyor. Accordingly, please consider this a 20-day notice of cancellation in accordance with section 21.36.220. <u>In the event that the survey requirements have been complied with and premiums paid, this letter constitutes a 60-day notice of cancellation. This cancellation is final</u>.

(Emphasis added) (WQIS Rule 30(b)(6) Dep. Ex. 22, Ex. F hereto)

Despite WQIS's assertion, Inlet clearly paid the premium for the 1999-2000 policy period.[2] Accordingly, based on Mr. Garger's representation that coverage would be cancelled, regardless of IFI's response, Patrick Klier wrote to Mr. Parthemer and asked, "If we do surveys can we be reinstated? Must know this answer right away as we are setting up a plan to do survey. If they won't reinstate, we won't survey." (Parthemer Dep. Ex. 1, Ex. D hereto)

Mr. Parthemer immediately faxed Tony Gerone of WQIS and asked,

---

[2] (Klier Dep. Ex. 24, Ex. B hereto) In late August 2000, Inlet received a notice of a returned premium in the amount of $2,769.73 as a result of the cancellation. (Townsend Dep., pp. 58, 59, Dep. Ex. 29, Ex. G hereto) If Inlet had not paid the premium, there would not have been a refund paid. (Townsend Dep., p. 59, Ex. G hereto)

INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al*, Case No. A04-0058 CV (JWS)    Page 9 of 19

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

> Please advise if the insured has the surveys and recommendations complied with if you will remain at risk. Inlet Fisheries will have the surveys done and comply with the recommendations shortly as the season is winding down. They want to do the surveys and recommendations prior to the storage of the vessels for winter. Please let me know what your thoughts are.

(Townsend Dep. Ex. 17, Ex. G hereto)

On October 14, Ms. Townsend spoke with Tony Gerone, and was told that WQIS was "canceling [the] policy effective 21 days from 8/7 or 60 days from date of survey completion per their claims V.P. fishing season should not have occurred until done." (Townsend Dep. Ex. 17, Ex. G hereto)

### F.   Totem's Efforts to Secure Alternative Vessel Pollution Insurance

After Totem received WQIS's advices in June 2000, Totem began looking for alternative marine pollution insurance for Inlet. (Parthemer Dep., pp. 67, 68, Ex. D hereto) At that time, Mr. Parthemer was unaware of any other market for standalone vessel pollution insurance.[3] (Parthemer Dep., p. 67, Ex. D hereto) Mr. Parthemer made calls to various marine underwriters, and ultimately contacted Woody Wilton. (Parthemer Dep., p. 68, Ex. D hereto) Mr. Wilton advised Mr. Parthemer that he thought that Lloyds was an alternative, and actually faxed Mr. Parthemer an application for Puget Sound Underwriters. (Parthemer Dep., p. 68, Ex. D hereto)

Mr. Parthemer gave the PSU application to Jan Townsend to fill out. (Townsend Dep., pp. 46, 47, Dep. Ex. 18, Ex. G hereto) It was Ms. Townsend's understanding that Totem was seeking to replace vessel pollution insurance that WQIS had issued. (Townsend Dep., p. 47, Ex. G hereto)

According to Ms. Townsend, Totem's files and Mr. Parthemer were Ms. Townsend's sole sources of information upon which she relied in filling out the

---

[3] The only type of vessel pollution insurance that Mr. Parthemer considered was "standalone" coverage. (Parthemer Dep., p. 69, Ex. D hereto)

INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al*, Case No. A04-0058 CV (JWS)     Page 10 of 19

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

application. (Townsend Dep., pp. 61, 62, Ex. G hereto)  While Patrick Klier was the individual at Inlet to whom she spoke about insurance issues, she did not talk to Mr. Klier about the application. (Townsend Dep., pp. 49, 50, 62, Ex. G hereto)  Nor did she provide him with a copy of the completed application.  If she had, Mr. Klier would observed that the completed application contained an error:  the hull of the HARVESTER BARGE was not fiberglass, it was steel. (Klier Dep., p. 66, Ex. B hereto)  He would also have had an opportunity to advise her of the recent HARVESTER BARGE incident.[4]

With respect to the application's request for "Pollution Loss History," it was Mr. Parthemer's understanding that the application called for the pollution loss history of the vessels being insured. (Totem Rule 30(b)(6) Dep., pp. 20, 21, Ex. C hereto)  He confirmed this understanding with Woody Wilton. (Totem Rule 30(b)(6) Dep., p. 21, Ex. C hereto)  Accordingly, the completed application contained no information regarding either the HARVESTER BARGE or MAREN I loss.

G.   **Renewal of the Lloyds Policy in 2001**

On August 27, 2001, PSU/American E&S issued Certificate of Insurance No. 0P01 0025 which was a renewal of Certificate No. 0P00 9039 issued on August 31, 2000. (Docket No. 151, Inlet's Opp./Cross-Mot. for Sum. J. Ex. 6, Oct. 26, 2004 Elliott Dep.)  Totem did not submit another application, nor did PSU/American E&S request any additional information. (4/11/05 Parthemer Dec., ¶ 5)  The policy period was August 28, 2001 through August 28, 2002.

---

[4] On August 9, 2000, Dave Yansen, a third-party contractor who was part of the MAREN I cleanup effort, was removing diesel fuel from the HARVESTER BARGE and transferring it to barrels on shore. (Goddard Dep., p. 60, Ex. A hereto)  During the transfer, oil spilled on gravel near the water's edge. (Goddard Dep., p. 60, Ex. A hereto)  Mr. Yansen did not report the spill to Inlet. (Goddard Dep., p. 60, Ex. A hereto)  Subsequently, a big rainstorm flushed the oil out of the gravel and into the Kuskokwim River. (Goddard Dep., p. 61, Ex. A hereto)  The spill was reported to WQIS and WQIS paid the entire cost of cleanup ($4,254).  (WQIS Rule 30(b)(6) Dep. Ex. 26, Ex. F hereto)

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al,* Case No. A04-0058 CV (JWS)     Page 11 of 19

### H. The QP Spill

On August 26, 2002, Inlet learned that there had been a pollution incident at Steamboat Slough in Bethel, Alaska involving the QP. (Goddard Dep. Ex. F, p. 2, Dep. Ex. G, p. IFI008, Ex. A hereto) The QP had not been used in the 2002 season and had remained in Steamboat Slough since the end of the 2001 season. (Goddard Dep., p. 110, Ex. A hereto)

Although IFI's resources were limited due to its Chapter 11 filing, IFI alerted the U.S. Coast Guard, the Alaska Department of Environmental Conservation, and American E&S, the local agent for Lloyds. (Goddard Dep. Ex. F, ¶¶ 3, 5, 6, Ex. A hereto)

Mr. Goddard informed American E&S's surveyor, Dave Willoughby, and Amanda Schaeffer at American E&S that IFI needed immediate support from Lloyds in order to handle the cleanup and not having the government take over. (Goddard Dep. Ex. G, ¶ 6, Ex. A hereto) IFI also made it clear to American E&S and Lloyds that their refusal to assist IFI financially would result in the federalization of the cleanup project — an action that would increase the cleanup expenses. Despite the advices, Lloyds refused to become involved in the cleanup and the United States government subsequently federalized cleanup effort. (Goddard Dep., p. 77, Dep. Ex. G, ¶ 6, Ex. A hereto)

As a result of the QP spill, individuals located in Bethel, Alaska have filed suit seeking to recover damages from IFI for the spill by the QP. In addition, the United States has filed suit against IFI seeking to recover the costs incurred in cleaning up the oil spill.

### III. STANDARD OF REVIEW

Under Rule 56, summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is in dispute if the evidence would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986). The mere existence of an alleged factual dispute is not enough. Id. at 247-48. Rather, once the moving party has met its initial burden of proof, "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the " "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

## IV.  ARGUMENT

A broker who undertakes to procure insurance for another has a duty to either procure the insurance as promised or notify the prospective insured of his failure or inability to do so within a reasonable time. Jonas v. Bank of Kodiak, 162 F. Supp. 751, 754 (D. Alaska 1958); 1 B. Harnett, RESPONSIBILITIES OF INSURANCE AGENTS AND BROKERS §§ 3.03, 3.04 (1985 ed.);[5] 3 Lee R. Russ, COUCH ON INSURANCE §§ 46:48, 46:49 (3d ed.) (hereinafter "COUCH ON INSURANCE"). Where, however, the broker, through fault or neglect, fails to procure the promised insurance or provide timely notification of his failure to procure, the broker is liable to the "insured" for any resulting loss.[6]

The broker's liability exists as one for breach of contract as well as negligence.[7] To prevail under either theory, the "insured" must prove: (1) an undertaking or agreement by the broker to obtain insurance coverage; (2) failure of the broker to use reasonable

---

[5] Although the Alaska Supreme Court cited this treatise extensively in its decision in Jefferson v. Alaska 100 Insurance, Inc., 717 P.2d 360 (Alaska 1986), Inlet was unable to locate a copy locally. Pertinent portions of this treatise are, therefore, attached hereto as Ex. H for the Court's convenience.

[6] Harnett, supra, §§ 3.02[1], 3.03, 3.04 at 3-5, 3-14 to 3-17, 3-50; COUCH ON INSURANCE, supra, §§ 46:46, 46:48, 46:49.

[7] See McAlvin v. General Insurance Co. of America, 554 P.2d 955, 958 (Idaho 1976) (noting that the "weight of authority is that the insured may recover under either theory"); accord COUCH ON INSURANCE § 46:49.

care, skill, and diligence in attempting to place the insurance or failure to notify the insured promptly of the broker's inability to procure; and (3) that the broker's actions warranted an assumption that the client was properly insured.[8]

### A. Totem Entered into an Agreement to Procure Marine Pollution Insurance for Inlet

Here, there is no doubt that Totem both undertook and entered into an agreement to procure marine pollution insurance for Inlet. Totem has continuously served as Inlet's insurance broker since 1988, servicing all of Inlet's insurance needs. (Goddard Dep., p. 74, Ex. A hereto; Totem Rule 30(b)(6) Dep., p. 51. Ex. C hereto) With respect to Inlet's marine pollution insurance, Totem procured Inlet's first marine pollution policy in 1992. (Parthemer Dep., p. 18, Ex. D hereto; WQIS Rule 30(b)(6) Dep. Ex. 23, Ex. F hereto) Totem renewed this policy for the next eight years, adding and removing vessels and adjusting coverage as requested. During this time, Totem directly billed Inlet for the policy and then forwarded payment, less commission, to the insurer. (Parthemer Dep., pp. 56, 57, Ex. D hereto)

After Totem received notice of WQIS's intent to cancel Inlet's marine pollution policy in June 2000, Totem began looking for replacement coverage. (Parthemer Dep., pp. 67, 68, Ex. D hereto) In August 2000, Totem advised Inlet that it had found another insurer. On August 26, Inlet instructed Totem to secure marine pollution coverage on the QP, YUKON II, and FORT YUKON. (Klier Dep., p. 68, Dep. Ex. 10, Ex. B hereto) Five days later, Inlet instructed Totem to add pollution coverage for the HARVESTER BARGE. (Klier Dep., pp. 71, 72, Dep. Ex. 11, Ex. B hereto) Totem subsequently filled out and submitted an application form for marine pollution insurance on Inlet's behalf. Totem received a commission for its services. Under these facts, Totem entered into an

---

[8] See Bell v. O'Leary, 744 F.2d 1370, 1373-74 (8th Cir. 1984); Jonas 162 F.Supp. at 753-54; Harnett, supra, § 3.04 at 3-50; COUCH ON INSURANCE, supra, §§ 46:48, 46:71.

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

agreement to procure marine pollution insurance for Inlet in August 2000 and did, in fact, undertake to procure such insurance on behalf of Inlet.  See Beluga Mining Co. v. State Dep't of Natural Resources, 973 P.2d 570, 578 (Alaska 1999) (explaining that formation of a valid contract requires "an offer encompassing all essential terms, unequivocal acceptance by the offeree, consideration, and an intent to be bound"); Turner-Bass Assocs. of Tyler v. Williamson, 932 S.W.2d 219 (Tex. App. 1996) (continuation of ongoing business relationship and commissions on policies issued can serve as consideration for agreement to procure insurance); see also Clay v. Sandal, 369 P.2d 890, 893 & n.1 (Alaska 1962) (explaining that once the contract has been executed, the defense of uncertainty regarding terms is not available).

### B. Totem Failed to Exercise Reasonable Care, Skill, and Diligence in Procuring Marine Pollution Insurance For Inlet

Absent an unconditional promise to procure or conduct that misleads the "insured" to his detriment, a broker is not required to go to extraordinary measures to secure insurance.  Jefferson v. Alaska 100 Insurance, Inc., 717 P.2d 360, 363-64 (Alaska 1986). Rather, he is required to exercise "reasonable care, skill, and diligence" to procure the requisite insurance in a timely fashion.  Id. at 363 (internal quotes and citations omitted). As explained by one court, in a hard market, the requested insurance may not be available.  Bell v. O'Leary, 744 F.2d 1370 (8th Cir. 1984).  Accordingly, when confronted with the impossibility of obtaining insurance, the broker discharges his duty to the prospective insured by timely notification so as not to mislead him into believing that protection is afforded.  Id. at 1373.  Prompt notification ensures that the prospective insured "has the opportunity to make other arrangements to protect against subsequent losses." Jefferson, 717 P.2d at 364; accord Jonas, 162 F. Supp. at 753; Bell, 744 F.2d at 1373-74; Boothe v. American Assurance Co., 327 So.2d 477, 481-82 (La. 1976).

Unfortunately for all involved, Totem failed to exercise reasonable care, skill, and diligence in procuring marine pollution insurance for the Inlet entities.  This conclusion is

mandated by case law, Totem's testimony, and the findings of fact contained in this Court's own Order, dated September 11, 2005, granting Lloyds' motion for summary judgment and declaring void the policy procured by Totem.

Among other things, the duty to exercise reasonable care, skill, and diligence to procure coverage encompasses a duty to be sufficiently familiar with the insurance business to know the conditions and requirements insurers impose on the issuance of coverage.[9] An insurance broker is a professional "charged to more than simply fill out application forms. He is charged with knowledge of his business which includes an awareness of what facts render his clients ineligible for insurance coverage." Bell, 774 F.2d at 1373.

These same principles hold true in the marine insurance industry. "Every insurance broker of average capacity must know that there are matters on which all material information must be submitted to the underwriter." ARNOULD'S LAW OF MARINE INSURANCE AND AVERAGE § 219 (16th ed. 1981). Likewise, "[e]very insurance broker is bound to know all the ordinary and formal details necessary to be complied with in order to make a marine policy a legally valid instrument." Id.

In its previous ruling, this Court held that the term "pollution loss history", as used in the marine pollution insurance industry, includes the loss history of the proposed insured based on "common knowledge and understanding." Order From Chambers [Re: Motions at Docket Nos. 135, 151, and 163], dated September 11, 2005, at p. 18. In addition, this Court held that the proposed insured's pollution loss history as well as "cancellation of a policy by a previous insurer" are material to the risk and therefore must be disclosed in any application for marine pollution insurance. Id. at pp. 25, 26. Because Inlet's application for insurance failed to provide this information, the Court declared

---

[9] Robert Michael Ey, *Cause of Action Against Insurance Agent or Broker for Failure to Procure Insurance*, 14 CAUSES OF ACTION 881 § 9 (1st Series 2005 & Supp.).

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

Inlet's marine insurance policy void under the doctrine of *uberrimae fidei*, or utmost good faith. Id. at 40.

The undisputed facts of this case establish that Totem completed the Inlet entities' application for insurance based on the limited information it had in its files and on its own understanding of what the application required. (Totem Rule 30(b)(6) Dep., p. 43, Ex. C hereto; Townsend Dep., pp. 49, 50, 61, 62. Ex. G hereto) Based on past conversations with Woody Wilton, Eric Parthemer interpreted the phrase "pollution loss history" to mean the loss history of the vessels to be insured.[10] (Totem Rule 30(b)(6) Dep., pp. 20, 21, Ex. C hereto) At that time, Totem had never heard of the doctrine of *uberrimae fidei* and was unaware of the insured's obligation to disclose all material risks, whether solicited by the insurer or not. (Parthemer Dep., pp. 82, 83, Ex. D hereto) Accordingly, although Totem was fully aware of the MAREN I loss as well as WQIS's impending cancellation of coverage and the reasons therefore, Totem failed to disclose either item on Inlet's application. Moreover, in failing to have anyone at Inlet review the application, Totem precluded the inclusion of any information regarding the HARVESTER BARGE incident and fact that the vessel's hull was steel. By Totem's own admission, therefore, it did not adhere to industry standards when completing and submitting the Inlet entities application for marine pollution insurance in August 2000. The foregoing analysis demonstrates that, as a matter of law, Totem failed to exercise reasonable care, skill, and diligence in procuring marine pollution insurance for the Inlet entities.

---

[10] Ironically, however, no one at Totem contacted Inlet to determine whether any of the vessels sought to be insured had a loss history. Ron Boardman, also a Totem employee, testified that it was his experience, based on 21 years of experience in the insurance industry, that the insured always filled out the insurance application to ensure that correct information is provided. (Boardman Dep., pp. 30-31, attached hereto as Ex. I)

INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al*, Case No. A04-0058 CV (JWS)     Page 17 of 19

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

### C. Totem's Actions Warranted an Assumption That Inlet Was Insured

Inlet, however, had no reason to believe that Totem did not secure the requested marine pollution insurance. Totem billed Inlet for the coverage and ultimately provided proof of insurance indicating that the policy had been bound. (Townsend Dep. Exs. 19, 21, Ex. G hereto) From all outward appearances, Totem had secured the requested insurance and Inlet was adequately protected. It was only after the QP spill, when Lloyds declined coverage under its policy, that Inlet had any reason to question Totem's conduct.

### D. Totem is Liable For All Damages Resulting From Its Failure to Exercise Reasonable Care

Had Totem acted with the requisite level of care, skill, and diligence in procuring the requested marine pollution policy, Inlet's application would have either been accepted at a higher rate or rejected. Presumably, therefore, Totem would have discharged its duty to Inlet by procuring the insurance as promised or advising Inlet of its inability to do so. Because of Totem's inept handling of Inlet's application for marine pollution insurance, however, Inlet was lulled into a false sense of security and effectively deprived of any opportunity to protect itself against subsequent loss. Accordingly, Totem is liable to Inlet for all damages proximately caused by Totem's failure to exercise reasonable care.[11]

Case law establishes that these damages necessarily include the amount of money that Inlet would have recovered under the Lloyds policy,[12] plus any consequential

---

[11] Harnett, supra, § 3.04 at 3-50; COUCH ON INSURANCE, supra, §§ 46:48, 46:71.

[12] See, e.g., Bell, 744 F.2d at 1373-74 (finding broker liable to proposed insureds where broker's negligence in leading proposed insureds to believe that they were protected when, in fact, they were uninsurable, precluded the prospective insured from considering other options); Wood v. Newman, Hayes & Dixon Insurance, 905 S.W.2d 559, 564-65 (Tenn. 1995) (holding insurance agent liable for uninsured loss based on the fact that the agent's failure to inform of change in replacement coverage "completely denied [the insureds'] any opportunity to explore other methods of protecting their property"); see also Jonas 162 F. Supp. at 753-54 (explaining that liability attaches where the broker's conduct induces reliance to the "insured's" detriment).

INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al*, Case No. A04-0058 CV (JWS)   Page 18 of 19

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

damages resulting from Totem's breach of duty. 3 COUCH ON INSURANCE § 46:74. Here, as a direct, foreseeable, and proximate result of Totem's breach, Inlet incurred significant expense in defending against Lloyd's action to declare the policy void as well as increased clean-up costs based on Lloyd's failure to respond to the spill and the resulting federalization of the clean-up efforts. Because litigation surrounding the QP spill is ongoing, Totem should be required to indemnify Inlet for all losses sustained in the ensuing litigation up to the $1,000,000 policy limit, regardless of when such losses are incurred, as well as all losses sustained as a result of the federalization of the cleanup efforts.

## V.  CONCLUSION

The undisputed facts of this case demonstrate that Inlet is entitled to summary judgment as a matter of law. There are no genuine issues of material fact. Totem failed to procure insurance as promised to Inlet's detriment. Totem should therefore be held accountable to the full extent of Inlet's losses.

DATED this 16th day of December, 2005, at Anchorage, Alaska.

DORSEY & WHITNEY LLP
Attorneys for Inlet Fisheries, Inc. and
Inlet Fish Producers, Inc.

CERTIFICATE OF SERVICE

This certifies that on the 16th day of December, 2005, a copy of the foregoing document was served via first-class mail on:

Thomas A. Matthews
Matthews & Zahare, P.C.
431 West 7th Avenue, Suite 207
Anchorage, AK  99501

By: /s/ Wendy E. Lee
John A. Treptow, ABA #7605059
Wendy E. Leukuma, ABA #0211048

Certification Signature

INLET ENTITIES' MOTION FOR PARTIAL SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al*, Case No. A04-0058 CV (JWS)   Page 19 of 19
4848-5615-2576\3\476759\00001

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557