Page 1

[1]
[2] IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF ALASKA
[3] ------------------------------X
    CERTAIN UNDERWRITERS AT LLOYDS,
[4] LONDON, SUBSCRIBING TO CERTIFICATE
    OF INSURANCE OP01 0025, through Puget
[5] Sound Underwriters, Inc.,
           Plaintiffs,
[6]
         vs.
[7]
    INLET FISHERIES, INC., an Alaska
[8] Corporation, and INLET FISH PRODUCERS,
    INC., an Alaska Corporation,
[9]        Defendants.
    ------------------------------X
[10] INLET FISH PRODUCERS, INC., an Alaskan
    Corporation,
[11]      Third-Party Plaintiffs,
[12]     vs.
[13] TOTEM AGENCIES, INC., a Washington
    Corporation, and AMERICAN E&S INSURANCE
[14] BROKERS CALIFORNIA, INC., a Washington
    Corporation
[15]      Third-Party Defendants.
    ------------------------------X
[16]      292 Madison Avenue
[17]      New York, New York
[18]      December 6, 2005
           2:45 P.M.
[21]      EXAMINATION BEFORE TRIAL of RUSSELL
[22] BROWN, taken pursuant to Notice, held at the
[23] above mentioned time and place before Keith
[24] Rudolph, a Notary Public of the State of New
[25] York

Page 2

[1]
[2] APPEARANCES:
[3]
[4]   (Telephonically present)
[5]   DORSEY & WHITNEY LLP
[6]     Attorneys for Inlet Fisheries
[7]     1031 West Fourth Avenue
[8]     Suite 600
[9]     Anchorage, Alaska 99501
[10]  BY: JOHN A. TREPTOW, ESQ.
[11]
[12]
[13]  MATTHEWS & ZAHARE, P.C.
[14]    Attorneys for Totem Agencies, Inc.
[15]    431 West 7th Avenue
[16]    Suite 207
[17]    Anchorage, Alaska 99501
[18]  BY: THOMAS A. MATTHEWS, ESQ.
[19]
[20]  RUBIN, FIORELLA & FRIEDMAN LLP
        Attorneys for Witness
        292 Madison Avenue
[23]    New York, New York 10017
[24]  BY: ALAN R. SACKS, ESQ.
[25]

Page 3

[1]
[2]    IT IS HEREBY STIPULATED AND AGREED
[3] by and among counsel for the respective
[4] parties hereto, that the sealing and
[5] certification of the within deposition
[6] shall be and the same are hereby waived;
[7]
[8]    IT IS FURTHER STIPULATED AND AGREED
[9] that all objections, except to the form of
[10] the question, shall be reserved to the
[11] time of trial;
[12]
[13]   IT IS FURTHER STIPULATED AND AGREED
[14] that the within deposition may be signed
[15] before any Notary Public with the same
[16] force and effect as if signed and sworn to
[17] before the Court.
[18]
[19]   IT IS FURTHER STIPULATED AND AGREED
[20] that counsel for the witness examined
[21] herein shall be furnished with a copy of
[22] the within deposition without charge.
[23]
[24]
[25]

Page 4

[1]               R. Brown
[2]   RUSSELL BROWN, having first
[3] been duly sworn by a Notary Public of the
[4] State of New York, was examined and testified
[5] as follows:
[6]            EXAMINATION BY
[7]            MR. MATTHEWS:
[8]   Q: Will you state your name for the
[9] record, please?
[10]  A: Russell Brown.
[11]  Q: Spell the last name for me.
[12]  A: B-R-O-W-N.
[13]  Q: By whom are you employed,
[14] Mr. Brown?
[15]  A: Water Quality Insurance Syndicate.
[16]  Q: How long have you been employed by
[17] that company?
[18]  A: Just over eight years.
[19]  Q: Before you there is a document
[20] which has been marked as Exhibit 1. That's a
[21] copy of a notice of deposition for today.
[22]  (Document marked as Defendant's
[23] Exhibit 1 for identification; 12/06/05,
[24] K.R.)
[25]  Have you seen that document

EXHIBIT A
Page 1 of 8

Page 5

[1]           R. Brown
[2] before?
[3]    A: Yes.
[4]    Q: That is a notice which asks Water
[5] Quality Insurance Syndicate to designate a
[6] witness to testify on its behalf concerning
[7] four different subject areas. Do you
[8] understand that?
[9]    A: Yes.
[10]   Q: Are you the witness who has been
[11] designated to testify on behalf of WQIS
[12] today?
[13]   A: Yes, I am.
[14]   Q: The notice also asks for the
[15] production of certain documents and records.
[16] Do you understand that?
[17]   A: Yes.
[18]   Q: Have certain records been brought
[19] for us?
[20]   A: Yes, they have.
[21]   Q: Are those what have been placed in
[22] front of us in the file folders each marked
[23] Inlet Fisheries with a number of different
[24] policy numbers on them?
[25]   A: Yes.

Page 6

[1]           R. Brown
[2]    Q: Do I correctly understand that
[3] each of these files is the underwriting file
[4] for Inlet Fisheries for a particular policy
[5] year?
[6]    A: Yes.
[7]    Q: For example, the file marked Inlet
[8] Fisheries policy number 21-09047, is that the
[9] underwriting file for the 1992 to 1993 policy
[10] year?
[11]   A: Yes, it is.
[12]   MR. MATTHEWS: Let me ask the
[13] court reporter to mark each of these
[14] file folders, if we can, separately as
[15] an exhibit so that we know what we are
[16] talking about.
[17]   (File folders marked as
[18] Defendant's Exhibits 2 through 10 for
[19] identification; 12/06/05, K.R.)
[20]   Q: Mr. Brown, we've now marked as
[21] exhibits 2 through 10 to this deposition
[22] copies of the underwriting files which you
[23] brought with you today, is that right?
[24]   A: Yes.
[25]   Q: Do I correctly understand that

Page 7

[1]           R. Brown
[2] each of these files is a true and correct
[3] copy of the WQIS underwriting files for each
[4] of the years previously mentioned?
[5]    A: Yes.
[6]    Q: Exhibit 2 is the underwriting file
[7] for '92-'93. Exhibit 3 is '93-'94. Exhibit
[8] 4 is '94-'95. Exhibit 5 is '95-'96. Exhibit
[9] 6 is '96-'97. Exhibit 7 is '97-'98. Exhibit
[10] 8 is '98-'99. Exhibit 9 is '99-2000 and
[11] Exhibit 10 is 2000 to 2001. Is that correct?
[12]   A: Correct.
[13]   Q: Each of those files are maintained
[14] in the ordinary course of business for WQIS?
[15]   A: Yes.
[16]   Q: Let me ask you this, if I can, are
[17] the documents for underwriting purposes at
[18] WQIS maintained electronically?
[19]   A: They are now, yes.
[20]   Q: Is the office paperless?
[21]   A: Yes.
[22]   Q: I noticed in looking through some
[23] of the file materials that there are dates.
[24] For example, in Exhibit 2, on the top
[25] left-hand corner of the policy itself there

Page 8

[1]           R. Brown
[2] is a date stamp. In this case it's 3/13/2004
[3] and a time, 10:39 A.M. Do you see that?
[4]    A: Yes.
[5]    Q: Do you know whether or not that's
[6] a scanning mark of some kind or an
[7] identifier?
[8]    A: I'm not sure, but I believe it's a
[9] scanning — when it was scanned, but I'm not
[10] positive. That would make sense in that time
[11] period.
[12]   Q: It appears, for instance, that
[13] each of the documents in this file, Exhibit
[14] 2, has the same date and time stamp of March
[15] 13, 2004, 10:39 A.M. Is that right?
[16]   A: Yes.
[17]   Q: Does that suggest to you at least
[18] that all of these documents were scanned in
[19] to the WQIS computer system on that day?
[20]   A: Yes.
[21]   Q: I started to ask you some
[22] questions about your background, but let me
[23] go back to that, if I can. What is your
[24] current job position with WQIS?
[25]   A: I'm the Vice President

EXHIBIT A
Page 2 of 8

Page 25

R. Brown

[2] Mr. Ondrejcik?
[3] A: Yes.
[4] Q: What was your specific involvement
[5] in that renewal?
[6] A: Primarily assigning the renewals
[7] to Mr. Ondrejcik and making sure in due
[8] course that the renewal quotation was out at
[9] the proper time.
[10] Q: Was a renewal offered for the year
[11] 2000?
[12] A: Yes.
[13] Q: Was it accepted by Inlet?
[14] A: Yes.
[15] Q: WQIS did renew the policy for the
[16] year 2000, at least initially, right?
[17] A: Yes.
[18] Q: The vessels to be insured included
[19] what we call the QP, the Quanirtuuk Princess;
[20] that was one of the vessels, right?
[21] A: Yes.
[22] Q: And potentially the Harvester
[23] Barge as well?
[24] A: Yes.
[25] Q: The policy would have renewed

Page 26

R. Brown

[2] effective June 12, 2000, right?
[3] A: Correct.
[4] Q: Shortly before the renewal there
[5] was a claim involving one of the insured
[6] vessels. Are you aware of that?
[7] A: Yes.
[8] Q: That was the Maren I?
[9] A: Yes.
[10] Q: Did you have any involvement at
[11] all in the claim side of that?
[12] A: No.
[13] Q: Does WQIS have a separate Claims
[14] Department?
[15] A: Yes.
[16] Q: Do Underwriting and Claims
[17] communicate from time to time?
[18] A: Yes.
[19] Q: About the nature of the risk?
[20] A: Yes.
[21] Q: Why would Claims be involved in
communicating directly with Underwriting?
A: For informed underwriting of
[24] certain losses and particularly the amount of
[25] the loss and how the loss arose could affect

Page 27

R. Brown

[2] next year's renewal or rating or certain
[3] terms and conditions of the policy.
[4] Q: Do you know whether or not the
[5] Maren I claim impacted WQIS's decision to
[6] cancel the policy?
[7] A: Yes. It did have influence on it,
[8] yes.
[9] Q: Explain please.
[10] A: Shortly after renewing the policy
[11] it had become aware to the Underwriting
[12] Department that there was a claim on this
[13] particular insured and by doing so it drew
[14] attention to the policy itself and looking
[15] back upon the policy themselves we had not
[16] had a survey. We asked for a survey through
[17] the broker and upon that we did additionally
[18] learn that we were not paid for the previous
[19] year's policy or the current renewal policy.
[20] Q: Were you involved in determining
[21] whether or not you had been paid for the
[22] previous year's policy?
[23] A: At that time, yes.
[24] Q: Is it possible that what you
[25] haven't been paid for was an endorsement

Page 28

R. Brown

[2] policy as opposed to the policy itself?
[3] A: For the previous year, no.
[4] Q: Are there records within what we
[5] have here showing the payment history for
[6] this account?
[7] A: For that particular year, I'm not
[8] sure.
[9] Q: In any event, you became concerned
[10] about the nature of the risk, is that fair to
[11] say, because of the Maren I incident?
[12] A: Yes.
[13] Q: You mentioned that you did not
[14] have a survey. Had you had a survey on any
[15] of these vessels at any point prior to year
[16] 2000?
[17] A: No, it did not appear so.
[18] Q: Had you asked for one?
[19] A: Not to my knowledge.
[20] Q: After the Maren I incident, did
[21] WQIS ask for the vessels to be surveyed?
[22] A: Yes.
[23] Q: Who was involved in making that
[24] request?
[25] A: It was from the Underwriting

EXHIBIT 4
Page 3 of 8

Page 49

R. Brown

[1]
[2] A: Correct.
[3] MR. MATTHEWS: TOT 1304, John.
[4] (Letter marked as Defendant's
[5] Exhibit 22 for identification; 12/6/05,
[6] K.R.)
[7] Q: I show you what we've now marked
[8] as Exhibit 22, Mr. Garger's letter on behalf
[9] of Water Quality Insurance Syndicate
[10] confirming the cancellation.
[11] A: Correct.
[12] Q: At that point in time was WQIS
[13] willing to continue with this risk under any
[14] circumstances?
[15] A: It's a possibility. I don't think
[16] he ever got there.
[17] Q: The letter says, "This
[18] cancellation is final" in the second
[19] paragraph, does is not?
[20] A: Yes.
[21] Q: What does that mean to you?
[22] A: It appears that we cancelled the
[23] policy.
[24] Q: Period, not to be reinstated?
[25] A: Correct.

Page 50

R. Brown

[1]
[2] Q: Was that a decision you agreed
[3] with?
[4] A: Yes.
[5] Q: Was this a risk that WQIS was
[6] willing to continue to insure as of August 7,
[7] 2000?
[8] A: No.
[9] Q: Under any circumstances?
[10] A: No.
[11] Q: Let me ask you this, Mr. Brown,
[12] WQIS, as the dominant market participant at
[13] this point in time, was not willing to write
[14] this risk in the year 2000. If Lloyds, as
[15] the other dominant market participant, was
[16] not willing to write this risk in the year
[17] 2000, is anybody else going to be willing to
[18] write it?
[19] MR. TREPTOW: Objection.
[20] A: I would doubt it. I cannot speak
[21] for any of the others.
   MR. MATTHEWS: Thank you
Mr. Brown, that's all the questions I
[24] have.
[25]

Page 51

R. Brown

[1]
[2] EXAMINATION BY
[3] MR. TREPTOW:
[4] Q: Mr. Brown, would you like to take
[5] a short break? We've been going for about
[6] an hour.
[7] A: No, that's fine. I'm okay.
[8] Q: Then let's get to it.
[9] My name is John Treptow. I
[10] represent Inlet Fisheries, Inc. and Inlet
[11] Fish Producers, Inc. I have a couple of
[12] questions that I'd like to follow up with.
[13] First of all, could you tell me,
[14] generally, what are your functions as
[15] Underwriting Manager for WQIS?
[16] A: I supervise and manage the staff
[17] of the underwriters which encompasses setting
[18] a budget, approving expense accounts,
[19] approving risks outside their authority,
[20] keeping daily, quarterly and yearly
[21] evaluations on the employees. Along with
[22] that, I do assume underwriting duties on a
[23] day-to-day basis as underwriter.
[24] Q: How many underwriters does WQIS
[25] currently employ?

Page 52

R. Brown

[1]
[2] A: We currently employ five,
[3] including myself.
[4] Q: Does WQIS currently have written
[5] guidelines for underwriting?
[6] A: We have written authorities for
[7] the underwriting and underwriting title.
[8] Q: The underwriting authority that
[9] you're talking about are documents that
[10] evidence the insurers consent that WQIS can
[11] underwrite risk for them, is that correct?
[12] A: I'm sorry. Can you repeat that?
[13] Q: The underwriting authorities that
[14] you were talking about, are those documents
[15] for the insurers to comprise between WQIS
[16] that gives WQIS the authority to bind
[17] insurance on their behalf?
[18] A: Does it include that?
[19] Q: Is that what those documents are?
[20] A: Yes. It's a limited
[21] responsibility, yes.
[22] Q: With respect to reviewing a new
[23] risk that WQIS is presented with, are there
[24] any written guidelines telling the
[25] underwriters what information is necessary in

EXHIBIT A
Page 4 of 8

Page 53

R. Brown

[1] order to arrive at a decision on whether or
[2] not WQIS will underwrite a risk?
[3] **A:** We do have guidelines as far as
[4] questions, but no guidelines whether to
[5] determine if a risk is acceptable or not.
[6] **Q:** What types of items are written in
[7] those written guidelines?
[8] **A:** They are a matter of questions
[9] upon the specifics upon the vessel and the
[10] operator and the owner of the particular
[11] vessel and the operations. It's very similar
[12] to the underwriting criteria that I was asked
[13] previously.
[14] **Q:** From 1992 up until the time that
[15] you became Underwriting Manager, did WQIS
[16] have an underwriting manager?
[17] **A:** No.
[18] **Q:** Who was what individual?
[19] **A:** There was none.
[20] **Q:** Are you the first underwriting
[21] manager with that title at WQIS?
[22] **A:** Yes.
[23] **Q:** I'd like you to first take a look
[24] at, I believe it's Exhibit 2, to your

Page 54

R. Brown

[1] deposition.
[2] Is Exhibit 2 WQIS's policy year
[3] for Inlet, policy year June 1992 through June
[4] 1993?
[5] **A:** Correct.
[6] **Q:** Is that a document that was
[7] maintained in the regular course of WQIS's
[8] business?
[9] **A:** The document itself?
[10] **Q:** No, the file itself?
[11] **A:** The file itself, yes.
[12] **Q:** Would there be any information
[13] relating to that particular policy that is
[14] not contained in the underwriting file?
[15] **A:** I'm sorry. Can you restate the
[16] question?
[17] **Q:** Would there be any information in
[18] WQIS relating to that particular policy, '92
[19] to '93 from Inlet that would not be found in
[20] that file?
[21] **A:** Not to my knowledge.
[22] **Q:** Is there a policy of insurance
[23] issued by WQIS in that file?
[24] **A:** Yes.

Page 55

R. Brown

[1] **Q:** What is the policy number for that
[2] particular policy?
[3] **A:** 9047-01.
[4] **Q:** What is the insured entity under
[5] that policy?
[6] **A:** Inlet Fisheries, Inc.
[7] **Q:** The policy period is June 12, 1992
[8] to June 12, 1993, correct?
[9] **A:** Correct.
[10] **Q:** Scheduled vessels shows that the
[11] vessels being insured are the Maren I and
[12] Quanirtuuk Princess, is that correct?
[13] **A:** Correct.
[14] **Q:** Could you look in Exhibit 2 and
[15] tell me what information was provided to WQIS
[16] prior to underwriting that policy with
[17] respect to the vessels that were insured
[18] under that policy?
[19] **A:** Let me take a look.
[20] **MR. MATTHEWS:** John, while
[21] he's doing that, can I take you up on
[22] that short break?
[23] **MR. TREPTOW:** Sure.
[24] (A recess was taken.)

Page 56

R. Brown
EXAMINATION CONTINUES
BY MR. TREPTOW:

[1] **A:** (Continuing) I've reviewed the
[2] file.
[3] **MR. TREPTOW:** Tom, did you make
[4] copies of those document numbers I sent
[5] you.
[6] **MR. MATTHEWS:** Yes, I did.
[7] **MR. TREPTOW:** Could you have the
[8] court reporter mark WQIS 428 and 427?
[9] (Documents marked as Defendant's
[10] Exhibit 23 and 24 for identification;
[11] 12/6/05, K.R.)
[12] **Q:** Can you look at Exhibit 23,
[13] please?
[14] **A:** Yes.
[15] **Q:** Mr. Brown, is Exhibit 23 found in
[16] WQIS's file, Exhibit 2?
[17] **A:** Yes, it is.
[18] **Q:** Could you identify Exhibit 24? Is
[19] that document also found in WQIS's file,
[20] Exhibit 2?
[21] **MR. MATTHEWS:** Sorry, John. I had
[22] stapled them together. I thought that

EXHIBIT A
Page 5 of 8

Page 57

R. Brown

[1] was the way you wanted them. We'll
[2] separate them.
[4] A: Yes, this is also in the policy.
[5] Q: Would I be correct that Exhibit 23
[6] is a fax from Totem Agencies to WQIS
[7] requesting pollution coverage on the Maren I
[8] and the QP in the amount of $500,000,
[9] correct?
[10] A: Correct.
[11] Q: The gross tonnage for the vessels
[12] is provided, correct?
[13] A: Yes.
[14] Q: The fax indicated that both
[15] vessels are non-authorized barge operating
[16] port risk in Bethel, Alaska correct?
[17] A: Yes.
[18] Q: To your knowledge, from your
[19] review of Exhibit 2, is there any other
[20] information for those two vessels or Inlet
[21] Fisheries in Exhibit 2?
[22] A: No.
[23] Q: Is Exhibit 24 a response to
[24] Exhibit 23 WQIS to Totem?
[25] A: It appears so, yes.

Page 58

R. Brown

[1]
[2] Q: Does Exhibit 24 indicate that
[3] WQIS's binding coverage for the following
[4] barges to a limit of $500,000 for each vessel
[5] effective June 12, 1992 to 1993?
[6] A: Correct.
[7] Q: Would I be correct in assuming
[8] that the premiums have been calculated by
[9] WQIS based solely on the gross registered
[10] tonnage of each vessel?
[11] A: No.
[12] Q: What other information was used in
[13] coming up with the premiums?
[14] A: I'm led to believe the type of
[15] vessel and the port risk status and the
[16] location of the vessel are taken into
[17] account.
[18] Q: Is there any information in
[19] Exhibit 2 as to the pollution loss history of
[20] the Inlet entities — vessels going to be
[21] insured under this policy?
[22] A: Not that I'm aware of.
[23] Q: Is there any information in
[24] Exhibit 2 dealing with the pollution loss
[25] history of the two vessels to be insured?

Page 59

R. Brown

[1]
[2] A: No.
[3] Q: Is there any information in
[4] Exhibit 2 that shows the age of those
[5] vessels?
[6] A: No, not that I see.
[7] Q: Is there any information in
[8] Exhibit 2 that indicates what the general
[9] condition of those two vessels is?
[10] A: Not that I see.
[11] Q: Is there any information in
[12] Exhibit 2 that indicates which other
[13] insurance Inlet may have for those two
[14] vessels?
[15] A: No, not that I see.
[16] Q: Despite that lack of information
[17] that we just enumerated as to what was not in
[18] the file, is it true that WQIS went ahead and
[19] issued a policy of insurance providing vessel
[20] pollution coverage to Inlet?
[21] A: Yes, it appears so.
[22] Q: Have you reviewed the rest of the
[23] files, Exhibits 3 through 10, in preparation
[24] for this deposition?
[25] A: Yes, I went through them.

Page 60

R. Brown

[1]
[2] Q: Do you recall seeing in any of
[3] those policies in those files any information
[4] about the loss history of Inlet Fisheries,
[5] Inc. or Inlet Fish Producers, Inc.?
[6] A: Not that I've seen.
[7] Q: In any of those files from 1992 to
[8] 2000, did you see any information regarding
[9] the age of the vessels?
[10] A: No.
[11] Q: How about the general conditions?
[12] A: Perhaps on the last policy when
[13] there were questions on it, but nothing
[14] specific to the other policy folders.
[15] Q: That would have been the very
[16] last, Exhibit 10, for policy year 2000-2001
[17] that you entered information about the
[18] vessels' conditions correct?
[19] A: Correct.
[20] Q: What about other insurance for the
[21] period, 1992 through 2000? Do you recall
[22] seeing any information at all in those files
[23] about what other insurance Inlet entities may
[24] have had?
[25] A: Not that I recall in the earlier

EXHIBIT A
Page 6 of 8

Page 77

R. Brown

[1] counselor, so the court reporter could
[2] hear?
[3] Q: On August the 7th, you advised
[4] Inlet Fisheries that regardless of whether or
[5] not the survey requirements had been complied
[6] with and regardless of whether or not the
[7] payment had been paid, WQIS cancelled all
[8] payments providing a 60-day notice as a
[9] cancellation?
[10] A: That time we had received neither
[11] of those and decided that this was a risk we
[12] did not want to be part of.
[13] Q: Let me ask you this, by August the
[14] 7th of 2000, what did you know — what did
[15] WQIS know about age and the condition of the
[16] QP?
[17] A: We did not know anything. That's
[18] why we requested a formal survey.
[19] Q: Similarly with respect to the
[20] being of Harvester Barge as of August 7th of
[21] 2000, what, if anything, did you know about
[22] the age or condition of those two vessels?
[23] A: I'm sorry. Could you repeat that?
[24] Q: As of August 7th of 2000, what did

Page 78

R. Brown

[1] WQIS know about the age and condition of the
[2] vessels Fort Yukon and Harvester Barge, two
[3] of the vessels insured under that policy?
[4] A: I'm not sure if we knew of
[5] anything formally.
[6] Q: Did you know where it was located?
[7] A: I'm not particularly sure that we
[8] always know the locations of any of our
[9] vessels at one time.
[10] Q: Exhibit 23, which is the fax from
[11] Totem to WQIS in 1992, was there anything
[12] significant to WQIS in that the fact that the
[13] barges were non-authorized and operating port
[14] risk? Is that significant from an
[15] underwriting standpoint?
[16] A: Yes, it does influence the rate.
[17] Q: I know you weren't employed by
[18] WQIS in 1992, but currently in terms of port
[19] risk, what is the significance of that fact
[20] as it relates to underwriting factors at
[21] WQIS?
[22] A: According to the terms of the
[23] policy, port risk is defined as laid up and
[24] out of commission.

Page 79

R. Brown

[1] MR. TREPTOW: I have no further
[2] questions.
[3] Thank you.
[4] MR. MATTHEWS: I have just a few
[5] questions to follow-up if I can.
[6] EXAMINATION BY
[7] MR. MATTHEWS:
[8] Q: You were asked some questions
[9] about Exhibit 25, and this is a fax dated
[10] April the 29th 2003 from Totem Agencies to
[11] WQIS requesting a loss rung, correct?
[12] A: Correct.
[13] Q: Along with an attached loss rung?
[14] A: Yes.
[15] Q: The question you were asked
[16] earlier was whether or not the fact that WQIS
[17] had paid money, I think, influenced the
[18] decision to cancel because of these losses
[19] and I want to make sure that we're clear.
[20] Did the amount of the claim influence WQIS'
[21] decision to cancel this policy in any way?
[22] A: No.
[23] Q: In fact, do you know whether WQIS
[24] had paid any money at all for indemnity

Page 80

R. Brown

[1] purposes on this loss prior to the time the
[2] cancellation was issued in August of 2000?
[3] A: Im not aware of it.
[4] Q: Can you tell from looking at the
[5] loss rung that's attached to Exhibit 25 when
[6] those payments were made?
[7] A: No.
[8] Q: Is it fair to say the cancellation
[9] was made irrespective of what the
[10] significance of the loss was?
[11] A: Correct.
[12] Q: It was the fact that the claim
[13] involving the Maren I had brought to WQIS's
[14] attention the condition of the vessels?
[15] A: Correct.
[16] Q: Was that what concerned you at the
[17] time of the cancellation?
[18] A: Yes.
[19] Q: Do you know whether or not WQIS
[20] reserved its rights on the Maren I claim?
[21] A: I'm not aware of that. That would
[22] be a Claims function.
[23] Q: It is not something that you would
[24] get involved in at all from an underwriting

EXHIBIT A
Page 7 of 8

Page 81

R. Brown

[2] perspective?
[3] **A:** No.
[4] **Q:** If the Claims Department of WQIS
[5] reserved rights suggesting that the vessels
[6] had not been maintained in a sea worthy
[7] condition, is that information that would
[8] have come from Underwriting, to your
[9] knowledge?
[10] **A:** That would have come from
[11] Underwriting?
[12] **Q:** Yes.
[13] **A:** No.
[14] **Q:** That would have been something
[15] that the Claims Department gathered on their
[16] own?
[17] **A:** Correct.
[18] **Q:** Would that be information they
[19] would pass on to Underwriting typically?
[20] **A:** Yes.
[21] **Q:** You were asked some questions
[22] toward the end by Mr. Treptow about whether
[23] or not anyone from Totem ever offered to
[24] provide surveys to you. Do you remember
[25] that?

Page 82

R. Brown

[2] **A:** Yes.
[3] **Q:** Is it the case that in June of
[4] 2000, that was the first time that WQIS had
[5] ever requested a survey on the Maren I
[6] account?
[7] **A:** To my knowledge no.
[8] **Q:** Is it fair to say that once the
[9] Maren I claim happened, this account got
[10] scrutinized like it had never had before?
[11] **A:** Yes; it drew attention to it.
[12] **Q:** It drew attention to the fact that
[13] the account wasn't the risk that you were
[14] willing to remain on?
[15] **A:** Correct.
[16] **Q:** Ultimately, regardless of the
[17] condition of the vessels or whether the
[18] premiums had been paid, WQIS was not willing
[19] to entertain this risk any further?
[20] **A:** Yes.
[21] **MR. MATTHEWS:** Thank you.
I have
nothing further.
[24] **MR. TREPTOW:** Can I have two more
[25] questions? Then I'm done. I promise.

Page 83

R. Brown

[1]
[2] EXAMINATION BY
[3] MR. TREPTOW:
[4] **Q:** I believe you told us, Mr. Brown,
[5] that one of the underwriting factors that
[6] WQIS looks to is other insurance that a
[7] vessel has, is that correct?
[8] **A:** Yes.
[9] **Q:** From WQIS' perspective, what is
[10] the importance of vessels having other
[11] insurance on the vessels to WQIS?
[12] **A:** The only significance is
[13] determined if we're bearing any additional
[14] risk by them not having removal of wreck or
[15] any potential coverage for salvage that may
[16] get turned on to the pollution underwriter if
[17] they're the only insurance available.
[18] **Q:** Does WQIS typically require
[19] vessels to have hull and machinery and P and
[20] I insurance?
[21] **A:** Yes.
[22] **Q:** I take it, from your review of the
[23] files — and there is absolutely no
[24] indication in WQIS's files that Inlet had
[25] such insurance on its vessels from '92 to

Page 84

R. Brown

[2] 2000, correct?
[3] **A:** Yes. Upon underwriting in '92, it
[4] appears the information was a little bit more
[5] limited as far as written information
[6] collected is concerned.
[7] **Q:** In your experience to insure and
[8] supervise, do hull and machinery and
[9] protection and indemnity routinely require
[10] surveys from the vessels that they insure?
[11] **MR. SACKS:** I'm just going to
[12] object to that question. He can't
[13] answer what other hull and machinery
[14] insurers do.
[15] **Q:** Your answer?
[16] **A:** I can't comment on what they do or
[17] do not require or normally do.
[18] (Continued on next page.)

EXHIBIT A
Page 8 of 8