Eric Parthemer 30(B)(6) 11/17/05

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO CERTIFICATE OF INSURANCE OP01 0025, through Puget Sound Underwriters, Inc., <br><br>  Plaintiffs, <br><br> vs. <br><br> INLET FISHERIES, INC., an Alaska corporation, and INLET FISH PRODUCERS, INC., an Alaska corporation, <br><br>  Defendants and <br>  Third-Party Plaintiffs, <br><br> vs. <br><br> TOTEM AGENCIES, INC., a Washington corporation, <br><br>  Third-Party Defendant. | Case No. <br><br> A04-0058 CV (JWS) |

30(b)(6) DEPOSITION OF ERIC ALAN PARTHEMER
Thursday, November 17, 2005
Seattle, Washington

Reported by:
Amy Patricia Rostad
CCR No. 1901
Job No. 75218

Esquire Deposition Services
(206) 624-9099

EXHIBIT D
Page 1 of 4

d2ccaed7-c0fe-414f-97fd-d6a649d8430f

Eric Parthemer 30(B)(6) 11/17/05

Page 18

1  A. Not normally. We may with the current carrier. We may start
2     that process with the current carrier, but if we're
3     remarketing it, we need more information as a rule.
4        That's not my eyes, is it? Did that just go blurry?
5  Q. Do you remember, in 1992, placing vessel marine pollution
6     insurance for the MAREN I and the QP with WQIS?
7  A. Not specifically.
8  Q. Okay. I would ask the court reporter to hand you what's been
9     marked as Exhibit 9 to this deposition.
10 A. Okay.
11 Q. If you could take a look at Exhibit 9.
12 A. Bear with me a minute, my contacts are acting up a little
13    bit.
14 Q. Do you want to take a break?
15 A. No, I think they're probably -- I just changed them, it may
16    be that this is going to be an ongoing situation. I'm fine
17    right now. I can see it, I believe.
18 Q. Okay.
19 A. Okay.
20 Q. Can you identify Exhibit 9 for us.
21 A. It would appear to be a pollution -- water pollution
22    liability policy placed for Inlet Fisheries, Inc., effective
23    June 12th, 1992, to June 12th, 1993, by a broker of Totem
24    Agencies, Inc.
25 Q. And is that your company?

Page 19

1  A. Yes, it is.
2  Q. Do you recall whether or not you personally were involved in
3     the placement of this insurance in 1992?
4  A. I believe I was.
5  Q. Prior to the placement of this policy, what was your
6     familiarity with the company known as Water Quality Insurance
7     Syndicate, WQIS?
8  A. My personal or corporately?
9  Q. Let's start with corporately.
10 A. Corporately, Black Ball Ferry Lines would have been our
11    exposure to WQIS.
12 Q. Do you know whether or not prior to June of 1992, Totem had
13    arranged for vessel marine and pollution insurance for Black
14    Ball Ferry through WQIS?
15 A. Yes.
16 Q. And had you been involved in that?
17 A. No.
18 Q. Do you know for how long prior to 1992 Totem had been
19    assisting Black Ball Ferry in securing vessel pollution
20    insurance from WQIS?
21 A. From WQIS, no.
22 Q. Who was the individual at Totem who handled the Black Ball
23    Ferry account?
24 A. Neil Graham, he was the producer.
25 Q. Is Mr. Graham still employed by Totem?

Page 20

1  A. He's deceased.
2  Q. Okay. So do you personally have a recollection of placing
3     the insurance that's reflected in Exhibit 9?
4  A. Generally, yes.
5  Q. Was placing of this insurance for Inlet in June of 1999 your
6     personal first experience in placing vessel marine pollution
7     insurance for a client?
8  A. Yes.
9        MR. MATTHEWS: John, your question said
10       '99, you mean '92, I take it?
11 A. Sorry.
12       MR. TREPTOW: '92, thank you.
13 A. The answer would still be yes.
14 Q. (By Mr. Treptow) How did it come about that Totem placed
15    vessel marine and pollution insurance with WQIS in 1992?
16 A. My general recollection would be that I was involved and I
17    don't recall a specific year, but I was involved with putting
18    together and helping put together a subscription policy for
19    Black Ball Ferry Lines which includes clerical, such as
20    photocopying the policy, and became aware of WQIS. And I
21    believe I asked what specifically it was and what it was for,
22    and it was for water pollution coverage at the time.
23 Q. Prior to placing this insurance in 1992, were you aware of
24    what other insurers were in the marine pollution insurance
25    industry?

Page 21

1  A. To my knowledge, in 1992, it was the only market available.
2  Q. Does Totem Agencies still deal with WQIS?
3  A. Yes, we do.
4  Q. Okay. And do you have any understanding as to whether or not
5     there are other insurers out there who will underwrite marine
6     vessel pollution insurance?
7        MR. MATTHEWS: Are you talking about
8     currently?
9        MR. TREPTOW: Currently.
10 A. To my knowledge, other than where we stumbled across the
11    Puget Sound Underwriters' market, there is none.
12 Q. (By Mr. Treptow) Did you read the affidavit declaration of
13    Russell Brown filed in this case?
14 A. I believe so.
15 Q. Do you know Mr. Brown?
16 A. No, I do not.
17 Q. In 1992, did you look to see if there were any other insurers
18    other than WQIS who would insure vessel marine pollution
19    insurance?
20 A. Well, to my knowledge, there was none and people that we had
21    approached didn't know of any or were aware of none.
22 Q. In 1992, did you approach WQIS directly or through another
23    broker?
24 A. Directly.
25 Q. And did you contact the individual at WQIS who had to have

6 (Pages 18 to 21)

Esquire Deposition Services
(206) 624-9099

EXHIBIT D
Page 2 of 4

Eric Parthemer 30(B)(6) 11/17/05

Page 22

1   been working with Mr. Graham on the Black Ball Ferry?
2   A. I can't recall. I believe all we did was send in paper --
3      I believe I talked with Jan MacInnes and asked what was
4      required to receive a quote, and I believe it was sent in
5      this memo form and they provided us a quote. I did not talk
6      to anybody directly.
7   Q. And who's Jan MacInnes?
8   A. Jan MacInnes is a CSR with Totem Agencies.
9   Q. Is she still with Totem?
10  A. Yes, she is.
11  Q. Do you remember in 1992 filing -- or filling out an
12     application on behalf of Inlet to secure insurance from WQIS?
13  A. To my knowledge, there was no application.
14  Q. And I was going to say I've never seen one, so I was
15     interested in your best recollection.
16  A. My best --
17  Q. With respect to renewals of that WQIS policy, subsequent
18     renewals, do you recall or was there ever an application for
19     insurance filled out by Totem and submitted to WQIS to your
20     knowledge?
21  A. Not to my knowledge. Not that I can recall.
22  Q. Do you recall what initial information you provided to WQIS
23     about the Inlet vessels that were to be insured?
24  A. You want my recollection? Because I can't -- I mean, to my
25     recollection, I believe I -- we had three-part memo forms and

Page 23

1   I believe I provided them the age of the vessel and the gross
2   tonnage.
3   Q. And in 1992, the two vessels that were insured by WQIS were
4      the MAREN I and the QP?
5   A. It would appear to be. On this policy, yes.
6   Q. Do you recall who at Inlet you talked with about insuring the
7      MAREN I and the QP in 1992 for vessel pollution insurance?
8   A. Not off the top of my head.
9   Q. Did you have any understanding in 1992 whether or not the
10     MAREN I and the QP, too, represented Inlet's entire fleet?
11  A. I believe that's all we had at the time and that's all we
12     knew of.
13  Q. Okay. Now, the coverage that's reflected in Exhibit 9, what
14     was that insurance intended to cover? What's your
15     understanding it was to cover?
16  A. Liabilities incurred from an oil spill in the water.
17  Q. And looking at the page that's marked WQIS 354, it talks
18     about a liability in the United States for any claim and
19     imposed under Section 1002, the Oil Pollution Act of 1990.
20     Did I read that correctly?
21  A. I believe so, yes.
22  Q. In 1992, did you know what types of liability the operator of
23     a marine vessel might have under the Oil Pollution Act of
24     1990?
25  A. Not specifically, no.

Page 24

1   Q. In 1992, were you familiar at all with the requirements of
2      the Oil Pollution Act of 1990?
3   A. No.
4   Q. How about with respect to the Comprehensive Environmental
5      Response Compensation Liability Act, CERCLA, did this policy
6      cover liability imposed under Section 10781 of that act?
7   A. Section C says there's some coverage for that, yes.
8         I also would like to note on this that at the time we
9      placed this coverage, it generally took two years to get a
10     policy, so there was a period of -- at maybe two years, maybe
11     longer before we ever received a policy. We received
12     confirmation that coverage was bound, but we didn't have the
13     opportunity or at least I had no opportunity to review this
14     with the client, because we did not receive a policy for two
15     years.
16  Q. Despite the fact that you didn't receive a copy of the policy
17     for two years, did you know what WQIS was insuring Inlet for?
18  A. As I stated earlier, water pollution liabilities.
19  Q. Just generically water pollution liabilities?
20  A. I would say so.
21  Q. Well, did you have an understanding back in 1992 that the
22     insurance covered any liabilities under state and federal
23     law?
24  A. I believe that's what the intention was.
25  Q. And did you share that information with Inlet?

Page 25

1   A. I do not recall.
2   Q. Do you know why it took WQIS two years to provide copies of
3      policies?
4   A. I believe it's because they were the only market writing this
5      type of coverage.
6   Q. Okay. Looking again at Exhibit No. 9, under part 1, the
7      insuring provisions, the very first paragraph talks about
8      indemnification of the insured for such amounts as the
9      insured shall become liable to pay and shall have paid as
10     owner. As of 1992, did you have experience with marine
11     insurance policies that were indemnity policies?
12  A. No.
13  Q. Back in 1992, at the time that this insurance was written,
14     did you know what an indemnity policy was?
15  A. I'm not sure what you're asking.
16  Q. Sure. Let me ask you this: Since 1992 and up to today, have
17     you learned that most marine insurance policies, hull and
18     machinery, P&I, pollution insurances are indemnity policies,
19     at least on their face?
20  A. Well, I guess when you say -- I mean, policies in general
21     have an indemnity provision in them, all policies have an
22     indemnity provision in them. If you go down farther to 2,
23     it's a reimbursement-type policy and professional liability
24     policies generally are that way. And, for the most part,
25     it's the discretion of the claims adjustor as to how a claim

7 (Pages 22 to 25)

Page 82

1  A. Possibly.
2        MR. MATTHEWS: John, just --
3  Q. (By Mr. Treptow) Are you aware of any Totem files relating
4     to Inlet pollution issues that have not been provided to your
5     attorney?
6  A. No.
7        MR. MATTHEWS: John, can I make one quick
8     statement?
9        MR. TREPTOW: Sure.
10       MR. MATTHEWS: A lot of -- many of the
11    original Totem files are now in my office, so if you want to
12    look at those original files, we can certainly make those
13    available.
14       MR. TREPTOW: I appreciate that, Tom.
15    What I just wanted to make sure that everything relating to
16    Inlet marine insurance issues has been produced in this case.
17 A. Everything related to Inlet Fisheries, Inc., that we have in
18    our possession has been produced.
19       MR. TREPTOW: Thank you.
20 Q. (By Mr. Treptow) Now, prior to August of 2000 and Totem's
21    submission of an application for vessel pollution insurance
22    to Puget Sound Underwriters, was Totem aware of the marine
23    insurance doctrine of Uberrimae Fidei?
24 A. No.
25 Q. Prior to August of 2000, was Totem aware of the doctrine, the

Page 83

1     marine insurance doctrine of Utmost Good Faith?
2  A. Is that not the same thing, what you just asked me?
3  Q. It is, but I think it is, but it may be called by another
4     name and you might have known it by another name.
5  A. No.
6  Q. Prior to August of 2000, were you aware that certain vessel
7     pollution insurers took the position that it was the
8     insured's duty to disclose all information that the insurers
9     thought was material to the risk before the risk was
10    underwritten?
11 A. No.
12 Q. Since August of 2000, has Totem had any dealings with WQIS on
13    behalf of other clients?
14 A. Black Ball Ferry Lines is the only one.
15 Q. And as far as you know, does Black Ball Ferry Lines still --
16    are their vessels still insured under WQIS marine pollution
17    policies?
18 A. It's one vessel, it's the COHO, and I believe so.
19       MR. TREPTOW: Why don't we take a short
20    break and let me go over my notes. I think I'm close to
21    being done.
22       (Recess 11:49-12:02 p.m.)
23 Q. (By Mr. Treptow) Mr. Parthemer, could you look at Exhibit 10
24    again, please.
25 A. Yes.

Page 84

1  Q. After receiving Mr. Garger's letter, did you conclude that
2     WQIS was cancelling Inlet's policy 30-1640489 for two
3     reasons: One, a failure to pay premiums; and, two, failure
4     to comply with the demand that the vessels be surveyed?
5  A. That's what it says.
6  Q. Okay. With respect to the failure to pay, did you ever
7     resolve -- strike that.
8        Did you ever -- you, personally, look into the issue as
9     to whether or not WQIS had been paid for policy years '99 to
10    2000 and 2000 to 2001?
11 A. I had Mary Larson look into it.
12 Q. And she told you what?
13 A. She said that she contacted WQIS and it had been taken care
14    of.
15 Q. So was it your understanding that Mr. Garger was incorrect
16    when he said that the premiums had not been paid for the
17    current year or the previous year?
18 A. I would assume so, but I can't answer that specifically. It
19    was taken care of.
20 Q. Well, once you were advised that it had been taken care of,
21    did you contact Mr. Garger and ask him to reconsider his
22    decision about the cancellation?
23 A. I did not, Mary Larson did.
24 Q. And when did Ms. Larson do that?
25 A. I would assume after this letter came in.

Page 85

1  Q. Did you ever see any written followup from Mr. Garger about
2     the payment issues?
3  A. I believe there's some notes in the file from Mary Larson
4     addressing such.
5  Q. Well, did Mr. Garger ever get back to you and say, With
6     regard to the notice of cancellation, forget about the
7     payment issue, that's not a really a reason for cancellation,
8     we cleared it up, and Inlet paid those premiums?
9  A. No. In answer to your question, no, he did not get back to
10    me.
11 Q. Well, weren't you concerned when you learned that that issue
12    had been taken care of, that one of the two reasons for
13    cancellation really wasn't a reason at all?
14 A. Well, they wouldn't have extended coverage if they had been
15    cancelling it for nonpay because I believe Alaska statute
16    allows 10 days or 20 days and they extended the policy to
17    August.
18 Q. Right. They extended it to August, but as of the date of the
19    cancellation, they're still giving you 60 days' notice under
20    AS 21.36.220 for failure to pay and failure to comply,
21    correct?
22 A. The note that you gave me on August 7th; is that what you're
23    referring to?
24 Q. Yes.
25 A. It says, Accordingly, please consider this a 20-day notice of

22 (Pages 82 to 85)