IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA
------------------------------------X
CERTAIN UNDERWRITERS AT LLOYDS,
LONDON, SUBSCRIBING TO CERTIFICATE
OF INSURANCE OP01 0025, through Puget
Sound Underwriters, Inc.,
              Plaintiffs,

      vs.

INLET FISHERIES, INC., an Alaska
Corporation, and INLET FISH PRODUCERS,
INC., an Alaska Corporation,
              Defendants.
------------------------------------X
INLET FISH PRODUCERS, INC., an Alaskan
Corporation,
          Third-Party Plaintiffs,

      vs.

TOTEM AGENCIES, INC., a Washington
Corporation, and AMERICAN E&S INSURANCE
BROKERS CALIFORNIA, INC., a Washington
Corporation
         Third-Party Defendants.
------------------------------------X
          292 Madison Avenue

         New York, New York

         December 6, 2005

         2:45 P.M.


    EXAMINATION BEFORE TRIAL of RUSSELL

BROWN, taken pursuant to Notice, held at the

above mentioned time and place before Keith

Rudolph, a Notary Public of the State of New

York

df000a8b-4038-420a-ab6a-f2d66f161171

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4      (Telephonically present)
 5   DORSEY & WHITNEY LLP
 6      Attorneys for Inlet Fisheries
 7      1031 West Fourth Avenue
 8      Suite 600
 9      Anchorage, Alaska 99501
10   BY:  JOHN A. TREPTOW, ESQ.
11
12
13   MATTHEWS & ZAHARE, P.C.
14      Attorneys for Totem Agencies, Inc.
15      431 West 7th Avenue
16      Suite 207
17      Anchorage, Alaska  99501
18   BY: THOMAS A. MATTHEWS, ESQ.
19
20   RUBIN, FIORELLA & FRIEDMAN LLP
21      Attorneys for Witness
22      292 Madison Avenue
23      New York, New York 10017
24   BY: ALAN R. SACKS, ESQ.
25
```

Page 3

```
 1
 2      IT IS HEREBY STIPULATED AND AGREED
 3   by and among counsel for the respective
 4   parties hereto, that the sealing and
 5   certification of the within deposition
 6   shall be and the same are hereby waived;
 7
 8      IT IS FURTHER STIPULATED AND AGREED
 9   that all objections, except to the form of
10   the question, shall be reserved to the
11   time of trial;
12
13      IT IS FURTHER STIPULATED AND AGREED
14   that the within deposition may be signed
15   before any Notary Public with the same
16   force and effect as if signed and sworn to
17   before the Court.
18
19      IT IS FURTHER STIPULATED AND AGREED
20   that counsel for the witness examined
21   herein shall be furnished with a copy of
22   the within deposition without charge.
23
24
25
```

Page 4

```
 1              R. Brown
 2   R U S S E L L  B R O W N,  having first
 3   been duly sworn by a Notary Public of the
 4   State of New York, was examined and testified
 5   as follows:
 6   EXAMINATION BY
 7   MR. MATTHEWS:
 8      Q.   Will you state your name for the
 9   record, please?
10      A.   Russell Brown.
11      Q.   Spell the last name for me.
12      A.   B-R-O-W-N.
13      Q.   By whom are you employed,
14   Mr. Brown?
15      A.   Water Quality Insurance Syndicate.
16      Q.   How long have you been employed by
17   that company?
18      A.   Just over eight years.
19      Q.   Before you there is a document
20   which has been marked as Exhibit 1.  That's a
21   copy of a notice of deposition for today.
22          (Document marked as Defendant's
23      Exhibit 1 for identification; 12/06/05,
24      K. R.)
25          Have you seen that document
```

Page 5

```
 1              R. Brown
 2   before?
 3      A.   Yes.
 4      Q.   That is a notice which asks Water
 5   Quality Insurance Syndicate to designate a
 6   witness to testify on its behalf concerning
 7   four different subject areas.  Do you
 8   understand that?
 9      A.   Yes.
10      Q.   Are you the witness who has been
11   designated to testify on behalf of WQIS
12   today?
13      A.   Yes, I am.
14      Q.   The notice also asks for the
15   production of certain documents and records.
16   Do you understand that?
17      A.   Yes.
18      Q.   Have certain records been brought
19   for us?
20      A.   Yes, they have.
21      Q.   Are those what have been placed in
22   front of us in the file folders each marked
23   Inlet Fisheries with a number of different
24   policy numbers on them?
25      A.   Yes.
```

Page 6

R. Brown

1
2    Q.   Do I correctly understand that
3    each of these files is the underwriting file
4    for Inlet Fisheries for a particular policy
5    year?
6        A.   Yes.
7        Q.   For example, the file marked Inlet
8    Fisheries policy number 21-09047, is that the
9    underwriting file for the 1992 to 1993 policy
10   year?
11       A.   Yes, it is.
12           MR. MATTHEWS:  Let me ask the
13       court reporter to mark each of these
14       file folders, if we can, separately as
15       an exhibit so that we know what we are
16       talking about.
17           (File folders marked as
18       Defendant's Exhibits 2 through 10 for
19       identification; 12/06/05, K.R.)
20       Q.   Mr. Brown, we've now marked as
21   exhibits 2 through 10 to this deposition
22   copies of the underwriting files which you
23   brought with you today, is that right?
24       A.   Yes.
25       Q.   Do I correctly understand that

Page 7

R. Brown

1
2    each of these files is a true and correct
3    copy of the WQIS underwriting files for each
4    of the years previously mentioned?
5        A.   Yes.
6        Q.   Exhibit 2 is the underwriting file
7    for '92-'93.  Exhibit 3 is '93-'94.  Exhibit
8    4 is '94-'95.  Exhibit 5 is '95-'96.  Exhibit
9    6 is '96-'97.  Exhibit 7 is '97-'98.  Exhibit
10   8 is '98-'99.  Exhibit 9 is '99-2000 and
11   Exhibit 10 is 2000 to 2001.  Is that correct?
12       A.   Correct.
13       Q.   Each of those files are maintained
14   in the ordinary course of business for WQIS?
15       A.   Yes.
16       Q.   Let me ask you this, if I can, are
17   the documents for underwriting purposes at
18   WQIS maintained electronically?
19       A.   They are now, yes.
20       Q.   Is the office paperless?
21       A.   Yes.
22       Q.   I noticed in looking through some
23   of the file materials that there are dates.
24   For example, in Exhibit 2, on the top
25   left-hand corner of the policy itself there

Page 8

R. Brown

1
2    is a date stamp.  In this case it's 3/13/2004
3    and a time, 10:39 A.M. Do you see that?
4        A.   Yes.
5        Q.   Do you know whether or not that's
6    a scanning mark of some kind or an
7    identifier?
8        A.   I'm not sure, but I believe it's a
9    scanning -- when it was scanned, but I'm not
10   positive.  That would make sense in that time
11   period.
12       Q.   It appears, for instance, that
13   each of the documents in this file, Exhibit
14   2, has the same date and time stamp of March
15   13, 2004, 10:39 A.M.  Is that right?
16       A.   Yes.
17       Q.   Does that suggest to you at least
18   that all of these documents were scanned in
19   to the WQIS computer system on that day?
20       A.   Yes.
21       Q.   I started to ask you some
22   questions about your background, but let me
23   go back to that, if I can.  What is your
24   current job position with WQIS?
25       A.   I'm the Vice President

Page 9

R. Brown

1
2    Underwriting Manager.
3        Q.   How long have you held that
4    position?
5        A.   I'm Vice President for
6    approximately four to six months.
7        Q.   And underwriting manager, how long
8    have you held that position?
9        A.   Approximately since 2001.
10       Q.   Prior to 2001, what was your
11   position?
12       A.   I was an underwriter.
13       Q.   You've been with the company since
14   1997?
15       A.   Correct.
16       Q.   During the years 1997 through
17   2001, were you an underwriter?
18       A.   No.  I moved up to underwriter,
19   assistant underwriter to deputy underwriter
20   to full underwriter.
21       Q.   To underwriting manager, to VP and
22   underwriting manager?
23       A.   Correct.
24       Q.   All told, you've been with WQIS
25   since 1997?

df000a8b-4038-420a-ab6a-f2d66f161171

Page 10

R. Brown

1
2    A.   Correct.
3    Q.   Can you tell me about your career
4  prior to that time?
5    A.   I graduated from Kings Point in
6  June of '97, United States Merchant Marine
7  Academy.  WQIS was my first employment.
8    Q.   Tell us a little bit about WQIS,
9  if you would.  What's the nature of the
10  business that it underwrites?
11    A.   We insure vessels for pollution
12  liability.
13    Q.   Exclusively?
14    A.   Yes.
15    Q.   Is it a specialty insurer in that
16  sense?
17    A.   Yes, it is.
18    Q.   Very specialized?
19    A.   Yes, it is very specialized.  We
20  have a syndicate.
21    Q.   When you use the term "syndicate,"
22  what does that mean?
23    A.   We are comprised of now 12
24  different companies of the US market that
25  participate in a variety of percentage

Page 11

R. Brown

1
2  shares.  They control our profits and losses.
3    Q.   Do the syndicate members vary over
4  the years?
5    A.   Year to year, yes.
6    Q.   Currently there are 12 different
7  members?
8    A.   Yes, I believe so.
9    Q.   Those are all US companies?
10    A.   Correct.
11    Q.   Can you tell us a little bit about
12  the history of WQIS?  How long has it been
13  around, why was it formed?
14    A.   WQIS was formed in 1971.  It was
15  basically formed by the US market.  No
16  particular company wanted to take on all the
17  risks of pollution.  They thought it was too
18  much risk for them to bear as a solo company.
19  They believed that the market should share in
20  the potential risk.  That's when they came
21  together an formed WQIS.
22    Q.   I should have asked this earlier.
23  Just to be clear, we're talking about
24  pollution insurance for vessels?
25    A.   Vessels, correct.

Page 12

R. Brown

1
2    Q.   Exclusively for vessels?
3    A.   Exclusively for vessels.
4    Q.   Are you familiar generally with
5  WQIS's position in the market?  Its market
6  share, if you will?
7    A.   Yes.
8    Q.   Is that one of your
9  responsibilities as underwriting manager to
10  be familiar with that?
11    A.   Yes, generally.
12    Q.   Have you been familiar with the
13  market for pollution insurance generally
14  since the year 2000?
15    A.   Yes.
16    Q.   Has the market changed over the
17  last five years?
18    A.   Yes.
19    Q.   In what way?
20    A.   I believe our market share has
21  decreased.
22    Q.   WQIS's market share?
23    A.   WQIS's market share has decreased.
24    Q.   Are there more players now than
25  there were in the year 2000?

Page 13

R. Brown

1
2    A.   Yes.
3    Q.   In the year 2000, can you give me
4  an estimate of what WQIS's market share was?
5    A.   It was approximately, my best
6  estimate would be, 70 percent.
7    Q.   Is it somewhat less than that
8  today?
9    A.   Yes.  I would say closer to 60
10  percent today.
11    Q.   WQIS is still the dominant player,
12  if you will?
13    A.   Yes.
14    Q.   I show you what we've marked as
15  Exhibit 11 to this deposition.  Mr. Brown, I
16  ask you if you recognize that document.
17       (Document marked as Defendant's
18       Exhibit 11 for identification; 12/06/05,
19       K. R.)
20       MR. MATTHEWS:  John, for the
21  record, it's a declaration that he
22  signed 10/June/2005.
23       MR. TREPTOW:  Thank you.
24    Q.   Is that a document you're familiar
25  with, Mr. Brown?

4 (Pages 10 to 13)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 14

R. Brown

1
2     A.    Yes.
3     Q.    That is a declaration that you
4  submitted in this pending Alaska lawsuit in
5  June 2005, is that right?
6     A.    Yes.
7     Q.    Was this prepared and submitted at
8  the request of Lloyds of London?
9     A.    Yes.
10    Q.    Does it bear your signature on the
11 last page?
12    A.    Yes.
13    Q.    You signed it here in New York on
14 the 10th of June 2005?
15    A.    Correct.
16    Q.    Under penalty of perjury, under
17 the laws of the United States?
18    A.    Yes.
19    Q.    Are the statements made in this
20 declaration all true and accurate, to the
21 best of your belief?
22    A.    Yes.
23    Q.    If I could draw your attention to
24 paragraph five.  In that paragraph you
25 indicate that WQIS currently provides vessel

Page 15

R. Brown

1
2  pollution insurance to over 40,000 vessels
3  operating in the US markets, is that true?
4     A.    Yes.
5     Q.    Is that still true today?
6     A.    Yes.
7     Q.    Was it roughly true in the year
8  2000?
9     A.    Yes.
10    Q.    You also mentioned in paragraph
11 six that commercial vessels typically
12 operating in the United States can obtain
13 pollution insurance either as a stand-alone
14 policy or sometimes as part of a policy for
15 Protection and Indemnity insurance, correct?
16    A.    Yes.
17    Q.    For those policies that are
18 written on a stand-alone basis, that's what
19 you do right?
20    A.    Correct.
21    Q.    That's exclusively what WQIS does?
22    A.    Yes.
23    Q.    It does not write separate
24 Protection and Indemnity policies?
25    A.    No.

Page 16

R. Brown

1
2     MR. SACKS:  For the record, let's
3  make that clear.  It's correct that WQIS
4  does not write separate P&I policies?
5     THE WITNESS:  Yes, correct.
6     Q.    When we us the term "P&I policy,"
7  we're talking about protection and indemnity,
8  right?
9     A.    Yes.
10    Q.    You go on to say in paragraph six
11 that the market as written through
12 P and I policies is generally limited to the
13 blue water pollute; is that true?
14    A.    Correct, yes.
15    Q.    Those policies that are written
16 for what are known as P and I Clubs?
17    A.    Yes.
18    Q.    Can you tell us what P and I Clubs
19 are?
20    A.    It's actually a mutual insurance.
21    Q.    Is that where a group of vessel
22 owners get together and agree to insure
23 themselves?
24    A.    Correct.
25    Q.    That's generally written for very

Page 17

R. Brown

1
2  large vessels, tanker owners and the like?
3     A.    Yes.
4     Q.    You indicate in paragraph seven,
5  you're discussing market share in that
6  paragraph as well, right?
7     A.    Yes.
8     Q.    You had some familiarity both with
9  WQIS's position in the market as well as the
10 position held by Lloyds, is that true?
11    A.    Yes.
12    Q.    Lloyds was the other dominant
13 player in the market currently?
14    A.    Yes.
15    Q.    For stand-alone marine pollution
16 insurance?
17    A.    Yes.
18    Q.    Was that also true in the year
19 2000?
20    A.    Yes.
21    Q.    Is it fair for me to conclude that
22 between Lloyds and WQIS, in the year 2000,
23 that the two of you would have controlled
24 something in excess of 95 percent of the
25 market?

CONTINENTAL REPORTING
(800) 308-3377

df000a8b-4038-420a-ab6a-f2d66f161171

Page 18

R. Brown

1
2    A.   Yes, that's about right.
3    Q.   A great, great, great majority of
4  the market was in those two companies?
5    A.   Yes.
6    Q.   Are you generally familiar with
7  the standards for underwriting that are
8  employed for WQIS?
9    A.   Yes, for WQIS.
10    Q.   Are you familiar at all with the
11  standards for underwriting that are employed
12  by other underwriters?
13    A.   No, just generally.
14    Q.   Do you think that the standards
15  that are used by WQIS are consistent with
16  those employed by other market participants?
17    MR. TREPTOW:  Objection.
18    Q.   You can answer.
19    A.   It wouldn't be fair for me to
20  comment on exactly what they do, but I would
21  believe that the standards would be somewhat
22  similar, yes.
23    Q.   You haven't worked for any other
24  company?
25    A.   No.  I wouldn't know.

Page 19

R. Brown

1
2    Q.   You don't know specifically?
3    A.   No, specifically.
4    Q.   Let me ask you this, do you have
5  any reason to believe that the standards that
6  are employed by WQIS are more relaxed, if you
7  will, than those of other market
8  participants?
9    MR. TREPTOW:  Objection.
10    A.   No.
11    Q.   Do you think they are stricter?
12    MR. TREPTOW:  Objection.
13    A.   Case-by-case basis.
14    Q.   Are there certain things that are
15  significant to you as an underwriter?
16    A.   Yes.
17    Q.   What are those?
18    A.   It would be a variety of topics.
19  It depends on the vessel class, type of
20  business, type of vessel, loss history, cargo
21  carried, where they're navigating, year
22  built, conditional surveys, what other
23  insurance they're carrying, what P and I,
24  what their limits are, history of the
25  operator and the owner, crew experience; a

Page 20

R. Brown

1
2  number of other topics that don't immediately
3  come to the top of my head, but those would
4  be some examples.
5    Q.   As I understand it, the type of
6  vessel is going to be one factor for you?
7    A.   Yes.
8    Q.   Its loss history?
9    A.   Yes.
10    Q.   The loss history of the operator
11  as well?
12    A.   Yes.
13    Q.   The age of the vessel?
14    A.   Yes.
15    Q.   Its general condition?
16    A.   Yes.
17    Q.   What other insurance it has?
18    A.   Yes.
19    Q.   That would include hull and P and
20  I?
21    A.   Correct.
22    Q.   There may be other factors
23  depending upon a particular risk?
24    A.   Correct.
25    Q.   Each of those factors that we've

Page 21

R. Brown

1
2  just gone through would generally be factors
3  you would look at in determining whether to
4  underwrite a risk?
5    A.   Yes.
6    Q.   Is there a particular age limit,
7  if you will, for WQIS on a risk?
8    A.   No.
9    Q.   A vessel could be a World War I
10  vintage vessel and you might just consider
11  that as a risk?
12    A.   Yes.
13    Q.   Same with World War II?
14    A.   Yes.
15    Q.   Do you know whether or not other
16  underwriters have particular age guidelines
17  that they follow?
18    A.   Pollution?
19    Q.   Yes?
20    A.   I'm not sure.
21    Q.   Why is it that you look at what
22  other insurance vessels may have?
23    A.   We particularly look at all the P
24  and I limits they have to make sure they are
25  covered in other areas if we're not the only

6 (Pages 18 to 21)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 22

R. Brown

1     R. Brown
2  insurance taken out by the insured or
3  potential insured.
4     Q.  Why is that?
5     A.  Bring up other issues of salvage,
6  wreck removal.
7     Q.  Wreck removal would typically be
8  covered under a P and I policy?
9     A.  Correct.
10     Q.  Is that significant to you to
11  understand whether or not the owner has P and
12  I coverage?
13     A.  Yes.
14     Q.  Given your experience with WQIS in
15  the market, are there certain risks that come
16  to you for insurance that are so clean, if
17  you will, that you think virtually any
18  underwriter would be happy to underwrite
19  them?
20     A.  We can't comment about other
21  underwriters, but yes, for myself, there are
22  clean records that we do underwrite.
23     Q.  Are there also dirty records, if
24  you will, that you will not underwrite?
25     A.  There have been accounts that we

Page 23

1     R. Brown
2  declined due to their loss history, yes.
3     Q.  Are there accounts that have ever
4  been presented to you that you think are so
5  dirty that no underwriter would touch them?
6     A.  Once again, I can't really comment
7  on what another underwriter would do, but we
8  have again declined those kinds of risks.
9     Q.  Let me ask you this, Mr. Brown,
10  are you familiar with the account that was
11  written in this case for Inlet Fisheries?
12     A.  Yes.
13     Q.  What was your involvement in that
14  account?
15     A.  I was the supervisor at the time.
16  I wasn't the particular underwriter, but I
17  was consulted for the cancellation itself and
18  the general renewals.
19     Q.  It appears from the documents that
20  we have in front of us today that WQIS first
21  began writing the account for Inlet Fisheries
22  for the 1992 to 1993 policy year?
23     A.  Correct.
24     Q.  That was before you joined the
25  company right?

Page 24

1     R. Brown
2     A.  Yes.
3     Q.  Do you know who the underwriter
4  was at the time?
5     A.  I believe it was William
6  Ondrejcik.
7     Q.  Is that somebody you're familiar
8  with?
9     A.  Yes.
10     Q.  Is he still with the company?
11     A.  No; he has since retired.
12     Q.  When did Mr. Ondrejcik retire?
13     A.  October 1st of this year.
14     Q.  Is he still in the New York area,
15  to your knowledge?
16     A.  I believe so.
17     Q.  You mentioned that you were the
18  supervisor on this account; for what period
19  of time?
20     A.  I'd say the last renewal which
21  was, I believe, 2000-2001 renewal.
22     Q.  That would have been prior to the
23  time that you became underwriting manager?
24     A.  Correct.
25     Q.  You were supervising

Page 25

1     R. Brown
2  Mr. Ondrejcik?
3     A.  Yes.
4     Q.  What was your specific involvement
5  in that renewal?
6     A.  Primarily assigning the renewals
7  to Mr. Ondrejcik and making sure in due
8  course that the renewal quotation was out at
9  the proper time.
10     Q.  Was a renewal offered for the year
11  2000?
12     A.  Yes.
13     Q.  Was it accepted by Inlet?
14     A.  Yes.
15     Q.  WQIS did renew the policy for the
16  year 2000, at least initially, right?
17     A.  Yes.
18     Q.  The vessels to be insured included
19  what we call the QP, the Quanirtuuk Princess;
20  that was one of the vessels, right?
21     A.  Yes.
22     Q.  And potentially the Harvester
23  Barge as well?
24     A.  Yes.
25     Q.  The policy would have renewed

7 (Pages 22 to 25)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 26

R. Brown

1
2  effective June 12, 2000, right?
3     A.   Correct.
4     Q.   Shortly before the renewal there
5  was a claim involving one of the insured
6  vessels.  Are you aware of that?
7     A.   Yes.
8     Q.   That was the Maren I?
9     A.   Yes.
10    Q.   Did you have any involvement at
11 all in the claim side of that?
12    A.   No.
13    Q.   Does WQIS have a separate Claims
14 Department?
15    A.   Yes.
16    Q.   Do Underwriting and Claims
17 communicate from time to time?
18    A.   Yes.
19    Q.   About the nature of the risk?
20    A.   Yes.
21    Q.   Why would Claims be involved in
22 communicating directly with Underwriting?
23    A.   For informed underwriting of
24 certain losses and particularly the amount of
25 the loss and how the loss arose could affect

Page 27

R. Brown

1
2  next year's renewal or rating or certain
3  terms and conditions of the policy.
4     Q.   Do you know whether or not the
5  Maren I claim impacted WQIS's decision to
6  cancel the policy?
7     A.   Yes.  It did have influence on it,
8  yes.
9     Q.   Explain please.
10    A.   Shortly after renewing the policy
11 it had become aware to the Underwriting
12 Department that there was a claim on this
13 particular insured and by doing so it drew
14 attention to the policy itself and looking
15 back upon the policy themselves we had not
16 had a survey.  We asked for a survey through
17 the broker and upon that we did additionally
18 learn that we were not paid for the previous
19 year's policy or the current renewal policy.
20    Q.   Were you involved in determining
21 whether or not you had been paid for the
22 previous year's policy?
23    A.   At that time, yes.
24    Q.   Is it possible that what you
25 haven't been paid for was an endorsement

Page 28

R. Brown

1
2  policy as opposed to the policy itself?
3     A.   For the previous year, no.
4     Q.   Are there records within what we
5  have here showing the payment history for
6  this account?
7     A.   For that particular year, I'm not
8  sure.
9     Q.   In any event, you became concerned
10 about the nature of the risk, is that fair to
11 say, because of the Maren I incident?
12    A.   Yes.
13    Q.   You mentioned that you did not
14 have a survey.  Had you had a survey on any
15 of these vessels at any point prior to year
16 2000?
17    A.   No, it did not appear so.
18    Q.   Had you asked for one?
19    A.   Not to my knowledge.
20    Q.   After the Maren I incident, did
21 WQIS ask for the vessels to be surveyed?
22    A.   Yes.
23    Q.   Who was involved in making that
24 request?
25    A.   It was from the Underwriting

Page 29

R. Brown

1
2  Department to the broker.
3     Q.   Was that done in your direction?
4     A.   Yes, along with the president of
5  the company.
6     Q.   Who is the president of the
7  company?
8     A.   Richard Hobbie.
9     Q.   In looking through the materials
10 that we have here, Exhibit 10, I believe, is
11 the 2001 renewal.  I didn't see a written
12 letter to the broker asking for those
13 surveys.  Are you aware of one?
14    A.   I'm not sure if it was written or
15 verbally communicated.
16    Q.   I also didn't see in the files
17 that there was ever a survey of any kind or a
18 report concerning the Maren I in your files
19 which would have triggered the request for
20 surveys.  Are you aware if you ever obtained
21 an actual survey?
22    A.   No, not to my knowledge.
23    Q.   Let me show you a series of
24 documents, if I can.  I want to make sure I
25 understand the chronology of the

8 (Pages 26 to 29)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 30

```
 1        R. Brown
 2  cancellation.
 3        Before we go on, I should let you
 4  know that, as I understand it, these files
 5  were previously subpoenaed when this case was
 6  pending in Washington by counsel for LLoyds.
 7  I have some records here that have Bates
 8  numbers on them.  Some of them have a WQIS
 9  designator which indicates, at least to me,
10  that they were obtained from WQIS previously.
11  Some of these documents are contained within
12  the underwriting files which you have
13  produced here today.  It's easier for our
14  records because the ones that I have have
15  numbers on the bottom if you look through
16  those.  Okay?
17      A.   Yes.
18      Q.   First of all, let me show you a
19  letter that bears the Bates number TOT 1326.
20  Is that a letter that you're familiar with?
21      A.   Yes, I've seen it before.
22      Q.   That is a part of your
23  underwriting file for the 2000 policy year,
24  correct?
25      A.   Yes.
```

Page 31

```
 1        R. Brown
 2      Q.   This is a letter dated June 6,
 3  2000, addressed to Inlet Fisheries from
 4  Jan Townsend of Totem Agencies, correct?
 5      A.   Yes.
 6        MR. TREPTOW:  Is that Exhibit 12?
 7        MR. MATTHEWS:  I haven't marked it
 8  yet.  Let's go ahead and mark this
 9  letter as Exhibit 12.
10        (Letter marked as Defendant's
11  Exhibit 12 for identification; 12/6/05,
12  K.R.)
13      Q.   We have now marked as Exhibit 12
14  the letter that we were just looking at,
15  correct?
16      A.   Yes.
17      Q.   What I wanted to ask you about was
18  the substance of the first paragraph in this
19  letter.  Beginning with, "Water Quality
20  Insurance Syndicate recently received a
21  survey regarding the condition of your
22  vessels," do you see that?
23      A.   Yes.
24      Q.   What I wanted to ask you is
25  whether that paragraph accurately sets forth
```

Page 32

```
 1        R. Brown
 2  WQIS's position as of June 6, 2000?
 3      A.   Not that I'm aware.  I wasn't
 4  aware that we received the survey.
 5      Q.   The second sentence says that they
 6  are wanting to send cancellation notice on
 7  your policy because of the age and condition
 8  of the vessels.  Is that accurate?
 9      A.   That's the interpretation from
10  Jan.  I'm not sure that we necessarily
11  relayed that.
12      Q.   Let me show you another document
13  marked as Exhibit 13.
14        (Document marked as Defendant's
15  Exhibit 13 for identification; 12/6/05,
16  K.R.)
17        Let me know when you've had a
18  chance to review both of these exhibits.
19      A.   Okay.
20      Q.   Exhibit 13, handwritten note.  It
21  has a Bates number WQIS 0471 on the lower
22  right.  I'll represent to you this was a
23  document that came from the files that we got
24  from Lloyds from the Washington case.  I did
25  not see this note in the records that were
```

Page 33

```
 1        R. Brown
 2  produced here today.  It does have a scanning
 3  mark similar to the ones we were looking at
 4  earlier in the upper left of 11/15/2002 at
 5  12:39 P.M.
 6        Do you see that?
 7      A.   Yes.
 8      Q.   From the substance of it, it
 9  appears to be a handwritten note that would
10  have come from WQIS.  Would you agree with
11  that?
12      A.   Yes.
13      Q.   Do you recognize the handwriting?
14      A.   No.
15      Q.   It appears to say, "Sending out
16  30-day cancel.  We have seen the condition
17  of these vessels.  Our Underwriting and
18  Claims Department have reviewed this info,
19  very disturbing.  We are willing to rescind
20  if they are surveyed by a surveyor of our
21  choice at their expense and after that they
22  adhere to all emergency recommendations and
23  adhere to any long term recommendations we
24  will rescind this cancellation."
25        Did I read that correctly?
```

CONTINENTAL REPORTING
(800) 308-3377

df000a8b-4038-420a-ab6a-f2d66f161171

Page 34

R. Brown

1
2  A.  Yes.
3  Q.  If you look at Exhibit 14, I'll
4  represent to you this is a handwritten note
5  that was produced in this case from the files
6  of Totem Agencies, my client, reflecting a
7  conversation between a Totem employee and
8  Tony Gerone at WQIS on June 1, 2000.
9      (Note marked as Defendant's
10     Exhibit 14 for identification; 12/6/05,
11     K.R.)
12     My question to you, Mr. Brown, is,
13  taking these two handwritten notes together,
14  does it appear in context that Exhibit 13 is
15  the other half of a conversation between
16  Mr. Gerone at WQIS and a Totem employee about
17  the Inlet Fisheries account?
18  A.  It's similar.
19  Q.  The substance of those two notes
20  is similar to what we see in the first
21  paragraph of the letter marked as Exhibit 12,
22  right?
23  A.  Yes.
24  Q.  Between those three exhibits, does
25  that accurately reflect WQIS's position as of

Page 35

R. Brown

1
2  June 1, 2000?
3  A.  We recognized there might have
4  been a problem, but nothing was established.
5  Q.  It was WQIS asking that the Inlet
6  vessels be surveyed at Inlet's expense by a
7  surveyor of WQIS' choosing in order to
8  continue on risk?
9  A.  Yes.
10  Q.  What was the reason for requesting
11  a survey?
12  A.  We needed to find out the
13  conditions of the vessels.
14  Q.  Do you know how it is that WQIS
15  came to question the condition of the
16  vessels?
17  A.  Yes.
18  Q.  How?
19  A.  From the claim.
20  Q.  The Maren I?
21  A.  Yes.
22  Q.  Had WQIS appointed a surveyor to
23  go to Bethel, Alaska as part of that claim?
24  A.  Yes; we had a surveyor on site.
25  Q.  Do you know who that was?

Page 36

R. Brown

1
2  A.  I believe it was Eddie Travers.
3  Q.  Do you know if Mr. Travers was
4  reporting to somebody within WQIS's claims
5  department?
6  A.  Yes.
7  Q.  Did you ever speak directly with
8  Mr. Travers?
9  A.  No.
10  Q.  Did you speak with somebody in the
11  Claims Department?
12  A.  Yes.
13  Q.  Would that have been
14  Harry Diamond?
15  A.  Yes.
16  Q.  Was Harry Diamond the claims
17  manager at the time?
18  A.  Yes.
19  Q.  The information about the
20  condition of the vessels, if I have this
21  correct, came from Mr. Travers through your
22  Claims Department ultimately to Underwriting
23  and that's what lead to the concern about the
24  condition of the vessels.  Is that true?
25  A.  That's a fair statement, yes.

Page 37

R. Brown

1
2  Q.  Take a look at Exhibit 15, if you
3  will.
4      I'll look through this as Exhibit
5  16.
6      This is TOT 1327, John.
7      MR. TREPTOW:  Thank you.
8      (Handwritten notes marked as
9      Defendant's Exhibits 15 and 16 for
10     identification; 12/6/05, K.R.)
11  Q.  Let me draw your attention to the
12  two exhibits that we've put in front of you.
13  Exhibit 15 is a handwritten note with a Bates
14  number on the bottom of WQIS 470, correct?
15  A.  Yes.
16  Q.  Exhibit 16 is a handwritten note
17  with a Bates number TOT 1327 on the bottom,
18  correct?
19  A.  Correct.
20  Q.  Do you recognize the handwriting
21  on Exhibit 15?
22  A.  No.
23  Q.  Does it appear to be same as the
24  person who wrote Exhibit 13?
25  A.  I don't know.

CONTINENTAL REPORTING
(800) 308-3377

df000a8b-4038-420a-ab6a-f2d66f161171

Page 38

R. Brown

1
2     Q.   Exhibit 16, I will represent to
3  you, is a handwritten note from the files of
4  Totem Agencies again reflecting Totem's half
5  of a conversation between Totem and Tony at
6  WQIS concerning the identification of a
7  specific surveyor.
8     A.   Yes.
9     Q.   The surveyor was Alexander Gowe,
10  Inc.?
11     A.   Correct.
12     Q.   That's also reflected in the
13  handwritten note we see from WQIS on the top
14  of the page, right?
15     A.   Correct.
16     Q.   Was Alexander Gowe the surveyor
17  that WQIS asked to do the surveys for the
18  Inlet vessels in 2000?
19     A.   Correct.
20     Q.   That is reflected in the letter
21  that we previously looked at in Exhibit 12,
22  right?
23     A.   Yes.
24     Q.   Why did WQIS want Alexander Gowe
25  to do the survey?

Page 39

R. Brown

1
2     A.   From my understanding, it was a
3  surveyor that the Claims Department was
4  comfortable with doing the surveys and the
5  conditional surveys of these vessels.
6     Q.   Why not simply ask Inlet to go get
7  a survey done by a surveyor of its choosing?
8     A.   Typically when we do surveys we
9  want to know who the surveyor is and make
10  sure they are reputable and somebody that we
11  know and trust and did business with before.
12     Q.   Mr. Gowe was such a surveyor?
13     A.   I believe so, yes.
14     Q.   Do you know whether or not Inlet
15  ever attained a survey?
16     A.   No, I do not.
17     Q.   Did you see a survey from Inlet in
18  any of the files that you looked at earlier?
19     A.   No, I have not.
20     Q.   Did WQIS eventually decide to
21  cancel the policy?
22     A.   Yes.
23     Q.   Because Inlet had not obtained
24  surveys?
25     A.   Yes, that's part of it.

Page 40

R. Brown

1
2     Q.   What was the rest of it?
3     A.   They never paid us.
4     Q.   Are you sure about the "they never
5  paid" you part?
6     A.   To my knowledge.
7     Q.   If the policy had been paid, would
8  it have made a difference to the
9  cancellation?
10     A.   I think we would have eventually
11  cancelled without a survey.
12     Q.   It is a survey that is a critical
13  component of the cancellation or the lack of
14  a survey?
15     A.   Yes.
16        MR. MATTHEWS:  John, this is TOT
17  1312.
18        (Copy of facsimile marked as
19  Defendant's Exhibit 17 for
20  identification; 12/6/05, K.R.)
21     Q.   Is that a fax that you recognize,
22  Mr. Brown?
23     A.   Yes.
24     Q.   Was that WQIS's initial effort to
25  cancel the policy?

Page 41

R. Brown

1
2     A.   Yes.
3     Q.   This is a fax apparently from
4  Mr. Gerone to Jan Townsend at Totem Agencies,
5  correct?
6     A.   Correct.
7     Q.   Is Mr. Gerone somebody you were
8  supervising in June 2000?
9     A.   Yes.
10     Q.   Was this fax sent in your
11  direction?
12     A.   Yes.
13     Q.   This refers to cancellation
14  pursuant to Section H of the policy, right?
15     A.   Correct.
16     Q.   What is Section H of the policy?
17     A.   Section H's are cancellation
18  sections of our policy and describes the
19  terms and conditions of how and when we can
20  cancel the policy, us and/or the insured.
21     Q.   Upon 30-day notice?
22     A.   Correct.
23        MR. MATTHEWS:  Off the record.
24        (A conversation was held off the
25  record.)

11 (Pages 38 to 41)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 42

R. Brown

1
2     Q.    Is it fair to say, Mr. Brown, that
3  WQIS had made the decision as of June the
4  21st to cancel this policy because Inlet had
5  not provided a survey?
6     A.    Yes.
7     Q.    Was there a period of time after
8  this June 21st notice was sent where Totem
9  was trying to get WQIS to rescind the
10  cancellation notice?
11     A.    No, I don't think so.
12     Q.    Were you involved in that in any
13  way?
14     A.    No.
15     Q.    Did Totem challenge, to your
16  knowledge, the attempted cancellation?
17     A.    Only the time period of which the
18  cancellation was made.
19     Q.    Meaning that?
20     A.    You have 30 days.  In the state of
21  Alaska you have a 60-day notice of
22  cancellation.
23     Q.    Is it fair to say that Totem
24  suggested to WQIS that the 30-day notice was
25  not in compliance with Alaska law?

Page 43

R. Brown

1
2     A.    Yes.
3     Q.    And suggested that if you wanted
4  to cancel the policy, you needed to comply
5  with Alaska law?
6     A.    Correct.
7     Q.    Did that have the effect of
8  pushing the cancellation out?
9     A.    Yes.
10     Q.    To 60 days?
11     A.    Yes.
12     Q.    Do you recognize that document?
13         (Copy of facsimile marked as
14     Defendant's Exhibit 18 for
15     identification; 12/6/05, K.R.)?
16     A.    Yes.
17     Q.    Does it appear to be a fax from
18  Totem Agencies to Mr. Gerone at WQIS asking
19  where's the notice of cancellation?
20     A.    Yes.
21     Q.    It appears to have been sent a
22  couple of different times?
23     A.    Yes.
24     Q.    Is that consistent with your
25  memory of what happened?

Page 44

R. Brown

1
2     A.    Yes.
3     Q.    Did WQIS consider the notice,
4  which we looked at as Exhibit 17, to be an
5  official notice of cancellation?
6     A.    Initially, yes.
7     Q.    Does it appear from Exhibit 18
8  that Totem took a different view?
9     A.    Yes.
10         MR. MATTHEWS:  John, this is TOT
11     1321.
12         (Facsimile marked as Defendant's
13     Exhibit 19 for identification; 12/6/05,
14     K.R.)
15     Q.    Do you recognize that fax?
16     A.    Yes.
17     Q.    That fax appears in your file.
18  Well, first of all, this appears to be a fax
19  cover sheet from Mary Larson at Totem
20  Agencies addressed to WQIS dated July the
21  20th.  Again, discussing the effectiveness of
22  the cancellation, right?
23     A.    Yes.
24     Q.    She provided a number of materials
25  to WQIS with that fax?

Page 45

R. Brown

1
2     A.    I would say so.
3     Q.    I have not attached to this
4  exhibit all of those documents, but I have
5  attached the fax transmission sheet which
6  appears to show ten pages were transmitted
7  with the cover sheet.
8     A.    Yes.
9     Q.    In Exhibit 10, which is WQIS'
10  file, there appears to be WQIS' receiving
11  side of that fax, right?
12     A.    Yes.
13     Q.    This again is a fax dated July 20,
14  2000.  It may be out of order, but it looks
15  like nine pages on your end.  I can't tell
16  what's missing, but from the fax standards it
17  looks like you got at least nine pages of
18  that fax?
19     A.    Correct.
20     Q.    Again, this fax was informing WQIS
21  of the Alaska statutes and the requirements
22  for notice of cancellation?
23     A.    Correct.
24     Q.    After receiving this fax, did
25  WQIS's legal department get involved?

12 (Pages 42 to 45)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 46

R. Brown
2    A.   Yes.
3    Q.   Andrew Garger?
4    A.   Yes.
5    Q.   Was a letter eventually sent
6  confirming that WQIS was going to cancel the
7  policy in accordance with the Alaska
8  statutes?
9    A.   Yes.
10   Q.   After receiving Exhibit 19, did
11 you have any involvement directly in the
12 communication with Totem?
13   A.   No.
14   Q.   Let me show you a handwritten note
15 from Totem's file.  We'll mark that as
16 Exhibit 20.
17        MR. MATTHEWS:  John, that's TOT
18 1318.
19        MR. TREPTOW:  Thank you.
20        (Handwritten note marked as
21        Defendant's Exhibit 20 for
22        identification; 12/6/05, K.R.)
23   Q.   As you're reading this, Mr. Brown,
24 I'll represent to you this is a note from
25 Totem's file, apparently from Mary Larson,

Page 47

R. Brown
2  dated July 20, 2000, making notes on the
3  conversation she had with you on that same
4  day.
5    A.   Yes.
6    Q.   Does that note refresh your memory
7  as to whether or not you spoke to Ms. Larson
8  that day?
9    A.   I don't recall, but apparently I
10 did.
11   Q.   The comment that says, "Per Russ,
12 have to stand by the 60 days, reinstating as
13 of today."  Do you see that?
14   A.   Yes.
15   Q.   Was this cancellation originally
16 supposed to take effect on July the 20th?
17   A.   I believe so, yes.
18   Q.   Did you then make a decision to
19 extend it out in compliance with Alaska law?
20   A.   Yes, I did.
21   Q.   That's what we see reflected in
22 this handwritten note?
23   A.   Yes.
24   Q.   While you may not have a specific
25 memory of it, do you have any reason to doubt

Page 48

R. Brown
2  if it's an accurate recitation of what
3  occurred?
4    A.   No, I do not.
5        MR. MATTHEWS:  Mark that as the
6  next one, TOT 1313.
7        (Facsimile marked as Defendant's
8        Exhibit 21 for identification; 12/6/05,
9        K.R.)
10   Q.   In response to that conversation,
11 did Mr. Gerone then send a letter back to
12 Jan Townsend confirming the extension in
13 compliance with Alaska law?
14   A.   Yes.
15   Q.   That's what we've marked as
16 Exhibit 21?
17   A.   Correct.
18   Q.   After some jockeying back and
19 forth, if you will, between Totem and WQIS
20 over this cancellation, did WQIS make the
21 decision to stand by its cancellation?
22   A.   Yes.
23   Q.   Was that reflected in the letter
24 from Mr. Garger to Inlet, dated August 7,
25 2000?

Page 49

R. Brown
2    A.   Correct.
3        MR. MATTHEWS:  TOT 1304, John.
4        (Letter marked as Defendant's
5        Exhibit 22 for identification; 12/6/05,
6        K.R.)
7    Q.   I show you what we've now marked
8  as Exhibit 22, Mr. Garger's letter on behalf
9  of Water Quality Insurance Syndicate
10 confirming the cancellation.
11   A.   Correct.
12   Q.   At that point in time was WQIS
13 willing to continue with this risk under any
14 circumstances?
15   A.   It's a possibility.  I don't think
16 he ever got there.
17   Q.   The letter says, "This
18 cancellation is final" in the second
19 paragraph, does is not?
20   A.   Yes.
21   Q.   What does that mean to you?
22   A.   It appears that we cancelled the
23 policy.
24   Q.   Period, not to be reinstated?
25   A.   Correct.

13 (Pages 46 to 49)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 50

R. Brown

1  Q.  Was that a decision you agreed
2
3  with?
4  A.  Yes.
5  Q.  Was this a risk that WQIS was
6  willing to continue to insure as of August 7,
7  2000?
8  A.  No.
9  Q.  Under any circumstances?
10  A.  No.
11  Q.  Let me ask you this, Mr. Brown,
12  WQIS, as the dominant market participant at
13  this point in time, was not willing to write
14  this risk in the year 2000.  If Lloyds, as
15  the other dominant market participant, was
16  not willing to write this risk in the year
17  2000, is anybody else going to be willing to
18  write it?
19       MR. TREPTOW:  Objection.
20  A.  I would doubt it.  I cannot speak
21  for any of the others.
22       MR. MATTHEWS:  Thank you
23  Mr. Brown, that's all the questions I
24  have.
25

Page 51

R. Brown

1
2  EXAMINATION BY
3  MR. TREPTOW:
4  Q.  Mr. Brown, would you like to take
5  a short break?  We've been going for about
6  an hour.
7  A.  No, that's fine.  I'm okay.
8  Q.  Then let's get to it.
9       My name is John Treptow.  I
10  represent Inlet Fisheries, Inc. and Inlet
11  Fish Producers, Inc.  I have a couple of
12  questions that I'd like to follow up with.
13       First of all, could you tell me,
14  generally, what are your functions as
15  Underwriting Manager for WQIS?
16  A.  I supervise and manage the staff
17  of the underwriters which encompasses setting
18  a budget, approving expense accounts,
19  approving risks outside their authority,
20  keeping daily, quarterly and yearly
21  evaluations on the employees.  Along with
22  that, I do assume underwriting duties on a
23  day-to-day basis as underwriter.
24  Q.  How many underwriters does WQIS
25  currently employ?

Page 52

R. Brown

1
2  A.  We currently employ five,
3  including myself.
4  Q.  Does WQIS currently have written
5  guidelines for underwriting?
6  A.  We have written authorities for
7  the underwriting and underwriting title.
8  Q.  The underwriting authority that
9  you're talking about are documents that
10  evidence the insurers consent that WQIS can
11  underwrite risk for them, is that correct?
12  A.  I'm sorry.  Can you repeat that?
13  Q.  The underwriting authorities that
14  you were talking about, are those documents
15  for the insurers to comprise between WQIS
16  that gives WQIS the authority to bind
17  insurance on their behalf?
18  A.  Does it include that?
19  Q.  Is that what those documents are?
20  A.  Yes.  It's a limited
21  responsibility, yes.
22  Q.  With respect to reviewing a new
23  risk that WQIS is presented with, are there
24  any written guidelines telling the
25  underwriters what information is necessary in

Page 53

R. Brown

1
2  order to arrive at a decision on whether or
3  not WQIS will underwrite a risk?
4  A.  We do have guidelines as far as
5  questions, but no guidelines whether to
6  determine if a risk is acceptable or not.
7  Q.  What types of items are written in
8  those written guidelines?
9  A.  They are a matter of questions
10  upon the specifics upon the vessel and the
11  operator and the owner of the particular
12  vessel and the operations.  It's very similar
13  to the underwriting criteria that I was asked
14  previously.
15  Q.  From 1992 up until the time that
16  you became Underwriting Manager, did WQIS
17  have an underwriting manager?
18  A.  No.
19  Q.  Who was what individual?
20  A.  There was none.
21  Q.  Are you the first underwriting
22  manager with that title at WQIS?
23  A.  Yes.
24  Q.  I'd like you to first take a look
25  at, I believe it's Exhibit 2, to your

CONTINENTAL REPORTING
(800) 308-3377

df000a8b-4038-420a-ab6a-f2d66f161171

Page 54

```
1              R. Brown
2  deposition.
3         Is Exhibit 2 WQIS's policy year
4  for Inlet, policy year June 1992 through June
5  1993?
6      A.   Correct.
7      Q.   Is that a document that was
8  maintained in the regular course of WQIS's
9  business?
10     A.   The document itself?
11     Q.   No, the file itself?
12     A.   The file itself, yes.
13     Q.   Would there be any information
14 relating to that particular policy that is
15 not contained in the underwriting file?
16     A.   I'm sorry.  Can you restate the
17 question?
18     Q.   Would there be any information in
19 WQIS relating to that particular policy, '92
20 to '93 from Inlet that would not be found in
21 that file?
22     A.   Not to my knowledge.
23     Q.   Is there a policy of insurance
24 issued by WQIS in that file?
25     A.   Yes.
```

Page 55

```
1              R. Brown
2      Q.   What is the policy number for that
3  particular policy?
4      A.   9047-01.
5      Q.   What is the insured entity under
6  that policy?
7      A.   Inlet Fisheries, Inc.
8      Q.   The policy period is June 12, 1992
9  to June 12, 1993, correct?
10     A.   Correct.
11     Q.   Scheduled vessels shows that the
12 vessels being insured are the Maren I and
13 Quanirtuuk Princess, is that correct?
14     A.   Correct.
15     Q.   Could you look in Exhibit 2 and
16 tell me what information was provided to WQIS
17 prior to underwriting that policy with
18 respect to the vessels that were insured
19 under that policy?
20     A.   Let me take a look.
21     MR. MATTHEWS:  John, while
22 he's doing that, can I take you up on
23 that short break?
24     MR. TREPTOW:  Sure.
25     (A recess was taken.)
```

Page 56

```
1              R. Brown
2  EXAMINATION CONTINUES
3  BY MR. TREPTOW:
4      A.   (Continuing) I've reviewed the
5  file.
6      MR. TREPTOW:  Tom, did you make
7  copies of those document numbers I sent
8  you.
9      MR. MATTHEWS:  Yes, I did.
10     MR. TREPTOW:  Could you have the
11 court reporter mark WQIS 428 and 427?
12     (Documents marked as Defendant's
13 Exhibit 23 and 24 for identification;
14 12/6/05, K.R.)
15     Q.   Can you look at Exhibit 23,
16 please?
17     A.   Yes.
18     Q.   Mr. Brown, is Exhibit 23 found in
19 WQIS's file, Exhibit 2?
20     A.   Yes, it is.
21     Q.   Could you identify Exhibit 24?  Is
22 that document also found in WQIS's file,
23 Exhibit 2?
24     MR. MATTHEWS:  Sorry, John.  I had
25 stapled them together.  I thought that
```

Page 57

```
1              R. Brown
2  was the way you wanted them.  We'll
3  separate them.
4      A.   Yes, this is also in the policy.
5      Q.   Would I be correct that Exhibit 23
6  is a fax from Totem Agencies to WQIS
7  requesting pollution coverage on the Maren I
8  and the QP in the amount of $500,000,
9  correct?
10     A.   Correct.
11     Q.   The gross tonnage for the vessels
12 is provided, correct?
13     A.   Yes.
14     Q.   The fax indicated that both
15 vessels are non-authorized barge operating
16 port risk in Bethel, Alaska correct?
17     A.   Yes.
18     Q.   To your knowledge, from your
19 review of Exhibit 2, is there any other
20 information for those two vessels or Inlet
21 Fisheries in Exhibit 2?
22     A.   No.
23     Q.   Is Exhibit 24 a response to
24 Exhibit 23 WQIS to Totem?
25     A.   It appears so, yes.
```

15 (Pages 54 to 57)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 58

R. Brown

1
2      Q.   Does Exhibit 24 indicate that
3   WQIS's binding coverage for the following
4   barges to a limit of $500,000 for each vessel
5   effective June 12, 1992 to 1993?
6      A.   Correct.
7      Q.   Would I be correct in assuming
8   that the premiums have been calculated by
9   WQIS based solely on the gross registered
10  tonnage of each vessel?
11     A.   No.
12     Q.   What other information was used in
13  coming up with the premiums?
14     A.   I'm led to believe the type of
15  vessel and the port risk status and the
16  location of the vessel are taken into
17  account.
18     Q.   Is there any information in
19  Exhibit 2 as to the pollution loss history of
20  the Inlet entities -- vessels going to be
21  insured under this policy?
22     A.   Not that I'm aware of.
23     Q.   Is there any information in
24  Exhibit 2 dealing with the pollution loss
25  history of the two vessels to be insured?

Page 59

R. Brown

1
2      A.   No.
3      Q.   Is there any information in
4   Exhibit 2 that shows the age of those
5   vessels?
6      A.   No, not that I see.
7      Q.   Is there any information in
8   Exhibit 2 that indicates what the general
9   condition of those two vessels is?
10     A.   Not that I see.
11     Q.   Is there any information in
12  Exhibit 2 that indicates which other
13  insurance Inlet may have for those two
14  vessels?
15     A.   No, not that I see.
16     Q.   Despite that lack of information
17  that we just enumerated as to what was not in
18  the file, is it true that WQIS went ahead and
19  issued a policy of insurance providing vessel
20  pollution coverage to Inlet?
21     A.   Yes, it appears so.
22     Q.   Have you reviewed the rest of the
23  files, Exhibits 3 through 10, in preparation
24  for this deposition?
25     A.   Yes, I went through them.

Page 60

R. Brown

1
2      Q.   Do you recall seeing in any of
3   those policies in those files any information
4   about the loss history of Inlet Fisheries,
5   Inc. or Inlet Fish Producers, Inc.?
6      A.   Not that I've seen.
7      Q.   In any of those files from 1992 to
8   2000, did you see any information regarding
9   the age of the vessels?
10     A.   No.
11     Q.   How about the general conditions?
12     A.   Perhaps on the last policy when
13  there were questions on it, but nothing
14  specific to the other policy folders.
15     Q.   That would have been the very
16  last, Exhibit 10, for policy year 2000-2001
17  that you entered information about the
18  vessels' conditions correct?
19     A.   Correct.
20     Q.   What about other insurance for the
21  period, 1992 through 2000?  Do you recall
22  seeing any information at all in those files
23  about what other insurance Inlet entities may
24  have had?
25     A.   Not that I recall in the earlier

Page 61

R. Brown

1
2   files.
3      Q.   Mr. Brown, are you aware of any
4   pollution losses by the Inlet vessels insured
5   by WQIS from 1992 up through April of 2000?
6      A.   Not to my knowledge.
7      Q.   Would it be fair to say, sir, that
8   after 1992-93 policy years that WQIS
9   automatically renewed the vessel pollution
10  for the Inlet vessels?
11     A.   It appears that WQIS renewed as
12  expired on a regular basis.
13     Q.   In renewing them before they
14  expired, did you see anything to indicate
15  that WQIS at any time from '92 up through
16  April of 2000 requested any type of
17  information from Inlet through a broker?
18     A.   Not that I have seen written, no.
19     Q.   How about any direct requests from
20  WQIS to Inlet?  Did you see any requests for
21  information in that regard?
22     A.   Not to my knowledge, no.
23     Q.   You have submitted an affidavit in
24  this case, have you not, sir, on the Lloyds
25  case?

16  (Pages 58 to 61)

Page 62

R. Brown

1
2    A.    Yes.
3    Q.    Do you have that affidavit in
4  front of you?
5    A.    A declaration?
6    Q.    Yes.
7    A.    Yes.
8    Q.    In paragraph ten of your
9  declaration you state, "When a prospective
10  insured seeks vessel pollution insurance from
11  WQIS, I expect the insured to comply with the
12  duty of utmost good faith and disclose all
13  facts know to him that are material to the
14  risk."
15        Did I read that correctly?
16    A.    Yes.
17    Q.    With respect to information that
18  was disclosed in 1992, we had the gross
19  tonnage of the vessel that they were
20  non-authorized, that they were on port risk
21  and that they were in Bethel, Alaska;
22  correct?
23    A.    Correct.
24    Q.    That is the extent of the
25  information that was provided about Inlet and

Page 63

R. Brown

1
2  the vessels to be insured, correct?
3    A.    It appears it's the only extent
4  that was written.
5    Q.    Well, then in 1992 with the
6  information that was provided as reflected in
7  Exhibit 23, all the information that WQIS
8  needed to make a decision as to whether or
9  not to insure the Maren I and the QP for the
10  policy year '92 through '93?
11    A.    I can't make a comment on that
12  time period, as far as exactly what
13  information they had collected and assumed
14  the risk on.
15    Q.    In reviewing exhibits for the
16  policy in question, Exhibits 2 through 10,
17  did you see any information about the Maren I
18  and the QP, other than their gross tonnage,
19  the fact that they were non-authorized barges
20  and port risks in Bethel, Alaska?
21    A.    No, I did not.
22    Q.    In 2000, QP was insured and so was
23  the Maren I, do you recall that?
24    A.    Yes.
25    Q.    Do you recall that there were also

Page 64

R. Brown

1
2  two other vessels insured in that year?
3    A.    Yes.
4    Q.    Do you know where those vessels
5  were located?
6    A.    I'd have to review the file.
7        MR. MATTHEWS:  Off the record.
8        (A conversation was held off the
9  record.)
10    A.    I've reviewed the file.
11    Q.    Do you know where in that policy
12  here that the other two vessels that were
13  insured under the policy are located?
14    A.    Physically located?
15    Q.    Yes, sir.
16    A.    It does not say.  I cannot find
17  the information.
18    Q.    Could you look at Exhibit 10.  I'd
19  like to ask you some questions about the
20  policy itself.
21    A.    Exhibit 10?
22    Q.    Yes, which is the folder for
23  policy year 2000 to 2001.
24    A.    Yes.
25    Q.    I've got some specific questions

Page 65

R. Brown

1
2  about the policy itself.
3    A.    Okay.
4    Q.    Do you have the policy?
5    A.    Yes, I do.
6        MR. TREPTOW:  Could we mark that
7  policy next in order please?
8        MR. MATTHEWS:  John, I've printed
9  a separate copy of that.
10        MR. TREPTOW:  Okay.  The separate
11  copy is fine.
12        MR. MATTHEWS:  You want the 2000
13  policy right?
14        MR. TREPTOW:  Right.  Starting
15  with WQIS 52.
16        MR. MATTHEWS:  Fifty-two?
17        MR. TREPTOW:  Right, 52 through
18  63.
19        MR. MATTHEWS:  Sorry.  That wasn't
20  one of the ones that was in my
21  packet.
22        MR. TREPTOW:  That was the one
23  that you sent an e-mail on.
24        Why don't we take the policy for
25  2000-2001 out of Exhibit 10 and Mark it

17 (Pages 62 to 65)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 66

```
 1          R. Brown
 2    Exhibit 25.
 3         (Fax marked as Defendant's Exhibit
 4    25 for identification; 12/6/05, K.R.)
 5         MR. SACKS:  Why don't we just
 6    refer to it as part of Exhibit 10 in
 7    global?
 8         MR. TREPTOW:  That's fine.
 9         MR. SACKS:  You can identify a
10    specific page through some means of
11    description.
12    EXAMINATION CONTINUES
13    BY MR. TREPTOW:
14    Q.   Mr. Brown, do you have in front of
15    you the WQIS policy that covers the Inlet
16    vessels from June of 2000 to June of 2001?
17    A.   Yes.
18    Q.   What is the policy number for that
19    particular policy?
20    A.   That's 30-16489.
21    Q.   Is policy number 30-16489 a policy
22    of insurance that WQIS cancelled finally in
23    August of 2000?
24    A.   Yes.
25    Q.   If you could turn to the last page
```

Page 67

```
 1          R. Brown
 2    of the policy, the one with the list of
 3    subscribers?
 4    A.   Correct.
 5    Q.   Down at the bottom it has
 6    countersigned in New York, New York,
 7    April 28, 2000 stamped in there.  Do you see
 8    that?
 9    A.   Yes.
10    Q.   What is the significance of the
11    countersigned in New York and an April 28th
12    of 2000 date?
13    A.   That's actually the signature
14    upon -- you're acting as the agent for the
15    subscriber and you're enacting the policy
16    upon signing that section of the actual
17    subscription list.
18    Q.   Do you know who signed it on the
19    28th?
20    A.   We do not keep a signed copy
21    inside the policy.  The signed policy has
22    only one copy made and that's the original
23    and it goes to the insured.
24    Q.   Who typically in April of 2000
25    would sign those?
```

Page 68

```
 1          R. Brown
 2    A.   In 2000, I believe the only people
 3    who had the power of signature were
 4    Richard Hobbie, whose signature is to the
 5    left, and Harry Yerkes.
 6    Q.   Would it be correct in signing
 7    this, dating it April 28th of 2000, that the
 8    underwriters reflected above that by the
 9    signature were agreeing to bind coverage for
10    Inlet for the vessels specified in that
11    policy?
12    A.   Yes.
13    Q.   Is it true that subsequent to
14    April 28th of 2000, WQIS learned that the
15    Maren I spilled?
16    A.   Yes.
17    Q.   In providing notification to Inlet
18    of the cancellation, it was indicated by WQIS
19    that the policy was being cancelled under
20    part H the policy correct?
21    A.   Correct.
22    Q.   Does part H require WQIS to state
23    any reason for the cancellation of its
24    policy?
25    A.   No.
```

Page 69

```
 1          R. Brown
 2    Q.   Is it true under part H of this
 3    particular policy WQIS can cancel the policy
 4    for any reason or no reason at all?
 5    A.   Correct.
 6    Q.   Likewise, the insured under that
 7    policy could have cancelled for any reason or
 8    no reason at all, correct?
 9    A.   Correct.
10    Q.   If that's the case, if after
11    citing part H, which is the cancellation
12    letter, why is there a reference to the
13    vessels surveyed and a failure to pay
14    premiums?
15    A.   Can you repeat the question again?
16    Q.   In light of the fact that part H
17    is cited and what you've already testified to
18    there is no reason for WQIS to cancel the
19    policy, why then after citing part H are
20    reasons for cancellation given that there was
21    no survey secured and the premiums were not
22    paid?
23    A.   We didn't have to give a reason
24    but we did.
25    Q.   Are you aware in this case that
```

18 (Pages 66 to 69)

Page 70

R. Brown

1  there was a returned premium by WQIS sent to
2  Inlet for policy year 2000-2001?
3      A.   No, not to my knowledge.
4      Q.   I'd like you to assume that that
5  happened.  Assuming that happened, did that
6  indicate to you that Inlet had in fact paid
7  the premium for the policy year if there was
8  a return of payment?
9      A.   I can't make comments upon the
10  procedures of the Accounting Department at
11  that time, but it can be a mistake.
12     Q.   With the general accounting
13  practice, you wouldn't expect WQIS to return
14  a premium to an insured that had not been
15  paid?
16     A.   No.
17     Q.   Do you know whether or not WQIS
18  paid claims submitted by Inlet for the spills
19  by the Maren I?
20     A.   To the extent I'm not sure.
21         MR. TREPTOW:  Tom, do you have
22  WQIS 6 and 7 there?
23         MR. MATTHEWS:  I do.
24         MR. TREPTOW:  Could you have that

Page 71

R. Brown

1  next in order please?
2         MR. MATTHEWS:  Do you want that as
3  one exhibit or two?
4         MR. TREPTOW:  One, I believe.
5         MR. SACKS:  I'm looking at the
6  particular exhibit here to be
7  marked as 25 and I believe that comes
8  from claims and we have the underwriting
9  file here and under the 30(b)(5) and
10  30(b)(6) notice, the witness has been
11  designated to discuss the underwriting
12  issues and the non-renewal issues and
13  I've allowed some questions concerning
14  the knowledge of the claim insofar as it
15  might affect underwriting  or renewal or
16  cancellation.  I just want to caution
17  you, I don't want to get too far afield
18  and this witness really can't
19  answer any questions concerning the
20  claim side.
21     Q.   Let me ask you this then, with
22  respect to the underwriting for and the
23  cancellation of the policy 2000 and 2001,
24  Mr. Brown, did the fact that WQIS apparently

Page 72

R. Brown

1  paid a loss in the amount of $88,763.34 on
2  the Maren I impact at all on WQIS's decision
3  to cancel the policy for 2000-2001?
4      A.   For the loss itself, it did
5  influence our decision, yes.
6      Q.   I'm sorry, it did not?
7      A.   It did, yes.
8      Q.   Did the amount of the loss paid
9  influence your decision?
10         MR. MATTHEWS:  Objection to form.
11     A.   I wasn't aware of the exact amount
12  of the loss.
13     Q.   Are you aware of whether or not a
14  payment was made on the policy number
15  30-16429, a policy that was cancelled by
16  WQIS?
17     A.   Say that again.
18     Q.   Were you, in August of 2000, aware
19  that there was a loss by the vessel Harvester
20  Barge and the claim was submitted to WQIS for
21  that loss?
22     A.   I was not aware of that.
23     Q.   To your knowledge, I take it that
24  you had nothing to do with that particular

Page 73

R. Brown

1  bill in August of 2000?  It had to deal with
2  the Underwriting Department's decision to
3  cancel the 2000-2001 policy?
4      A.   No.
5         MR. TREPTOW:  If you'll give me a
6  second, I think I'm about done, but I'd
7  like an opportunity to check my notes.
8         MR. MATTHEWS:  Fair enough.  Would
9  you like to go off record?
10         MR. TREPTOW:  Yes, why don't we do
11  that.
12         (A discussion was held off the
13  record.)
14     Q.   Back in the May to June time frame
15  of 2000, do you know if anyone from Totem
16  volunteered to provide surveys of the four
17  vessels insured by WQIS to WQIS?
18     A.   Not that I'm aware of.
19     Q.   Did anybody at Totem advise WQIS
20  that surveys of the four vessels had been
21  done in 1998?
22     A.   Not that I'm aware of.
23     Q.   Did anybody at Totem advice WQIS
24  that 1999 Inlet had followed up the

19 (Pages 70 to 73)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 74

R. Brown

1    R. Brown
2  surveyor's recommendations for those four
3  vessels and provided information as to what
4  repairs had been undertaken and would be
5  undertaken in 1999?
6        MR. MATTHEWS:  Objection to form.
7     A.   I have no knowledge of that.
8     Q.   In early June of 2000, Totem was
9  advised that the QP, one of two vessels
10  surveyed, was surveyed by Alexander Gowe and
11  Company, correct?
12     A.   Correct.
13     Q.   Where was Alexander Gowe and
14  Company located?
15     A.   I'm not sure.  I'd have to take a
16  look at the file.  I think we have a number
17  and a reference, but I'm not sure about the
18  exact location of where they are out of.
19        MR. SACKS:  Do you need the
20     witness to look that up or you just want
21     to know if he knows --
22        MR. TREPTOW:  I just want to know
23     if he knows whether or not Alexander
24     Gowe has any surveyors in Alaska.
25     A.   I'm not aware of that.

Page 75

R. Brown

1        R. Brown
2     Q.   Is it fair to say that in the
3  first part of June you told Inlet that you
4  want the vessels surveyed and that by June
5  21, because Inlet has not contacted
6  Alexander Gowe, that WQIS had then attempted
7  to cancel the coverage for 2000-2001; is that
8  correct?
9     A.   Could you repeat that again?
10     Q.   The first part of June you advised
11  Totem that WQIS wants the vessels surveyed by
12  Alexander Gowe, correct?
13     A.   Correct.
14     Q.   As of June 21st, is it your
15  understanding -- WQIS' understanding -- that
16  no one from Inlet had contacted Gowe about
17  the surveys, correct?
18     A.   I'm not aware of that, no.
19     Q.   Wasn't it because no one from
20  Inlet had contacted Gowe about the surveys
21  that WQIS on June 21st decided to cancel the
22  policy for 2000-2001?
23     A.   No.  We had not received surveys
24  themselves.  I'm not sure if we are aware if
25  they had been contacted or not, but we gave

Page 76

R. Brown

1        R. Brown
2  them an additional 30 days to get those
3  surveys as per notice of cancellation.
4     Q.   Did you mean by "additional 30
5  days to get the surveys" done because you
6  were affording them the opportunity to do
7  that or were you doing that because you
8  wanted to comply with Alaska law?
9     A.   We were affording them the
10  opportunity to get the surveys done, but in
11  protecting our own interests we did put a
12  notice of cancellation and then had to amend
13  our notice of cancellation to comply with
14  Alaska law.
15     Q.   In August of 2000, didn't you make
16  it clear that in the event that the survey
17  requirement had been complied with and the
18  payments paid, that WQIS still attempted to
19  cancel the policy?
20     A.   At that point the cancellation was
21  final, yes.
22     Q.   That was regardless of whether or
23  not they had complied with the survey
24  requirements, regardless of whether or not --
25        MR. SACKS:  Could you repeat that,

Page 77

R. Brown

1        R. Brown
2     counselor, so the court reporter could
3     hear?
4     Q.   On August the 7th, you advised
5  Inlet Fisheries that regardless of whether or
6  not the survey requirements had been complied
7  with and regardless of whether or not the
8  payment had been paid, WQIS cancelled all
9  payments providing a 60-day notice as a
10  cancellation?
11     A.   That time we had received neither
12  of those and decided that this was a risk we
13  did not want to be part of.
14     Q.   Let me ask you this, by August the
15  7th of 2000, what did you know -- what did
16  WQIS know about age and the condition of the
17  QP?
18     A.   We did not know anything.  That's
19  why we requested a formal survey.
20     Q.   Similarly with respect to the
21  being of Harvester Barge as of August 7th of
22  2000, what, if anything, did you know about
23  the age or condition of those two vessels?
24     A.   I'm sorry.  Could you repeat that?
25     Q.   As of August 7th of 2000, what did

20  (Pages 74 to 77)

Page 78

R. Brown

1   WQIS know about the age and condition of the
2   vessels Fort Yukon and Harvester Barge, two
3   of the vessels insured under that policy?
4       A.   I'm not sure if we knew of
5   anything formally.
6       Q.   Did you know where it was located?
7       A.   I'm not particularly sure that we
8   always know the locations of any of our
9   vessels at one time.
10      Q.   Exhibit 23, which is the fax from
11  Totem to WQIS in 1992, was there anything
12  significant to WQIS in that the fact that the
13  barges were non-authorized and operating port
14  risk?  Is that significant from an
15  underwriting standpoint?
16      A.   Yes, it does influence the rate.
17      Q.   I know you weren't employed by
18  WQIS in 1992, but currently in terms of port
19  risk, what is the significance of that fact
20  as it relates to underwriting factors at
21  WQIS?
22      A.   According to the terms of the
23  policy, port risk is defined as laid up and
24  out of commission.
25

Page 79

R. Brown

1       MR. TREPTOW:  I have no further
2   questions.
3       Thank you.
4       MR. MATTHEWS:  I have just a few
5   questions to follow-up if I can.
6   EXAMINATION BY
7   MR. MATTHEWS:
8       Q.   You were asked some questions
9   about Exhibit 25, and this is a fax dated
10  April the 29th 2003 from Totem Agencies to
11  WQIS requesting a loss rung, correct?
12      A.   Correct.
13      Q.   Along with an attached loss rung?
14      A.   Yes.
15      Q.   The question you were asked
16  earlier was whether or not the fact that WQIS
17  had paid money, I think, influenced the
18  decision to cancel because of these losses
19  and I want to make sure that we're clear.
20  Did the amount of the claim influence WQIS'
21  decision to cancel this policy in any way?
22      A.   No.
23      Q.   In fact, do you know whether WQIS
24  had paid any money at all for indemnity
25

Page 80

R. Brown

1   purposes on this loss prior to the time the
2   cancellation was issued in August of 2000?
3       A.   Im not aware of it.
4       Q.   Can you tell from looking at the
5   loss rung that's attached to Exhibit 25 when
6   those payments were made?
7       A.   No.
8       Q.   Is it fair to say the cancellation
9   was made irrespective of what the
10  significance of the loss was?
11      A.   Correct.
12      Q.   It was the fact that the claim
13  involving the Maren I had brought to WQIS's
14  attention the condition of the vessels?
15      A.   Correct.
16      Q.   Was that what concerned you at the
17  time of the cancellation?
18      A.   Yes.
19      Q.   Do you know whether or not WQIS
20  reserved its rights on the Maren I claim?
21      A.   I'm not aware of that.  That would
22  be a Claims function.
23      Q.   It is not something that you would
24  get involved in at all from an underwriting
25

Page 81

R. Brown

1   perspective?
2       A.   No.
3       Q.   If the Claims Department of WQIS
4   reserved rights suggesting that the vessels
5   had not been maintained in a sea worthy
6   condition, is that information that would
7   have come from Underwriting, to your
8   knowledge?
9       A.   That would have come from
10  Underwriting?
11      Q.   Yes.
12      A.   No.
13      Q.   That would have been something
14  that the Claims Department gathered on their
15  own?
16      A.   Correct.
17      Q.   Would that be information they
18  would pass on to Underwriting typically?
19      A.   Yes.
20      Q.   You were asked some questions
21  toward the end by Mr. Treptow about whether
22  or not anyone from Totem ever offered to
23  provide surveys to you.  Do you remember
24  that?
25

21 (Pages 78 to 81)

Page 82

R. Brown

1
2    A.    Yes.
3    Q.    Is it the case that in June of
4  2000, that was the first time that WQIS had
5  ever requested a survey on the Maren I
6  account?
7    A.    To my knowledge no.
8    Q.    Is it fair to say that once the
9  Maren I claim happened, this account got
10  scrutinized like it had never had before?
11    A.    Yes; it drew attention to it.
12    Q.    It drew attention to the fact that
13  the account wasn't the risk that you were
14  willing to remain on?
15    A.    Correct.
16    Q.    Ultimately, regardless of the
17  condition of the vessels or whether the
18  premiums had been paid, WQIS was not willing
19  to entertain this risk any further?
20    A.    Yes.
21    MR. MATTHEWS:  Thank you.
22    I have
23  nothing further.
24    MR. TREPTOW:  Can I have two more
25  questions?  Then I'm done.  I promise.

Page 83

R. Brown

1
2  EXAMINATION BY
3  MR. TREPTOW:
4    Q.    I believe you told us, Mr. Brown,
5  that one of the underwriting factors that
6  WQIS looks to is other insurance that a
7  vessel has, is that correct?
8    A.    Yes.
9    Q.    From WQIS' perspective, what is
10  the importance of vessels having other
11  insurance on the vessels to WQIS?
12    A.    The only significance is
13  determined if we're bearing any additional
14  risk by them not having removal of wreck or
15  any potential coverage for salvage that may
16  get turned on to the pollution underwriter if
17  they're the only insurance available.
18    Q.    Does WQIS typically require
19  vessels to have hull and machinery and P and
20  I insurance?
21    A.    Yes.
22    Q.    I take it, from your review of the
23  files -- and there is absolutely no
24  indication in WQIS's files that Inlet had
25  such insurance on its vessels from '92 to

Page 84

R. Brown

1
2  2000, correct?
3    A.    Yes.  Upon underwriting in '92, it
4  appears the information was a little bit more
5  limited as far as written information
6  collected is concerned.
7    Q.    In your experience to insure and
8  supervise, do hull and machinery and
9  protection and indemnity routinely require
10  surveys from the vessels that they insure?
11    MR. SACKS:  I'm just going to
12    object to that question.  He can't
13    answer what other hull and machinery
14    insurers do.
15    Q.    Your answer?
16    A.    I can't comment on what they do or
17  do not require or normally do.
18    (Continued on next page.)
19
20
21
22
23
24
25

Page 85

R. Brown

1
2    MR. SACKS:  We're getting a little
3    out of the scope here, counselor.  I'm
4    trying to work with you, but you're
5    getting beyond the scope of this
6    30(b)(5), 30(b)(6) deposition.
7    MR. TREPTOW:  I don't have any
8    more questions.
9    Thank you, Mr. Brown.
10    Thank you, counsel.
11    MR. MATTHEWS:  Can I follow-up
12  with one more question?
13    MR. SACKS:  That's between you
14  guys.
15    Go ahead.
16  EXAMINATION BY
17  MR. MATTHEWS:
18    Q.    On the question of underwriting,
19  Mr. Brown, do your underwriting rates assume
20  that there is P and I coverage and hull and
21  machinery coverage?
22    A.    Could you repeat that again?
23    Q.    You were just asked a number of
24  questions about P and I coverage and hull and
25  machinery coverage.  Is it fair to say you

22  (Pages 82 to 85)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 86

```
1              R. Brown
2  assume that there is P and I coverage because
3  of wreck removal and salvage considerations?
4      A.   Yes.
5      Q.   Do your rates reflect that
6  assumption?
7      A.   There would be a significant
8  increase in rates if there were no hull or P
9  and I underwriters to take that risk.
10     Q.   Technically.
11         MR. MATTHEWS:  I have no further
12  questions.
13         MR. TREPTOW:  No questions.
14         (TIME NOTED 4:35 P.M.)
15
16
17         _____
18            RUSSELL BROWN
19
20  Sworn To Before Me This
21  _____ day of_____ 2005.
22
23
24  _____
25  Notary Public State of New York
```

Page 88

```
1
2  EXHIBITS:  (Continued)
3  21        Fax        48
4  22        Letter     49
5  23-24      Fax        56
6  25        Fax        66
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 87

```
1
2              INDEX
3  WITNESS              PAGE
4  RUSSELL BROWN          4
5
6  EXAMINATION BY          PAGE
7  MR. MATTHEWS           4
8  MR. TREPTOW           51
9  MR. MATTHEWS          79
10  MR. TREPTOW          82
11  MR. MATTHEWS         85
12
13  EXHIBITS            PAGE
14  1      Notice         4
15  2-10      File Folders    6
16  11       Declaration    13
17  12       Letter        31
18  13       Handwritten Note   32
19  14       Handwritten Note   34
20  15-16      Handwritten Notes  37
21  17       Fax          40
22  18       Fax          43
23  19       Fax          44
24  20       Handwritten Note   47
25
```

Page 89

```
1
2          C E R T I F I C A T E
3
4  STATE OF NEW YORK  )
4                     )  ss.:
   COUNTY OF NEW YORK )
5
6      I, KEITH RUDOLPH, a Notary Public
7  of the State of New York, do hereby certify
8  that the foregoing deposition of
9  RUSSELL BROWN was taken before me on
10  December 6, 2005.
11      The said witness was duly sworn
12  before the commencement of his testimony; the
13  said testimony was taken stenographically by
14  myself and then transcribed.  The within
15  transcript is a true record of the said
16  deposition.
17      I am not connected by blood or
18  marriage with any of the said parties, nor
19  interested directly or indirectly in the
20  matter in controversy, nor am I in the employ
21  of any of the Counsel.
22
23      Dated:          New York,
24
25              Keith Rudolph
```

23 (Pages 86 to 89)

df000a8b-4038-420a-ab6a-f2d66f161171

Page 90

```
 1
 2          ERRATA SHEET
 3     I wish to make the following changes,
 4  for the following reasons:
 5  PAGE LINE
 6  ____ ___ CHANGE:_____
 7          REASON:_____
 8  ____ ___ CHANGE:_____
 9          REASON:_____
10  ____ ___ CHANGE:_____
11          REASON:_____
12  ____ ___ CHANGE:_____
13          REASON:_____
14  ____ ___ CHANGE:_____
15          REASON:_____
16  ____ ___ CHANGE:_____
17          REASON:_____
18  ____ ___ CHANGE:_____
19          REASON:_____
20  ____ ___ CHANGE:_____
21          REASON:_____
22  ____ ___ CHANGE:_____
23          REASON:_____
24  ____ ___ CHANGE:_____
25          REASON:_____
```

CONTINENTAL REPORTING
(800) 308-3377

df000a8b-4038-420a-ab6a-f2d66f161171