```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3   CERTAIN UNDERWRITERS AT LLOYDS,  )
     LONDON, SUBSCRIBING TO           )
 4   CERTIFICATE OF INSURANCE         )
     OP01 0025, through Puget Sound   )
 5   Underwriters, Inc.,              )
                                      )
 6                 Plaintiffs,        )
                                      )
 7   vs.                              )
                                      )
 8   INLET FISHERIES, INC., an        )
     Alaska Corporation, and          )
 9   INLET FISH PRODUCERS, INC.,      )
     an Alaska Corporation,           )
10                                    )
                   Defendants,        )
11   _____)
                                      )
12   INLET FISH PRODUCERS, INC.,      )
     an Alaskan Corporation,          )
13                                    )
         Third-Party Plaintiffs,      )
14                                    )
     vs.                              )
15                                    )
     TOTEM AGENCIES, INC., a          )
16   Washington Corporation, and      )
     AMERICAN E&S INSURANCE BROKERS   )
17   CALIFORNIA, INC., a Washington   )
     Corporation,                     )
18                                    )
         Third-Party Defendants.      )
19   _____)
     IN ADMIRALTY
20   USDC Alaska No.:  A04-0058 CV
21
            VIDEOTAPE DEPOSITION OF VINCENT L. GODDARD
22             30(b)(6) of INLET FISHERIES, INC.
23                      November 10, 2005
24
25
```

RECEIVED
MATTHEWS & ZAHARE
NOV 2 3 2005
File No. 3500-13
Atty TPM
Approved to File

Exhibit J
Page 1 of 7

Page 22

```
 1         this litigation involving Lloyds.
 2    A    I believe so.
 3    Q    If you flip over to the next page, 2215, that appears to
 4         show liabilities and equity.....
 5    A    Uh-huh.
 6    Q    .....as of December 31, 2003?
 7    A    Yes.
 8    Q    If I'm reading this correctly, it shows roughly
 9         5.9 million in total liabilities.
10    A    Yes.
11    Q    Is it fair for me to conclude based upon the sale of the
12         assets that we just looked at that Inlet Fisheries, Inc.
13         still has liabilities in excess of 4 million?
14    A    Yes.
15    Q    And no current ability to pay any of those liabilities.
16    A    No.
17    Q    To your knowledge, is there any reflection in these
18         financial statements that we've just been looking at for
19         claims by the Bethel fisherman relating to the QP?
20    A    No.
21    Q    Do you know why not?
22    A    It was, you know, their claimed damages, which we do not
23         believe have much validity and they've never been
24         quantified.
25    Q    So at this point they're unliquidated, obviously.
```

Computer Matrix, LLC　　　　Phone - 907-243-0668　　Exhibit ___　　　jpk@gci.net
310 K Street, Suite 200　　　Fax　　907-243-1473　　　　　　　　　　sahile@gci.net
　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 2 of 7

Page 48

```
 1   Q      Is there currently an agreement in place of any kind
 2          settling claims made by the US government related to the
 3          QP?
 4   A      Once again I'll interpret your meaning of the word
 5          agreement to be a written, formal, legally-binding
 6          document and answer that as no.
 7          MR. MATTHEWS:  Let me do this.  John, just to make sure
 8   that we're clear on the documents, I think we mentioned this
 9   off the record, but rather than go through the documents that
10   have been produced one by one to authenticate them, you and I
11   are going to try and see if we can't stipulate that they're all
12   business records and to the authenticity.  Is that fair?
13          MR. TREPTOW:  They're all business records and I so
14   stipulated to them.
15          MR. MATTHEWS:  Okay.  I think I'm done with Inlet
16   Fisheries, Inc.  I want to take a quick look at my notes.
17   Let's take a short break.
18          (Off record)
19          (On record)
20   Q      I just have a few more follow-up questions if I can,
21          Mr. Goddard.  In 2002, at the time of the QP spill, Inlet
22          Fisheries, Inc. was not operating, correct?
23   A      Correct.
24   Q      If there had been on marine pollution insurance coverage
25          for the QP in August of 2002, how would Inlet Fisheries,
```

Computer Matrix, LLC                Phone - 907-243-0668                              jpk@gci.net
310 K Street, Suite 200             Fax    907-243-1473      Exhibit ___              sahile@gci.net
                                                             Page 3 of 7

Page 49

```
 1        Inc.'s operations have been any different?
 2   A    Well, if we'd known back in 2000 that there was no
 3        insurance available for the QP, we may very well have done
 4        something different in order to get rid of the boat,
 5        including scuttling it.
 6   Q    Scuttling it prior to -- you might have scuttled it
 7        yourself?
 8   A    Well, we would have hired Magone to do it.  I discussed it
 9        with him.
10   Q    When?
11   A    When we hired him to do the Maren I.
12   Q    So at the time you were scuttling the Maren I, you were
13        considering scuttling the QP?
14   A    Considering the future potential requirement to do so.
15   Q    Why?
16   A    If a boat has less and less economic value, you have to do
17        something with it.
18   Q    Including sinking it?
19   A    That's one of the alternatives.
20   Q    Is it fair to say that following the 2001 fishing season
21        in Bethel that the QP essentially had no value to Inlet
22        Fisheries, Inc.?
23   A    It was of di minimus value.
24   Q    I was more of a liability than value?
25   A    Certainly with retrospective viewpoint, yes.
```

Computer Matrix, LLC　　　　　　Phone - 907-243-0668　　　　　　　　　　jpk@gci.net
310 K Street, Suite 200　　　　　Fax　　907-243-1473　　Exhibit _____ sahile@gci.net
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page __4__ of __7__

Page 50

```
 1   Q   Was Inlet Fisheries, Inc. actively trying to get rid of it
 2       after 2001?
 3   A   Yes.
 4   Q   And you were actively considering scuttling it?
 5   A   I discussed it with Dan Magone when the contract with the
 6       Maren I was finalized, which didn't actually occur until
 7       the -- I believe it was until the spring of 2001.
 8   Q   The Maren I was actually scuttled in '01, is that right?
 9   A   Right.
10   Q   Did you make any notes of your conversation with Dan
11       Magone?
12   A   No.
13   Q   Did you get a price for scuttling?
14   A   He just said if it was set up in advance and everything
15       was -- there was no problem and the boat was clean, which
16       it was supposed to be, that it would be cheaper than the
17       Maren I.
18   Q   Is it fair to say that by the spring of 2001, when you
19       were having this discussion with Mr. Magone, the QP was
20       not intended to be an operational part of your plan any
21       longer?
22   A   No, it was still intended to be.
23   Q   Its value as an asset was limited?
24   A   Yes.
25   Q   Did you discuss the possibility of scuttling the Maren I
```

Page 51

1  -- excuse me, scuttling the QP with anybody other than Dan
2  Magone?
3  A  Not that I'm -- not that I remember.
4  Q  Did you mention that possibility to anybody at Totem?
5  A  No.
6  Q  Did you discuss it with Patrick Clear?
7  A  It may have been discussed with Patrick. I don't recall
8     any discussion like that though.
9     MR. MATTHEWS: Thank you, Mr. Goddard. That's all I have
10 for Inlet Fisheries, Inc.
11    MR. TREPTOW: Can we take a two second break? I may have
12 some questions for him.
13    MR. MATTHEWS: Sure.
14    (Off record)
15    (On record)
16                    VINCENT L. GODDARD
17 testified as follows on:
18                    CROSS EXAMINATION
19 BY MR. TETLOW:
20 Q  Mr. Goddard, when was the first year that the QP and the
21    Maren I were insured under separate marine pollution
22    insurance policies, if you recall?
23 A  I believe it was sometime around 1992 because prior to the
24    Exxon Valdez spill I don't believe there was specific
25    separate oil spill liability insurance. I think that

Computer Matrix, LLC              Phone - 907-243-0668        jpk@gci.net
310 K Street, Suite 200           Fax     907-243-1473    Exhibit ___J___  sahile@gci.net
                                                          Page _6_ of _7_

Page 54

```
 1                    C E R T I F I C A T E

 2    UNITED STATES OF AMERICA        )
                                      ) ss
 3    STATE OF ALASKA                 )

 4         I, Joseph P. Kolasinski, Notary Public in and for the

 5    state of Alaska, residing in Anchorage in said state, do hereby

 6    certify that the deponent in the foregoing matter was duly

 7    sworn to testify to the truth, and nothing but the truth;

 8         That said testimony was taken at the time and place

 9    therein stated;

10         That the testimony of said witness was recorded by

11    videotape and electronically and thereafter transcribed under

12    my direction and reduced to print;

13         That the foregoing is a full, complete, and true record of

14    said testimony.

15         I further certify that I am not a relative, nor employee,

16    nor attorney, nor of counsel of any of the parties to the

17    foregoing matter, nor in any way interested in the outcome of

18    the matter therein named.

19         IN WITNESS WHEREOF I have hereunto set my hand and affixed

20    my seal this 22nd day of November, 2005.

21

22                         _____
                           Joseph P. Kolasinski, Notary Public
23                         in and for the State of Alaska.
                           My Commission Expires: 03/12/2008
24

25
```

Computer Matrix, LLC            Phone - 907-243-0668       Exhibit J            jpk@gci.net
310 K Street, Suite 200         Fax     907-243-1473                            sahile@gci.net
                                                           Page 7 of 7