John A. Treptow, ABA #7605059
Wendy E. Leukuma, ABA #0211048
DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, Alaska 99501-5907
Telephone: (907) 276-4557
Facsimile: (907) 276-4152

Attorneys for Inlet Fisheries, Inc.
 and Inlet Fish Producers, Inc.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

CERTAIN UNDERWRITERS AT
LLOYDS, LONDON, SUBSCRIBING TO
CERTIFICATE OF INSURANCE OP01
0025, through Puget Sound Underwriters,
Inc.,

                Plaintiff,

vs.

INLET FISHERIES, INC., an Alaska
corporation, and INLET FISH
PRODUCERS, INC., an Alaska corporation,

                Defendants and Third-
                Party Plaintiffs,

vs.

TOTEM AGENCIES, INC., a Washington
corporation,

                Third-Party Defendant.

Case No. A04-0058 CV (JWS)

**INLET ENTITIES' OPPOSITION TO
TOTEM AGENCIES' MOTION FOR
<u>SUMMARY JUDGMENT</u>**

## I.    INTRODUCTION

       Totem Agencies, Inc. ("Totem") mischaracterizes the negligence claim asserted by

Inlet Fisheries, Inc. ("IFI") and Inlet Fish Producers, Inc. ("IFP") (collectively "Inlet" or

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

"Inlet entities") and ignores their breach of contract claim entirely. Had Totem correctly completed the Inlet entities' application for marine pollution insurance, Lloyds would have either (1) issued the policy at a higher rate, or (2) rejected Inlet's application. If accepted, Inlet would have been insured. If rejected, Inlet would have had an opportunity to protect itself by other means. Because of Totem's failure to complete Inlet's application correctly, however, neither result occurred. Rather, Inlet was lulled into a false sense of security. Totem is therefore liable for Inlet's resulting uninsured losses, as well as all other damages proximately caused by Totem's inept handling of the Inlet entities' application for insurance.

## II.    FACTS & PROCEEDINGS

As this Court is well aware, the dispute at issue in this case arises from a marine pollution insurance policy (the "Lloyds Policy") procured by Totem in August 2000. The Lloyds Policy was declared void *ab initio* by this Court following a determination that the Inlet entities' application for insurance failed to disclose material facts. In particular, this Court found that Inlet failed to disclose its prior loss history and the fact that its current coverage had been cancelled.

The undisputed facts of this case establish that Totem completed the Inlet entities' application for insurance based on the limited information it had in its files and on its own understanding of what the application required. [Parthemer Dep., p. 43, attached hereto as Ex. A; Townsend Dep., pp. 49, 50, 61, 62, attached hereto as Ex. B] Based on conversations with Woody Wilton, Eric Parthemer interpreted the phrase "pollution loss history" to mean the loss history of the vessels to be insured.[1] [Parthemer Dep., pp. 20,

---

[1] Ironically, however, no one at Totem contacted Inlet to determine whether any of the vessels sought to be insured had a loss history. Ron Boardman, also a Totem employee, testified that it was his experience, based on 21 years of experience in the insurance

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

21, Ex. A hereto]  At that time, Totem had never heard of the doctrine of *uberrimae fidei* and was unaware of the insured's obligation to disclose all material risks, whether solicited by the insurer or not.  [Totem Rule 30(b)(6) Dep., pp. 82, 83, attached hereto as Ex. C]  Accordingly, although Totem was fully aware of the MAREN I loss as well as WQIS's impending cancellation of coverage and the reasons therefore, Totem failed to disclose either item on Inlet's application.  [Klier Dep. Ex. 9, attached hereto as Ex. D] Totem also failed to have anyone at Inlet verify the contends of the application, thereby precluding the inclusion of any information regarding the HARVESTER BARGE incident.  [Townsend Dep., pp. 49, 50, 61, 62, Ex. B hereto]

Unfortunately for all involved, Totem's failure to correctly and accurately complete the Inlet entities' application went undetected until after the Lloyds Policy was issued and the Inlet entities suffered a marine pollution incident in late August 2002. This incident involved the QP.  While trying to determine whether it should step in to avoid federalization of the clean-up efforts, Lloyds became aware of the fact that the Inlet entities had suffered a prior undisclosed marine pollution incident (the MAREN I incident).[2]  Lloyds ultimately decided to reserve its rights under the policy and therefore did not step-in to aid in the clean up efforts.

Following the QP incident and Lloyds' reservation of rights in early September of that year,[3] IFP renewed its efforts to sell the HARVESTER BARGE, another vessel insured under the policy, and thereby eliminate the risk of another pollution incident.  In 2001, IFP had discussions about selling the vessel for $60,000 to $70,000.  As a result of

---

industry, that the insured always filled out the insurance application to ensure that correct information is provided.  [Boardman Dep., pp. 30-31, attached hereto as Ex. E]

[2] See October 20, 2004 Order from Chambers at 4-5 [Docket No. 142].

[3] See Ex. F attached hereto (Lloyds' reservation of rights).

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK  99501
(907) 276-4557

the QP spill and Lloyds' reservation of rights, Inlet dropped its asking price to $30,000 to facilitate the vessel's sale. IFP had located a serious buyer and was attempting to close the sale in May 2003, when the HARVESTER BARGE was involved in a pollution incident.

Had Inlet known of its lack of marine pollution coverage in August 2000, it could have avoided both marine pollution incidents entirely. The QP could have been scuttled, and the HARVESTER BARGE sold much sooner. [IFI Rule 30(b)(6) Dep., p. 49, attached hereto as Ex. G; Goddard Aff. ¶ 12, filed herewith] Inlet was, however, unaware of its lack of coverage until it was too late. Although Inlet did its best to reduce its remaining liability, it was unable to do so in time to prevent a second uninsured loss.

## III.    ARGUMENT

### A.    Totem Mischaracterizes Inlet's Negligence Claim

Throughout its motion, Totem frames Inlet's negligence claim in terms of Totem's role in the "voiding of the Lloyds Policy." [Totem Agencies' Motion for Summary Judgment ("Motion") at 6, 10, 15] In doing so, Totem mischaracterizes Inlet's claim. Under Alaska law, an insurance agent or broker who undertakes to procure insurance for another has a duty to procure the requested insurance or promptly advise the prospective insured of his inability to do so. See Peter v. Schumaker Enterprises, Inc., 22 P.3d 481, 485-86 (Alaska 2001) (observing insurance agent's "well-established common-law duty 'to obtain requested coverage for their clients within a reasonable time or inform the client of the inability to do so'") (quoting Murphy v. Kuhn, 682 N.E.2d 972, 974 (1997)); Jefferson v. Alaska 100 Insurance, Inc., 717 P.2d 360, 363-64 (Alaska 1986) (charging insurance agents and brokers who undertake to procure insurance with same duties to prospective insured). Here, however, because of its failure to correctly complete the Inlet

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

entities' application for insurance Totem did neither.  Accordingly, Inlet's negligence claim encompasses both Totem's failure to procure stand-alone marine pollution insurance as well as its failure to notify Inlet of its inability to do so.

### B. Totem is Liable For Inlet's Loss Regardless of Whether Inlet Could Have Obtained a Stand-Alone Marine Pollution Policy

Because Totem's negligence claim is not limited to a failure to procure claim, it does not matter whether stand-alone marine pollution insurance could have been purchased for the Inlet vessels.  To the extent the requested stand-alone policies were not available, Totem had a duty to promptly notify the Inlet entities so that they could protect themselves in some other manner, such as obtaining the coverage through another type of policy or by scuttling or selling the vessels.[4]  Jonas v. Bank of Kodiak, 162 F. Supp. 751, 754 (D. Alaska 1958) (stating that bank collecting insurance premiums had "duty … to notify [] plaintiff that premiums would not give him coverage for which he was paying, so that he could protect himself in some other manner"); Jefferson, 717 P.2d at 364 (explaining that "prompt notification [of cancellation] assures the insured the opportunity to make other arrangements to protect against subsequent losses"); 16 J. Appleman, INSURANCE LAW & PRACTICE § 8841 at 198-200 (West 1981); 3 COUCH ON INS. § 46:48;

---

[4] See IFI Rule 30(b)(6) Dep., p. 49, Ex. G hereto (stating that if IFI had known of the lack of coverage in 2002, it may very well have done something different to get rid of the QP, including scuttling it); IFP Rule 30(b)(6) Dep., p. 10, Ex. H hereto (stating that IFP was actively trying to sell the HARVESTER BARGE at the time of the incident, and that the vessel was sold within one day of terminating the clean-up efforts); Totem Rule 30(b)(6) Dep., p. 69, Ex. C hereto (stand-alone coverage not only means of obtaining marine pollution insurance).  Notably, Mr. Parthemer indicated that marine pollution insurance could have been procured through a P&I policy, but that P&I coverage was not available for the vessels.  [Totem Rule 30(b)(6) Dep., p. 69, Ex. C hereto]  In fact, the vessels did have P&I coverage at the time.  See Exs. U & V hereto.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

1 B. Harnett, RESPONSIBILITIES OF INSURANCE AGENTS AND BROKERS § 3.04 at 3-50 to 3-53 (2005).

Totem did not do so.  Instead, Totem's conduct lulled the Inlet entities into believing they were insured when, in fact, they were not covered at all, thereby denying Inlet the opportunity to explore other methods of protecting itself.  Under these circumstances, Totem cannot escape liability for Inlet's loss by establishing that the requested insurance was not available.  Bell v. O'Leary, 744 F.2d 1370 (8th Cir. 1984) (holding insurance broker liable for flood losses where broker's conduct caused flood insurance policies to be erroneously issued in area where flood insurance was not available thereby precluding clients from taking any action to protect against loss); Boothe v. American Assurance Co., 327 So.2d 477 (La. Ct. App. 1976) (holding insurance agent liable for damage as a result of flood where agent's conduct led homeowners to believe that they were insured, even though flood insurance was not available from any source); see also Nu-Air Manufacturing Co. v. Frank B. Hall & Co. of New York, 822 F.2d 987, 997 (11th Cir. 1987) (observing that "broker, who is not to blame for the failure to obtain coverage, may become liable for damages if he fails to inform his principal that the requested insurance has not been obtained"); 3 COUCH ON INS. § 46:67 ("An insured's agent is not liable for failing to obtain coverage where such coverage is unavailable because it is not offered by the insurer or other insurance companies, *unless the agent falsely informs the applicant that the insurance has been obtained*.")  (Emphasis added).

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

None of the failure to procure cases cited by Totem hold otherwise.[5]  In each of these cases, the "claim for relief was predicated on the negligent failure of an insurance broker or agent to procure a particular type of insurance coverage sought by the plaintiff."  Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc., 739 P.3d 239, 241 (Colo. 1987) (owner of bar sued agent where owner specifically requested coverage for liquor liability but "multi-peril" policy obtained by agent did not provide such coverage); accord Johnson & Higgins of Alaska, Inc. v. Blomfield, 907 P.2d 1371, 1374-75 & n.4 (Alaska 1995) (insureds sued agent where insured requested a policy that covered against all risks and agent procured a policy that contained an exclusion for contamination); Grande v. St. Paul Fire & Marine Ins. Co., 365 F.Supp.2d 57, 62-63 (D. Maine 2005) (boat owner sued agent where agent procured a insurance policy that did not provide "trip insurance" requested by owner).  None of these cases expressly addressed a claim based on a complete failure to procure insurance or a failure to notify.  Rather, the essence of the claims asserted in these cases was that the agent's or broker's negligence caused the absence of coverage and hence the resulting loss (i.e., but for the agent's negligence, the insured's loss would have been covered).  Under these circumstances, a majority of courts require the plaintiff to establish, "as an aspect of causation and damages, that such insurance was generally available in the insurance industry when the broker or agent

---

[5] Likewise, the A.L.R. cited by Totem addresses the insured's burden of proof "in order to recover from an insurance agent or broker for procuring *inadequate* liability insurance coverage."  Robin C. Miller, *Liability of agent or broker on ground of inadequacy of liability-insurance coverage procured*, 60 A.L.R. 5th 165 § 5, at 185 (1998) (emphasis added).  As explained therein, "[c]ases involving a complete failure to procure insurance are beyond the scope of this annotation.  As to such matters, see instead Liability of insurance broker or agent to insured for failure to procure insurance, 64 A.L.R.3d 398."  Id. n.7.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

obtained insurance coverage for the plaintiff." <u>Bayly, Martin & Faye, Inc.</u>, 739 P.2d at 243-44, cited by the Alaska Supreme Court in <u>Johnson & Higgins of Alaska, Inc.</u>, 907 P.2d at 1374, 1375 n.2 (declining to determine which party bears burden of proof on issue and observing that the unavailability of insurance may be irrelevant in a contract-based action).

Here, however, Inlet's negligence claim is based on the fact that Totem neither procured the requested insurance or advised Inlet of its inability to do so and that, as a result, Totem's conduct misled Inlet to its detriment. As recognized by the Alaska Supreme Court, this type of failure to procure action is fundamentally different from the failure to procure cases cited by Totem. <u>See</u> <u>Jefferson</u>, 717 P.2d at 364 (distinguishing cases where agent's conduct "misleads the 'insured' to [his] detriment" and affirming judgment for insurance agency where agency made a diligent search for coverage and promptly notified client of its inability to secure the requested coverage).

To the extent the Inlet entities were indeed uninsurable, the analysis contained in <u>Boothe</u> and <u>Bell</u> is directly on point. In <u>Boothe</u>, the plaintiffs asked the defendant (an insurance agent) to procure flood insurance for them based on their understanding that their parish had recently been approved for flood insurance. 327 So.2d at 479. The plaintiffs were mistaken; at that time flood insurance was only available through the National Flood Insurance Program ("NFIP") and their parish had never been approved for coverage. <u>Id.</u> at 481. Despite this, the agent completed a flood insurance application, which indicated that the plaintiffs' had coverage for $5,000 on their dwelling and $5,000 on its contents in exchange for their payment of a $30 premium. <u>Id.</u> at 479. The agent then provided the plaintiffs with a photocopy of the application and forwarded the original application together with their payment (less his commission) to the insurer. <u>Id.</u>

After the plaintiffs suffered a flood loss and learned that they were not insured, they brought an action against the agent for his failure to obtain flood insurance or notify them of his failure to do so.  Id. at 478.  Following a bench trial, the trial court entered judgment in favor of the plaintiffs.

On appeal, the agent argued that because flood insurance was unavailable from any source, his failure to inform the plaintiffs that they were uninsured was not the cause of their injury.  Id. at 563.  The Louisiana Court of Appeals disagreed, explaining:

> It was not possible for [the agent] to obtain from any source the flood insurance applied for, but this did not relieve him of the obligation to his client to pursue the application with diligence and to timely inform his client that the insurance was not obtainable.  When, after a reasonable time and no reply was received from Aetna, [the agent] was less than diligent in not pursuing the application further.  Had he done so he would have known that the coverage could not be obtained, and Mrs. Boothe could have been notified.  Obtaining flood insurance from some other source was not the only option left to plaintiffs had they been timely notified of noncoverage.
>
> Counsel for appellants counters this argument with the further argument that plaintiffs had owned the property since 1969 and had taken no steps to protect it from flooding, such as by raising its foundation; nor had they made any attempt to sell it or take any other measures which they now suggest as options.  This argument is without merit.  We will not speculate what measures the plaintiffs might have taken or not have taken if they had been informed that they could not get flood insurance.  It certainly was within the realm of possibility that any one of several alternatives could have been employed.  If nothing more, they could have returned to their former use of the property as a week-end vacation cottage and moved their major furnishings to another location and thus reduced the extent of loss.
>
> Mrs. Boothe thought flood insurance was obtainable when she made application to [the agent].  His actions upon receipt of her application completely justify her assumption that she and her husband were insured against flood damages in the amount stated and for the term indicated. [The agent] also believed that the coverage had been obtained as reflected by his letter to Aetna informing Aetna of the casualty claim.  His failure to

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

follow up the application with diligence and promptly notify his client of their non-coverage, renders him liable for damages.

Boothe, 327 So.2d at 481.

A similar situation presented itself in Bell.  In that case, the plaintiffs requested flood insurance for their mobile homes, which were located in an unincorporated area. 744 F.2d at 1371.  As in Boothe, the only flood insurance available in the area was through the NFIP.  The insurance broker submitted the plaintiffs' applications for insurance, and, although the program did not provide coverage for unincorporated areas, the requested flood insurance policies were erroneously issued.  Id. at 1371-72.  After the plaintiffs suffered flood losses and their claims were denied, they brought a negligence action against the agent, seeking reimbursement for their losses.  As in Boothe, the broker argued that because the requested insurance was not available, his actions were not the proximate cause of the plaintiffs' losses.  Id. at 1373.  The Eighth Circuit Court of Appeals, relying on Boothe, rejected this argument as unsound:

> At the threshold we note that the unavailability of flood insurance from any source did not relieve [the broker] of the obligation to the plaintiffs to pursue their applications with diligence, and to inform his clients that the insurance was unobtainable.  Further, [the broker's] failure to discover crucial information lulled the plaintiffs into believing that no further actions were necessary.  In other words, by failing to discover the facts which would have prevented the mistaken belief by all that the plaintiffs were insured, [the broker] foreclosed the opportunity to consider other options that might have been available to the plaintiffs.  "Obtaining flood insurance from some other source was not the only option left to the plaintiffs had they been timely notified of noncoverage."  This is true particularly when one considers that the plaintiffs were trying to obtain coverage for mobile homes, property which could have been moved in order to meet eligibility requirements.  However, whether the plaintiffs would have pursued other options is not the point.  As noted in Boothe, we must not speculate what measures the plaintiffs might have taken or not taken if they had been informed that they could not get flood insurance.  As a result, the plaintiffs suffered monetary losses that they otherwise might not have incurred.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

<u>Bell</u>, 744 F.2d at 1373-74 (internal citations omitted); <u>accord</u> <u>Wood v. Newman, Hayes &</u>
<u>Dixon Ins. Agency</u>, 905 S.W.2d 559, 563-64 (Tenn. 1995) (holding that insurance agent's
failure to notify client that replacement policy no longer covered against ice and snow
damage was cause in fact of her loss from ice and snow storm, even though market
conditions had made ice and snow coverage unavailable at time replacement policy was
issued because agent's failure to notify completely denied client opportunity to explore
other methods of protecting against loss).

The reasoning employed in <u>Boothe</u> and <u>Bell</u> applies with equal force to this case.
Had Totem completed Inlet's application for marine pollution insurance correctly, Lloyds
would have either (1) issued the policy at a higher rate or (2) rejected Inlet's application.
If accepted, Inlet would have been insured.  If rejected, Inlet would have had an
opportunity to protect itself by other means.  Because of Totem's failure to exercise
reasonable care, however, Inlet was lulled into a false sense of security.  These facts are
sufficient to establish that Totem's conduct was the proximate cause of Inlet's damages,
even if Inlet was uninsurable.

**C.**     **Genuine Issues of Material Fact Exist as to Whether Inlet Was**
        **Uninsurable**

That said, genuine issues of material fact exist as to whether the Inlet vessels were
truly uninsurable.  The undisputed facts of this case demonstrate that stand-alone marine
pollution insurance was generally available in the insurance industry at the time Totem
secured the Lloyds Policy.  Indeed, Totem identifies three separate sources of such
insurance in its motion.  [<u>See</u> Totem's Motion for Summary Judgment, pp. 6-9
(identifying WQIS, Lloyds, and Great American Insurance).]  Accordingly, Inlet has met
its burden of proof with respect to commercial availability and the burden of proof now
shifts to Totem to introduce evidence that Inlet was "nonetheless uninsurable."  <u>Bayly,</u>

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

<u>Martin & Fay, Inc.</u>, 739 P.2d at 244.  "With the case in this posture, "[t]he whole case is then thrown open to be decided as a fact, upon all the evidence."  <u>Id.</u> (citations omitted).

Here, Totem essentially contends that no reasonable juror could conclude that Inlet was insurable because WQIS was no longer willing to continue the risk, because Lloyds would not have issued a policy if all material facts had been disclosed, and because Inlet presented too great a risk for the remaining player in the stand-alone market.  In making this argument, however, Totem overlooks its own role in WQIS's cancellation of the Inlet policy.  The overwhelming evidence in this case establishes that Totem was less than diligent in maintaining Inlet's coverage with WQIS.  During the several-month period that preceded the cancellation in August 2000, Totem was repeatedly advised by WQIS that it had no information regarding the condition of the Inlet vessels and that it would cancel coverage unless the vessels were promptly surveyed by a Mr. Alexander Gowe.[6]  Although Totem was made aware of the fact that Inlet could not provide the surveys in the time frame mandated by WQIS,[7] and, although Totem had recent surveys for each of the vessels in its files, Totem never made any effort to provide these surveys to WQIS or to explain the Inlet entities' plight.[8]  According to Mr. Parthemer, the only steps he took to prevent the cancellation were to advise Inlet of its need to comply with the vessel surveys and to provide Inlet with the name and contact information for the surveyor specified by WQIS.  [Totem Rule 30(b)(6) Dep., p. 54, Ex. C hereto]  Had Totem

---

[6] Townsend Dep., pp. 23-24, 35, 37, 38, Ex. B hereto; Townsend Dep. Ex. 7, attached hereto as Ex. I.

[7] Goddard Dep., p. 37, attached hereto as Ex. J; Townsend Dep. Ex. 17, attached hereto as Ex. K.

[8] Totem Rule 30(b)(6) Dep., pp. 43, 53, 54, 55, 74, 75, Ex. C hereto; WQIS Rule 30(b)(6) Dep., p. 28, attached hereto as Ex. L.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK  99501
(907) 276-4557

apprised WQIS of the situation, WQIS may very well have accepted the 1998 surveys and updates in lieu of an immediate survey by Mr. Gowe. Totem was also incorrectly advised by WQIS that Inlet's account was past due.[9] It is not clear what steps, if any, Totem took to correct this misperception.[10] In short, WQIS's cancellation of the Inlet entities' coverage may very well have been due to Totem's failure to diligently service the Inlet account.[11]

Turning to Lloyds, Totem overlooks the fact that Lloyds could have chosen to "load" the premium rather than reject Inlet's application. Indeed, when Lloyds ultimately discovered the Inlet entities' prior loss history, the question was posited as to whether the Underwriters wanted to send a notice of cancellation, or whether the Underwriters wanted to "recoup as much premium as possible." [Elliot Dep. Ex. 12, attached hereto as Ex. M] This Court recognized as much, when it observed that full disclosure "*could* have resulted in a rejection by Lloyds." [September 12, 2005, Order from Chambers at 16 n.35 (emphasis added).] Lloyds' self-serving testimony that it would not have provided stand-alone pollution coverage if fully apprised of the facts must be viewed in its proper context — Lloyds' attempt to protect its bottom line by voiding the policy *ab initio*. As such, the credibility of the Lloyds witnesses is a question for the jury.

---

[9] WQIS Rule 30(b)(6) Dep. Ex. 22, attached hereto as Ex. N (August 7, 2000 letter from WQIS indicating that Inlet had not paid its policy premiums); Klier Dep. Ex. 24, attached hereto as Ex. O (affirming that Inlet paid premium); Townsend Dep., pp. 58, 59, Ex. B hereto; Townsend Dep. Ex. 23, attached hereto as Ex. P (affirming that Inlet received a notice of a returned premium in the amount of $2,769.73 as a result of WQIS's cancellation); Townsend Dep., p. 59, Ex. B hereto (indicating that Inlet would not have received a refund if premium had not been paid).

[10] Totem Rule 30(b)(6) Dep., p. 42, Ex. C hereto.

[11] See WQIS Rule 30(b)(6) Dep., pp. 39-40, Ex. L hereto.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

In sum, genuine issues of material fact exist as to whether Inlet was truly uninsurable.

**D.    To the Extent Inlet Was Uninsurable, Totem Cannot Rely on the Terms and Conditions of the Lloyds Policy to Escape Liability**

To the extent Inlet was uninsurable, however, Totem cannot rely on the terms and conditions of the Lloyds Policy to avoid liability. Although the terms and conditions of the policy that *would have been secured* control recovery in a failure to procure case, Totem cites no authority for the proposition that the terms and conditions of a nonexistent policy control in a failure to notify context. Indeed, such logic is counterintuitive. If Inlet was uninsurable, then Totem would not have been able to secure any policy. Thus Totem cannot rely on the terms and conditions of the Lloyds Policy if Inlet was uninsurable.

Instead, Totem's policy-based defenses should be limited to arguing that Inlet's loss was beyond the scope of any coverage requested by Inlet. <u>See</u>, <u>e.g.</u>, <u>Pacific Dredging Co. v. Hurley</u>, 397 P.2d 819, 822-23 (Wash. 1964) (explaining that plaintiff bore the burden of proving that loss was caused by a peril he would have been insured against as a matter of causation and damages). Under the facts of this case, therefore, Inlet would not be able to recover for marine pollution losses in excess of the requested coverage (i.e., $1,000,000 per incident) or for losses that would not have been covered by any marine pollution policy (e.g., a non-marine pollution loss). This appears to have been the approach adopted by both the <u>Boothe</u> and <u>Bell</u> courts.

In addition to its actual losses, Inlet is entitled to recover the costs it incurred in defending against Lloyds' action to declare the policy void, the increase in clean-up

costs[12] caused by federalization of the clean-up efforts due to Lloyds' decision not to step-in,[13] as well as all other losses proximately caused by Totem's failure to exercise reasonable care.  See Lee R. Segalla, COUCH ON INS. § 46:74 (3d ed. 2005) (hereinafter COUCH ON INS.).

### E.    Even if the Terms and Conditions of the Lloyds Policy Apply, There is No Basis For Avoiding Liability

Even if the terms and conditions of the Lloyds Policy apply, however, Totem has no basis for avoiding liability as it cannot enforce the pay-to-be-paid clause or the alleged "P&I Warranty," and because Totem cannot avoid liability on either ground because it cannot benefit from its own misconduct.  Alternatively, Totem cannot escape liability because the Lloyds Policy did not contain a "P&I Warranty" and because Inlet's performance was excused under Alaska law.

### 1.    Totem Cannot Enforce the Pay-to-be-Paid Clause

Because the Lloyds Policy was an indemnity policy, requiring the assured to become liable for and pay damages before the underwriter had an obligation to pay, and because IFI does not currently possess the funds to pay any obligations incurred as a result of the spill, Totem asserts that Lloyds' indemnity provision would not have been triggered and thus Totem's conduct has not harmed IFI.  As explained by Arnould, however, Totem cannot simply rely on the pay-to-be-paid clause to escape liability.

---

[12] Federalization of the clean-up efforts resulting in an increase in cost of approximately 30-40%.  See Goddard Aff. ¶ 14.

[13] Shortly before deciding not to step in and thereby avoid federalization of the clean-up efforts, Lloyds discovered information relating to the MAREN I incident, which Totem failed to disclose on Inlet's application for insurance.  See October 20, 2004 Order from Chambers at 4-5 [Docket No. 142].

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

Rather, the pertinent question is whether the insurer would have been likely to rely on the clause to avoid payment.

> Nor can a broker who has failed to effect insurance rely on the fact that the particular loss sustained by his client was one in respect of which the insurers would have a good defence under a condition in their form of policy; in such a case, the client has prima facie lost the chance of recovering an indemnity from the insurers, and is entitled to damages for the loss of that chance. The test is whether the insurers would, as a matter of business, have been likely to rely on the condition in their policy and to repudiate liability.

1 ARNOULD'S LAW OF MARINE INSURANCE AND AVERAGE § 226 at 146 (16th ed. 1981) (hereinafter Arnould).

Here, the only evidence on point is that Lloyds typically did not enforce the pay-to-be-paid clause. Amanda Schaeffer testified that American E&S had an arrangement with Roepner (Lloyds' London broker)[14] whereby American E&S would pay some expenses directly to those involved in clean-up efforts while Roepner would cover expenses above a certain amount. [Schaeffer Dep., pp. 83-84, 88, attached hereto as Ex. Q] Thus Lloyds' practice was to pay for expenses directly, rather than require payment first by the assured.

Indeed, this appears to have been the marine pollution industry's practice as well. In conjunction with the MAREN I spill, WQIS paid a number of expenses directly to those involved in the clean-up efforts. See Affidavit of Vincent L. Goddard in Support of Inlet Entities' Opposition to Totem's Motion to Compel ¶ 6, filed October 31, 2006; see also White v. Goodville Mutual Casualty Co., 596 P.2d 1229, 1232 (Kan. 1979) (observing that "by practice, decision, statute or the policy itself the actual payment by

---

[14] See October 20, 2004 Order from Chambers, at 4 [Docket No. 142].

INLET ENTITIES' OPPOSITION TO TOTEM AGENCIES' MOTION FOR SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al.*, Case No. A04-0058 CV (JWS)     Page 16 of 27

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

the insured is no longer required to establish an obligation on the insurer" under an indemnity or pay-to-be-paid policy).  Thus Totem's conduct did indeed damage Inlet as Lloyds likely would have paid the expenses directly per its usual practice rather than require Inlet to pay to be paid.

Even if entitled to enforce the pay-to-be-paid clause, however, Totem cannot escape liability.  The evidence in this case is that IFI would have been able to secure a loan if the Lloyds Policy had not been voided and will be able to secure a loan if Totem is obliged to indemnify IFI.  [IFI Rule 30(b)(6) Dep., pp. 12-14, Ex. G hereto; Affidavit of Vincent L. Goddard in Support of Inlet Entities' Opposition to Totem's Motion to Compel ¶ 8, filed October 31, 2006]  Under these circumstances, the appropriate course of action is for this Court to require Totem to indemnify Inlet (i.e., to provide declaratory relief) and to retain jurisdiction over this action until Inlet's liability is fully determined and Inlet is provided a meaningful opportunity to satisfy its legal obligations.  This result is particularly warranted, where as here, there is ongoing litigation regarding Inlet's liability.  See Ryder v. Lynch, 201 A.2d 561, 570 (N.J. 1964) (assuming that personal injury and death action against "insured" were not yet resolved and thus damages determination would have to await resolution of the other actions); Robert M. Ey, *Cause of Action Against Insurance Agent or Broker for Failure to Procure Insurance*, 14 COA 881 § 54 ¶ 4 (2005) (noting that court may retain jurisdiction while other actions are resolved/losses are incurred) (citing Stein, Hinkle, Dawe & Associates Inc. v Continental Casualty Co., 313 N.W.2d 299 (Mich. 1981); Hildreth v Bergeron, 263 A.2d 664 (N.H. 1970)).  Totem should not be permitted to avoid liability based on a result caused by its own negligence.  See Offshore Prod. Contractors, Inc. v. Republic Underwriters Ins. Co., 910 F.2d 224, 233 (5th Cir. 1990) (holding that agent could not avoid liability on grounds

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK  99501
(907) 276-4557

that insured never paid premiums and thus would not have been entitled to payment under policy because policy never became effective, where agent counseled client not to pay premiums).

### 2.    Totem Cannot Enforce the Alleged "P&I Warranty"

Likewise, Totem cannot enforce the alleged "P&I Warranty" because the defense of breach of warranty must be affirmatively and specially pleaded to be available. Alex L. Parks, 1 THE LAW AND PRACTICE OF MARINE INSURANCE AND AVERAGE 249 (1987) (hereinafter MARINE INSURANCE AND AVERAGE) (citing Helen L., 1937 AMC 1170 (Wash.)). Until now, Totem has never raised any defense based on Inlet's alleged breach of a supposed P&I Warranty.[15]  Accordingly, Totem cannot do so now.

Regardless of whether this defense has been waived, however, Totem cannot rely on any alleged breach of warranty based on a lack of P&I coverage because Totem's conduct once again mislead Inlet to its detriment.  The undisputed facts of this case demonstrate that, as Inlet's insurance broker, Totem was fully aware of Inlet's loss of P&I coverage in the spring of 2002 and that Inlet continued to believe it had coverage under its marine pollution policy.  See Goddard Aff. ¶ 11, filed herewith (providing that Totem was involved in discussions regarding the effect of the loss of P&I coverage and that Totem never advised Inlet that loss of such coverage would affect its marine pollution coverage).  Despite this, and despite its acknowledged receipt of an OPA quote which bound coverage subject to "P&I Insurance to be purchased and maintained during

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

---

[15] See Totem Agencies, Inc.'s Answer to Third-Party Complaint of Inlet Fisheries, Inc., dated April 15, 2004, at pp. 4-5; Totem Agencies, Inc.'s Answer to Third-Party Complaint of Inlet Fish Producers, Inc., dated April 15, 2004, at pp. 4-5.

full period of pollution policy,"[16] Totem never advised Inlet that its lack of P&I coverage had any effect on its ability to maintain its marine pollution coverage.  Id. ¶ 11.  Instead, Totem forwarded another application[17] for marine pollution insurance to Lloyds on September 11, 2002, thereby reinforcing Inlet's belief that the loss of P&I coverage had no effect on its ability to maintain marine pollution coverage.  [Elliot Dep. Ex. 8, Ex. R hereto]

An insurance broker owes his clients a duty to exercise reasonable care, skill, and diligence in serving their insurance needs.  Jefferson, 717 P.2d at 363; United Farm Bureau Mutual Ins. Co. v. Cook, 463 N.E.2d 522, 527 (Ind. Ct. App. 1984).  In addition, where a special relationship exists, a broker has an affirmative duty to advise clients regarding the sufficiency of their coverage.  Peter v. Schumaker, 22 P.3d 481 (Alaska 2001).  Here, there is no doubt that Totem entered into a special relationship with Inlet. Totem served as the Inlet entities' insurance broker since 1988, making trips to Alaska each year to service the Inlet entities' account.  [Parthemer Dep., pp. 52-53, Ex. A hereto; Totem Rule 30(b)(6) Dep. at 101, Ex. C hereto (providing that Totem traveled to Alaska on a regular basis to discuss current coverage and renewals)]  Inlet relied on Totem's advice and expertise in providing such coverage.  [Klier Dep., pp. 112, 142, attached hereto as Ex. S; see also Goddard Aff. ¶ 11, filed herewith.]  Totem therefore breached its duties to Inlet when it failed to advise Inlet of the true effect of the lack of P&I coverage, and instead continued to represent that the marine pollution coverage was in place.

---

[16] See August 28, 2002, OPA Quote, attached as Ex. L to Totem's Motion for Summary Judgment.

[17] The OPA Quote also conditioned renewal of the Lloyds Policy on receipt of a completed application form.  Id. (referencing Mr. Harcombe's "email of August 28, 2002"); WQIS Rule 30(b)(6) (Brown) Dep. Ex. 18, Ex. T hereto (Mr. Harcombe's August 28, 2002 email).

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

Had Totem advised Inlet that its loss of P&I coverage also affected its ability to maintain marine pollution coverage in the spring of 2002, Inlet could have taken steps to protect itself in some other manner (e.g., by pursuing the sale of the HARVESTER BARGE much sooner and by scuttling the QP in mid-August when the river level rose). Accordingly, Totem should not now be permitted to avoid or reduce its liability based on Inlet's lack of P&I coverage.  See Offshore Prod. Contractors, Inc., 910 F.2d at 233 (holding that agent could not avoid liability on grounds that insured never paid premiums and thus would not have been entitled to payment under policy because policy never became effective, where agent counseled client not to pay premiums); see also 1 ARNOULD § 226 at 146 (explaining that insurance agent in a failure to procure action cannot take advantage of a breach of warranty founded on his own act or default).

### 3.    The Lloyds Policy Did Not Contain a "P&I Warranty"

Alternatively, Totem's attempt to avoid liability based on Inlet's alleged violation of the "P&I warranty" is misplaced.  Although this Court did characterize Inlet's request that insurance be bound as "impliedly warrant[ing] that it would purchase (or had purchased) and maintain P&I insurance"[18] per the terms and conditions of the OPA quote from Puget Sound Underwriters, neither federal admiralty nor Alaska law treat such representations as creating any type of warranty.  Thus to the extent this Court's treatment of an issue not addressed by any party[19] in a footnote contained in a 40-page Order can be construed as establishing the law of the case, the Inlet entities respectfully

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

---

[18] September 11, 2005 Order from Chambers, p. 39 n.98 [Docket No. 181].

[19] As implicitly acknowledged by this Court in its former Order, the parties have never briefed or addressed any issue surrounding the existence, or lack thereof, of P&I coverage.  Id.

request that this Court withdraw its former decision on the grounds that the previous disposition was clearly erroneous and would work a manifest injustice.[20]

The Ninth Circuit has held that "[d]isputes arising under marine insurance contracts are governed by State law … unless an established federal rule addresses the issues raised, or there is a need for uniformity in federal admiralty practice." Yu v. Albany Ins. Co., 281 F.3d 803, 806 (9th Cir. 2002) (citing Kiernan v. Zurich Cos., 150 F.3d 1120, 1121 (9th Cir. 1998). Here, the issue is whether Inlet warranted that it would maintain P&I insurance during the full period of the pollution policy when it accepted the OPA quote from Puget Sound Underwriters. To resolve this issue, this Court must consider the application of Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S. Ct. 368, 99 L. Ed. 337 (1955).

"In Wilburn Boat, the Supreme Court considered whether federal admiralty law or state law governed the validity and scope of warranties in a marine insurance policy." Port Lynch, Inc. v. New England Int'l. Assurety of American, Inc., 754 F. Supp. 816, 819 (W.D. Wash. 1991). In that case, the insurer attempted to avoid coverage based on the fact that the insured had violated an express warranty providing that the boat would not be transferred without the insurers' consent and that the boat would be used for pleasure purposes only. Both the district court and court of appeals applied, as a matter of federal admiralty law, the "literal performance" rule, which requires "literal performance of every policy warranty so that any breach would bar recovery." Id. The Supreme Court, however, reversed and remanded holding:

> that there was no established federal admiralty rule governing warranties of the kind involved in Wilburn Boat, that it would be inappropriate for the Court to fashion such a rule, and that in the absence of a federal rule of law,

---

[20] Leslie Salt Co. v. United States, 55 F.3d 1388, 1393 (9th Cir. 1995).

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

the scope and validity of such warranties were governed by state law. The Court emphasized that the Court had always treated marine insurance contracts, like all others, as subject to state control, and that the judicial and legislative history of insurance regulation warned against the judicial creation of admiralty rules to govern marine policy terms and conditions.

<u>Port Lynch</u>, 754 F. Supp. at 819.

Turning to the present dispute, Inlet's acceptance of the OPA quote did not create any type of express warranty — as apparently recognized by this Court. Under both federal maritime and Alaska law, an express warranty must be contained in the policy itself, in a rider or an endorsement to the policy, or expressly incorporated into the policy by reference. 1 MARINE INSURANCE AND AVERAGE at 233 ("Obviously, nothing could be considered an express warranty unless it is somehow incorporated in, or expressly referred to so as to effect an incorporation in, the policy."); AS 21.42.150 (providing that "[t]he policy, when issued, shall contain the entire agreement between the parties," and limiting "modification, after issuance, [to a] written rider or endorsement issued by the insurer"); <u>see also</u> 2 ARNOULD § 678 at 522 ("It is a fixed and long-established rule that nothing can amount to an express warranty unless it be inserted in writing on the face of the policy, or in some document incorporated therein by reference."). Here, the only document that contained any requirement concerning P&I coverage was the insurance quote, which was not incorporated by reference into the policy. Thus the pertinent question is whether Inlet's acceptance of the OPA quote created an implied warranty that it would maintain P&I coverage during the duration of the pollution policy.

In the marine insurance context, federal courts appear to recognize three types of implied warranties that automatically attach to every policy: (1) that the vessel is seaworthy and sound at the inception of insurance, (2) that the vessel will not voluntarily deviate from the voyage described in and covered by the policy, and (3) that the vessel

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

will not engage in illegal activity.  16 Richard A. Lord, WILLISTON ON CONTRACTS § 49:28 (4th ed. 2005); 2 ARNOULD §§ 705 to 742 (addressing implied warranty of seaworthiness) and §§ 743 to 760 (addressing illegality of the risk).  There does not, however, appear to be an established federal rule addressing the creation or attachment of other types of implied warranties.  Rather, federal courts look to state law to determine the nature and effect of conditions that are agreed to govern the attachment of the policy.  See, e.g., Drake Fishing, Inc. v. Clarendon Am. Ins. Co., 136 F.3d 851 at 853-54 (1st Cir. 1998) (applying Massachusetts law to determine whether conditions agreed to govern attachment of policy were conditions precedent or a warranty); see also 1 MARINE INSURANCE AND AVERAGE at 234 (noting distinction between representations and warranties).

Under Alaska law, "[a]ll statements and descriptions in an application for an insurance policy or annuity contract, or in negotiations for the policy or contract, … shall be considered to be ***representations*** and not warranties."  AS 21.42.110 (emphasis added).  Moreover, to be valid, any warranty must be found in the policy, itself, or in a subsequent rider or endorsement.  AS 21.42.150.  Thus under Alaska law, the Inlet entities' acceptance of the OPA quote, which was "Subject to: P&I Insurance to be purchased and maintained during full period of pollution policy," at most amounts to a representation and cannot be construed as a warranty.  Cf. Yu v. Albany Ins. Co., 281 F.3d 803, 810 (9th Cir. 2002) (holding that insured's breach of Caption Warranty was not a representation under a similar Hawaiian statute, where the Caption Warranty was part of the insurance contract itself).

Under Alaska law, therefore, and under the law of this case, Inlet's representation regarding the maintenance of P&I coverage must be evaluated under the doctrine of

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK  99501
(907) 276-4557

INLET ENTITIES' OPPOSITION TO TOTEM AGENCIES' MOTION FOR SUMMARY JUDGMENT
*Certain Underwriters at Lloyds et al. v. Inlet Fisheries, Inc. et al.,* Case No. A04-0058 CV (JWS)    Page 23 of 27

*uberrimae fidei* or utmost good faith.  Application of this doctrine to the undisputed facts of this case demonstrates that Inlet did not make any misrepresentation regarding the maintenance of P&I coverage in August 2000.

Section 20 of the Marine Insurance Act of 1906 provides that "[a] representation may be either a representation as to a matter of fact, or as to a matter of expectation or belief."  Representations as to matters of fact are evaluated in terms of whether they are actually correct, while representations as to matters of expectation or belief are true if made in good faith.  Id. §§ 20(4)&(5).  Here, Inlet maintained P&I coverage on the insured vessels from the inception of the marine pollution policy until the spring of 2002. [See Exs. U & V attached hereto (P&I and Hull & Machinery policies in place at inception of Lloyds Policy); Goddard Aff. ¶ 3, filed herewith]  At that time, although Inlet wanted to continue coverage, it was unable to do so because the Underwriters required recent out-of-water surveys within a time frame that was not possible due to conditions beyond Inlet's control.  See Goddard Aff. ¶¶ 4, 6-7, 9, filed herewith (explaining that the vessels had to be towed to another location for such surveys and that vessels could not be towed until well after the deadlines established by the Underwriters due to ice and then extremely low water levels in the Kuskokwim River).  Thus there is no evidence that any representation regarding the maintenance of P&I coverage when accepting the original OPA quote was false or misleading when made, and thus Totem's liability cannot be avoided or reduced on these grounds.  See AS 21.42.150.

Curiously, the application that Totem submitted on behalf on Inlet in August 2002 did represent that Inlet had P&I coverage on the HARVESTER BARGE.  [Elliot Dep. Ex. 8, Ex. Q hereto]  The application was signed by Ron Boardman for Eric Parthemer, both of Totem.  [Id.]  While this representation was obviously false, Totem cannot avoid

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

liability based on its own misrepresentation. Had the Lloyds Policy been declared void *ab initio* based on this misrepresentation, Inlet would have additional grounds for its breach of contract and negligence claims against Totem.

### 4. Even if Subject to a "P&I Warranty," Totem Cannot Escape Liability

Even if Inlet impliedly warranted that it would maintain P&I coverage, however, Totem cannot avoid liability by relying on the Inlet entities' lack of P&I coverage at the time of the QP and HARVESTER BARGE spills because Inlet's performance is excused under Alaska law as commercially impracticable.

Like the warranty involved in <u>Wilburn Boat</u>, there is no federally recognized rule requiring strict compliance with the warranty at issue here. Accordingly, Alaska law controls the effect of any alleged breach of the P&I warranty. <u>See</u> <u>Graham v. Milky Way Barge, Inc.</u>, 923 F.2d 1100, 1107 (5th Cir. 1991) (applying Louisiana law to determine whether assured's breach of express five foot seas warranty was excused because a mechanical failure rendered compliance impossible); <u>cf.</u> <u>Port Lynch</u>, 754 F. Supp. at 823 (holding that "cases decided before and after <u>Wilburn Boat</u> establish that there is a federal admiralty law concerning the strict construction of navigational and trading warranties").

Under Alaska law, Inlet's performance is excused because it was impossible as well as commercially impracticable to obtain the necessary coverage. Not only was Inlet unable to obtain the requested surveys in the timeframe specified by the Underwriters through no fault of its own, it would have cost Inlet $100,000 to $150,000 per vessel just to have the vessels towed to a location where the requested surveys could be done. <u>See</u> Goddard Aff. ¶¶ 3-9, filed herewith. Neither party could have contemplated that Inlet would encounter such obstacles in maintaining its P&I coverage. Accordingly, Inlet's breach of the P&I warranty is excused. <u>See</u> <u>Northern Corp. v. Chugach Elec. Ass'n.</u>, 518

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

P.2d 76, 80-81 n.6 (Alaska 1974), modified on rehearing, 523 P.2d 1234 (1974) (explaining that strict impossibility is not required; a party's performance is excused "if the costs of performance would be so disproportionate to that reasonably contemplated by the parties as to make the contract totally impractical in a commercial sense"); see also Murry E. Gildersleeve Logging Co. v. Northern Timber Corp., 670 P.2d 372, 375 (Alaska 1983) (recognizing defense of impracticability where an event failed to occur which both parties mutually assumed would occur and, as a result, the promisor's performance could only be done at an excessive and unreasonable cost).

### 5. P&I Insurance Would Not Have Covered the Full Amount Billed by Magone

In the unlikely event that this Court determines that Totem is not liable for amounts that would have been covered under a P&I policy, it should not reduce Totem's liability by the full amount billed by Magone. Although Totem contends that all of Magone's expenses would have been covered by the P&I policy, Magone did much more than simply raise and scuttle the QP. See Goddard Aff. ¶ 13, filed herewith. Inlet estimates that the P&I insurance would have covered $150,000 to $250,000 at most. It would not have covered the entire amount. [Id.]

## IV. CONCLUSION

Contrary to Totem's contention, its failure to exercise reasonable care in filling out the Inlet entities' application for marine pollution insurance damaged the Inlet entities. None of the arguments presented by Totem provide a valid defense. Totem's motion for summary judgment should be denied.

**DORSEY & WHITNEY LLP**
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557

DATED this 3rd day of February, 2006, at Anchorage, Alaska.

DORSEY & WHITNEY LLP
Attorneys for Inlet Fisheries, Inc. and
   Inlet Fish Producers, Inc.


By: s/Wendy E. Leukuma
    John A. Treptow, ABA #7605059
    Wendy E. Leukuma, ABA #0211048
    DORSEY & WHITNEY LLP
    1031 West 4th Avenue, Suite 600
    Anchorage, Alaska 99501
    Phone: 907-276-4557
    Fax: 907-276-4152
    Email: treptow.john@dorsey.com
    Email: leukuma.wendy@dorsey.com


CERTIFICATE OF SERVICE

This certifies that on the 3rd day of February, 2006, a copy
of the foregoing document was served electronically on:

Thomas A. Matthews
Matthews & Zahare, P.C.
431 W. 7th Avenue, Suite 207
Anchorage, AK  99501
Email:  tom.matthews@matthewszahare.com

Brewster H. Jamieson
Lane Powell
301 West Northern Lights Boulevard, Suite 301
Anchorage, AK  99503-2648
Email: jamiesonb@lanepowell.com

Christopher W. Nicoll
Nicoll Black Misenti & Feig, PLLC
816 Second Avenue, Suite 300
Seattle, WA  98104-1502
Email:  cnicoll@nicollblack.com


s/ Wendy E. Leukuma

DORSEY & WHITNEY LLP
1031 West 4th Avenue, Suite 600
Anchorage, AK 99501
(907) 276-4557