Page 1

IN THE UNITED STATES DISTRICT COURT?

FOR THE DISTRICT OF ALASKA

---

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO CERTIFICATE OF INSURANCE OP01 0025, through Puget Sound Underwriters, Inc., | ) ) ) ) Case No. ) ) A04-0058 CV (JWS) |
| Plaintiffs, | ) |
| vs. | ) |
| INLET FISHERIES, INC., an Alaska corporation, and INLET FISH PRODUCERS, INC., an Alaska corporation, | ) ) ) ) |
| Defendants and Third-Party Plaintiffs, | ) ) |
| vs. | ) |
| TOTEM AGENCIES, INC., a Washington corporation, | ) ) |
| Third-Party Defendant. | ) |

---

DEPOSITION OF ERIC ALAN PARTHEMER
Thursday, November 17, 2005
Seattle, Washington

Reported by:
Amy Patricia Rostad
CCR No. 1901
Job No. 75218B

Esquire Deposition Services
(206) 624-9099

EXHIBIT A
Page 1 of 6

04270628-36ad-4bcf-bd09-1a4d0ed03ee6

1  A.  I knew that there was a loss on the MAREN I under hull and
2      P&I, yes.
3  Q.  And you also knew that the claim had been reported to WQIS,
4      did you not?
5  A.  Yes, I believe so.
6  Q.  Well, under those circumstances, did that incident qualify as
7      a pollution loss in your opinion?
8  A.  I didn't know if anything had been paid out by WQIS at that
9      time.
10 Q.  Well, in discussing this application with Ms. Townsend, did
11     you and she discuss the MAREN I issue at all?
12 A.  I believe the statement she asked me is what do I put in
13     there for loss -- pollution loss history, and my response was
14     that it appears to be referring to-and-from conversation I
15     had with Woody Wilton, the vessel's to be insured.
16 Q.  When you and Mr. Wilton had your conversation, did you and he
17     discuss item No. 5, "Pollution Loss History," on the
18     application?
19 A.  I don't recall. Is it as it pertains to this application?
20 Q.  Well, in connection with this application, did you and
21     Mr. Wilton have a specific discussion about pollution loss
22     history as it relates to this application?
23 A.  Again, I don't recall.
24 Q.  Well, do you recall at some point in time having a discussion
25     with Mr. Wilton about the subject of pollution loss

Eric Parthemer 11/17/05

Page 21

1      histories?
2 A. I recall having a discussion with Mr. Wilton about the
3      interpretation by a marine underwriter of what an entity is,
4      and was explained in correlation to wages or P&I that the
5      wages of a crew are never assessed on a corporation, they're
6      always assessed on the vessel, and therefore the vessel is
7      arrested. And I said, Is that true through most all marine
8      insurance? And he answered to the affirmative.
9 Q. And when did that conversation take place?
10 A. I can't recall. I'm sure it was before this application.
11 Q. At any time prior to August 17th, 2002, did you and
12      Mr. Wilton discuss what the term "pollution loss history"
13      meant with respect to marine pollution insurance?
14 A. I don't recall.
15 Q. In the conversation that you and Mr. Wilton had prior to him
16      faxing you the application on August 16th, did you and he
17      discuss any aspect of the application at all?
18 A. I believe I discussed what the vessels were -- were and that
19      WQIS was getting off the risk.
20 Q. Okay. Anything else about Inlet, the vessels, anything of
21      that nature?
22 A. I don't recall.
23 Q. Do you remember in that conversation telling Mr. Wilton of
24      the MAREN I spill?
25 A. I don't recall.

Page 43

1  for the HARVESTER BARGE spill in August of 2000?
2  A. I have heard that there were some amounts paid, I don't know
3     what they were specific.
4  Q. If Totem had contacted Inlet in August of 2000 at the time
5     that this application was filled out, do you have any reason
6     to believe that Inlet would not have disclosed the HARVESTER
7     BARGE spill to Totem?
8  A. I can't answer that.
9  Q. And was the application dated August 17th, 2000, filled out
10    by Totem based upon information that was then in their files?
11 A. Which exhibit is -- is that the -- this one I've got, Exhibit
12    3?
13 Q. Yes, sir.
14 A. And your question was again, I'm sorry?
15 Q. Yeah. Was this application filled out based upon information
16    available to Totem in its files?
17 A. To the best of my knowledge, yes.
18 Q. Was there any other source of information that Totem relied
19    upon other than its own files in filling out this
20    application?
21 A. Not to my knowledge.
22 Q. I'm just about done, but I would like to go back to the
23    cancellation issue. Since WQIS cancelled in August of 2000,
24    have you learned that Inlet did, in fact, make the premium
25    payments for '99, 2000, and 2001 in a timely manner?

1  Q.  So do you check about existing coverages, do you also ask if
2      coverages need to be adjusted or deleted or added?
3  A.  Depending on the situation, I would say sure.
4  Q.  And would you consider yourself to be someone who's involved
5      with reviewing at least periodically Inlet's insurance needs?
6  A.  Yes.
7  Q.  And do you believe that you're equipped to review and
8      evaluate Inlet's insurance needs?
9  A.  Well, when you say "review and evaluate," I'm not sure
10     specifically what you're referring to.
11 Q.  Well, there have been occasions when you've done written
12     analysis of the existing insurance that Inlet has, correct?
13                  MR. MATTHEWS:  Objection to form.
14 A.  If you mean written, you mean summary, we generally deliver
15     the summary.  I mean, am I -- go ahead, I'm sorry.  We would
16     generally deliver a summary.
17 Q.  (By Mr. Treptow)  And then would you review that summary with
18     Inlet and discuss what was there?
19 A.  Yes.
20 Q.  And then would you discuss if there had been any changes in
21     operations that might warrant additional insurance, or the
22     deletion of insurance, or the modification of insurance?
23 A.  Sure.
24 Q.  From roughly 1988 or '89, are you aware of Inlet using any
25     other insurance agent or broker other than Totem for its

|   |    |                                                                      |
|---|----|----------------------------------------------------------------------|
| 1 |    | insurance needs?                                                     |
| 2 | A. | I believe, at least as intimated to me at times from Patrick         |
| 3 |    | Klier, that they went out for bid a few times while we               |
| 4 |    | handled it.  And I also believe there was a marine policy, at        |
| 5 |    | least I was told, for Inlet's nonowned fishing fleet that I          |
| 6 |    | do not handle.                                                       |
| 7 | Q. | So, as far as you're aware, there are occasions that Mr.             |
| 8 |    | Klier put Inlet's business out for bid, but would I be               |
| 9 |    | correct in saying that despite going out for bid, Inlet              |
| 10|    | remained with Totem?                                                 |
| 11| A. | Sure.                                                                |
| 12| Q. | We saw in Mr. Klier's deposition a summary for 1998, the             |
| 13|    | insurances that Inlet had and I did a rough calculations of          |
| 14|    | premiums of about $554,000; do you recall that testimony?            |
| 15| A. | Yes.                                                                 |
| 16| Q. | Do you know for the last calendar year what the premiums             |
| 17|    | billed to Inlet were for the insurance that it had secured           |
| 18|    | through Totem?                                                       |
| 19| A. | This year?  What do you mean, last calendar year?                    |
| 20| Q. | Well, however -- however you -- you judge it or whatever             |
| 21|    | system you use.                                                      |
| 22| A. | Not without something in front of me.                                |
| 23| Q. | Would you expect it to be more, for there to be an increase          |
| 24|    | for 1998 above the 554,000?                                          |
| 25| A. | To current?                                                          |