Jan Townsend 11/18/05

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, SUBSCRIBING TO CERTIFICATE OF INSURANCE OP01 0025, through Puget Sound Underwriters, Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> INLET FISHERIES, INC., an Alaska corporation, and INLET FISH PRODUCERS, INC., an Alaska corporation, <br><br> Defendants and Third-Party Plaintiffs, <br><br> vs. <br><br> TOTEM AGENCIES, INC., a Washington corporation, <br><br> Third-Party Defendant. | Case No. <br><br> A04-0058 CV (JWS) |

DEPOSITION OF JANICE L. TOWNSEND
Friday, November 18, 2005
Seattle, Washington

Reported by:
Amy Patricia Rostad
CCR No. 1901
Job No. 75219

EXHIBIT B
Page 1 of 16

Esquire Deposition Services
(206) 624-9099

1    there be a need?
2  A. Because usually as policies like these I would think they're
3     all the same, as long as the vessels are there, you know,
4     it's like a list of property.
5  Q. Okay.
6               MR. TREPTOW:  Could you hand the witness
7     the exhibit that's TOT 1328.
8               MR. MATTHEWS:  Exhibit 7.
9               MR. TREPTOW:  You're doing a good job,
10    Tom.
11              MR. MATTHEWS:  I'm glad I'm good for
12    something, John.
13              MR. TREPTOW:  You're too modest.
14 Q. (By Mr. Treptow)  Could you review that exhibit, Ms.
15    Townsend.
16 A. Okay.
17 Q. First of all, do you recognize the handwriting on Exhibit 7?
18 A. Yeah, that's mine.
19 Q. Okay. And it's a memo of a phone call with Tony Gerone?
20 A. Mm-hmm.
21 Q. You have to say yes or no.
22 A. I'm sorry; yeah.
23 Q. And it's dated June 1st, 2000?
24 A. Yes.
25 Q. And Mr. Gerone was with WQIS?

EXHIBIT B
Page 2 of 16

Page 24

1   A.   Yes.
2   Q.   And is this a memorandum that you made on June 1st, 2000,
3        reflecting a telephone call that you had with Mr. Gerone on
4        that date?
5   A.   Yes.  Basically, I was just writing down what he was telling
6        me.
7   Q.   And had he called you or had you called him?
8   A.   He'd called me.
9   Q.   Do you recall whether or not prior to June 1st you'd ever
10       dealt with Mr. Gerone at WQIS?
11  A.   No, but I might have.  I don't recall.
12  Q.   You had in renewing the insurance and getting the
13       endorsement, you'd dealt with Mr. Ondrejcik; is that correct?
14  A.   Yeah.
15  Q.   What did Mr. Gerone tell you in this conversation that you
16       had on June 1st?
17  A.   About Inlet's survey back from Inlet Fisheries on the
18       condition of the vessels.  And they get surveyed at their
19       expense by the surveyor of their choice, adhere to
20       recommendations of surveyor, and rescind the cancellation.
21       Short-term --
22  Q.   Why don't you just read for us what you wrote on Exhibit 7
23       word for word.
24  A.   Okay.  Subject is Inlet Fisheries.  Survey back from Inlet
25       Fisheries on condition of vessels.  Condition of vessels:  If

1     one from your office had contacted them, so they're now
2     sending cancellation notice to be effective July 20th, 2000.
3           Please call if you have any questions."
4  Q. Is there any correspondence from WQIS attached to Exhibit 9?
5  A. It's the fax verification.
6  Q. The transmission verification, is that a Totem document?
7  A. Yes.
8  Q. Okay. And does that indicate that your fax was sent on June
9     21st at 13:19 hours?
10 A. Yes.
11              MR. TREPTOW: We've been going for about
12    an hour. Why don't we take a short break.
13          Is that okay with you?
14 A. Yeah, that's fine.
15              MR. TREPTOW: Okay, about five minutes.
16              MR. MATTHEWS: Okay.
17                  (Recess 10:01-10:08 a.m.)
18 Q. (By Mr. Treptow) Ms. Townsend, let me back up for just a
19    second. Exhibit 7, which was your memorandum telephone call
20    with Tony Gerone, at the top of that form, it says, "Record
21    all conversations - use this form only"; do you see that?
22 A. Yeah.
23 Q. Was it your practice back in June of 2000 to make a memo of
24    all telephone calls that you received or made?
25 A. Yeah. Not all the time, but most of the time. It was kind

1   A.  I don't recall.
2   Q.  Do you remember what, if anything, Mr. Gerone told you about
3       the age and the condition of the Inlet vessels?
4   A.  I don't remember.
5   Q.  Well, as of 6-6-2000, had WQIS cancelled Policy 30-16489, to
6       your knowledge?
7   A.  Going by the memo, it sounds like they had, but I don't
8       remember.
9   Q.  Do you remember receiving any written communications from
10      WQIS indicating that as of June 1st they were rescinding the
11      policy?
12  A.  No, I don't.
13  Q.  Then you say, "The short-term recommendations will need to be
14      completed immediately, while any long-term recommendations,
15      Water Quality Insurance Syndicate is willing to work with you
16      on getting resolved in a reasonable manner." Is that what
17      Mr. Gerone told you?
18  A.  Yes.
19  Q.  Now, you sent this fax to Mr. Klier on June 6th, 2000. After
20      sending this, do you recall having a telephone conversation
21      with Mr. Klier about your fax?
22  A.  No.
23  Q.  Had you ever dealt with Patrick Klier prior to sending this
24      fax on June 6th?
25  A.  Probably.

EXHIBIT B
Page 5 of 16

1  Q.  Do you recall who Patrick Klier was?
2  A.  I believe he's the -- well, he's the main contact for Inlet
3      Fisheries.  Whether exactly he's the owner or the
4      comptroller, I don't recall.
5  Q.  Now, are you certain that you sent this fax to him on June
6      6th, 2000?
7  A.  Well, I would assume so, it's dated that.
8              MR. TREPTOW:  The next exhibit will be
9      1267.
10             MR. MATTHEWS:  Exhibit 9.
11 A.  Okay.
12 Q.  (By Mr. Treptow)  And can you identify Exhibit 9.
13 A.  It's a fax memo to Patrick as a second request regarding the
14     survey as no one had contacted them about it.
15 Q.  What's the date of this?
16 A.  6-21-2000.
17 Q.  And it's your fax to Mr. Klier?
18 A.  Right.
19 Q.  Okay.  And could you read to us what you wrote to Mr. Klier
20     on June 21st.
21 A.  "See attached copies of correspondence regarding Water
22     Quality Insurance Syndicate sending cancellation notice.
23         They were holding off sending the notice until you had
24     contacted and worked with their recommended surveyor.
25     However, when they contacted him today, they found that no

1       of an automatic habit.
2   Q.  Do you recall any conversations with Mr. Gerone between June
3       1st, 2000, and June 21st, 2000?
4   A.  No.
5   Q.  Okay.
6                   MR. TREPTOW:  Let's mark WQIS 465 as the
7       next in order.
8                   MR. MATTHEWS:  It's Exhibit 10.
9   Q.  (By Mr. Treptow)  Let me start by saying, Ms. Townsend, that
10      I wanted to send a clean copy of this without handwriting on
11      it and I couldn't quickly locate a copy, but I knew -- I do
12      have one sitting in front of me and it's WQIS 459, it is the
13      fax with the only handwriting on it Mr. Gerone's signature,
14      okay?
15  A.  Okay.
16  Q.  So for the purposes of my questions, if you could just
17      disregard the interlineations in the cancelled policy, okay?
18  A.  Okay.
19  Q.  On Exhibit 10, do you recall receiving on June 21st a fax
20      from Mr. Gerone saying, "Dear Jan, Please be advised that we
21      are issuing a 30-day notice of cancellation in accordance of
22      Section H of our policy.  This cancellation will take effect
23      July 20th , 2000.  Any questions please feel free to call.
24      Regards, Anthony F. Gerone."  Do you recall receiving that
25      fax?

EXHIBIT B
Page 7 of 16

Page 36

1  A.  Yes.

2  Q.  Is this the fax that you would have attached to the fax to
3      Mr. Klier, which is Exhibit 8 -- I mean, I'm sorry, which is
4      Exhibit 9, which is also dated June 21st, 2000?

5  A.  Have I attached it to it?

6  Q.  Yeah, you state you attached copies of correspondence
7      regarding Water Quality Insurance Syndicate sending
8      cancellation notice. This Exhibit 10, without the
9      interlineations, would appear to be the cancellation notice;
10     would you agree with that?

11  A.  Yeah.

12  Q.  So do you think that you attached Exhibit 10 to your fax of
13     June 21st to Mr. Klier, Exhibit 9?

14  A.  No, because it doesn't look like I attached anything on
15     Exhibit 8. It just says one page, including the cover page,
16     but --

17  Q.  No, I'm referring to Exhibit 9.

18  A.  Oh, I'm sorry. No, wouldn't have been that. It would have
19     been the actual cancellation instead of his memo advising me
20     that it is.

21  Q.  Okay. The reason that there's nothing attached to the
22     Exhibit No. 9 is because the documents that follow Page 1268
23     have nothing to do with the cancellation of insurance, so I'm
24     a little in the dark about what was attached. Can you
25     enlighten me on that? What's your best recollection?

1  A.  That it would have been an actual cancellation form.
2  Q.  Okay. Would the actual cancellation form -- do you remember
3      when that was dated?
4  A.  No.
5  Q.  Do you remember when the cancellation was to take effect on?
6  A.  Well, most likely the July 20th, 2000, date for my memo.
7  Q.  Okay. So, sitting here today, do you have any recollections
8      of talking with Mr. Gerone between June 6th, 2000, and June
9      21st, 2000?
10 A.  No, but I must have.
11 Q.  And if you did, would you assume that there were written
12     memos on those conversations?
13 A.  Yeah.
14 Q.  Now, on June 21st, you're telling Mr. Klier that WQIS was
15     holding off sending the notice of cancellation until Inlet
16     had contacted and worked with a recommended surveyor,
17     correct?
18 A.  Right.
19 Q.  And then WQIS advised you that because Inlet had not
20     contacted the recommended surveyor, who was Andrew King with
21     Alexander Gowe, that they were now sending the cancellation
22     notice to be effective July 20th, 2000; is that correct?
23 A.  Yeah.
24 Q.  So was it your understanding that because there was no
25     contact with Mr. King within that 15-day period, that WQIS

Page 38

1  was going to cancel its coverage?
2  A. Yes.
3  Q. Okay. And the cancellation of the coverage that we're
4     talking about is the coverage from June 12th, 2000, to June
5     12th, 2001, correct?
6  A. Right.
7  Q. Now, at any time during June of 2000, did you and Mr. Gerone
8     discuss the subject of the MAREN I spill in May of 2000?
9  A. I don't recall.
10 Q. Do you recall whether or not in May of 2000 or June of 2000,
11    you were even aware that there had been a spill by the MAREN
12    I in May of 2000?
13 A. I don't remember.
14         MR. TREPTOW: Could we do next WQIS 472.
15         MR. MATTHEWS: Exhibit 11.
16 Q. (By Mr. Treptow) Can you identify Exhibit 11, Ms. Townsend.
17 A. The fax memo to Tony at Water Quality, July 5th, 2000.
18 Q. And what message were you sending him on July 5th, 2000?
19 A. "Regarding the above insured, we still have not received a
20    cancellation notice from you, and were wondering when to
21    expect it. Please advice Eric or myself. Thank you. Jan."
22 Q. Now, when you say "cancellation notice," are you referring to
23    a specific document or type of document?
24 A. Yes.
25 Q. Okay. And would -- and what specifically are you referring

1  what was the construction of the hulls of the vessels?
2  A. I assume. I'm not real familiar with vessels and -- but,
3     yeah, I would say that that's what that meant.
4  Q. And do you remember where you got the information that the
5     construction of the HARVESTER BARGE, that its hull was
6     fiberglass?
7  A. Again, from applications or underwriting info in the file,
8     perhaps surveys, I don't know.
9  Q. And same with the year built, would you have gotten that from
10    the files or from the applications you already had?
11 A. Yeah.
12 Q. Now, with respect to any of the information that is contained
13    in the application that you filled in, did you contact anyone
14    at Inlet and request information to assist you in filling out
15    the application?
16 A. I don't recall if I had or not.
17 Q. If you had had such a conversation, would you assume that
18    there's a written memo somewhere reflecting that
19    conversation?
20 A. Yeah.
21 Q. Now, as of August of 2000, was the only person at Inlet that
22    you had dealt with on insurance issues Patrick Klier?
23 A. Yeah.
24 Q. You don't recall having dealt with anybody else on insurance
25    issues at Inlet?

1   A.   No.
2   Q.   So if you would have had a question about any information on
3        this application and wanted to contact somebody at Inlet,
4        would Patrick have been the one you would have gone to?
5   A.   Yeah.
6   Q.   Now, getting back to the front page of the application, 381,
7        it says, Description of operations, fish processing, correct?
8   A.   Yeah.
9   Q.   No. 5 is pollution loss history, and you have written none;
10       is that correct?
11  A.   Yeah.
12  Q.   Now, where did you get the information -- strike that.
13           With respect to pollution loss history, what
14       specifically when you say "none" were you referring to?
15  A.   Meaning that they hadn't had any pollution claims.
16  Q.   And is that -- does that mean that -- I'm sorry.
17  A.   For that policy that we were replacing, yeah.
18  Q.   So did you mean that none of the four vessels listed had had
19       pollution claims?
20  A.   Yeah, to my knowledge, they hadn't, yeah.
21  Q.   Well, my question is: When you say "pollution loss history,
22       none," are you referring to the fact that none of the
23       applicants, Inlet Fisheries, Inc., Inlet Fish Producers, or
24       Arctic Salmon had not had pollution loss claims or are you
25       saying that none of the four vessels listed had had pollution

Page 58

1    Q.   Now, were you having Mr. Klier do that because underwriters
2         were agreeing -- Lloyd's was agreeing to issue insurance
3         coverage effective 8-28-2000 to 8-28-2001; is that the reason
4         that it was cancelled that day?
5    A.   Yeah.
6    Q.   And do you recall whether or not Mr. Klier executed the
7         policy release form and returned it to you?
8    A.   No, I don't recall, but I would assume.
9    Q.   Then the exhibit with the number 1251.
10                    MR. MATTHEWS:  I think it's actually a --
11        no, my mistake, it's Exhibit 24.
12   Q.   (By Mr. Treptow)  Can you identify Exhibit 24.
13                    MR. MATTHEWS:  Sorry, John, I'm fouling
14        up your exhibits here.  You want the September 28th letter to
15        Patrick, right, 1251?  23.
16                    (Discussion off the record.)
17   Q.   (By Mr. Treptow)  Can you identify Exhibit 23, please.
18   A.   It's a cover letter to Patrick at Inlet Fisheries regarding
19        the Water Quality policy.  The above-captioned policy was
20        cancelled 8-28-2000.  The return premium 2,769.73 was created
21        by the cancellation and the credit invoice has been enclosed.
22        It's basically our letter advising him that the policy was
23        cancelled and returned premium will be following.
24   Q.   Okay.  Now, you referenced the policy that was cancelled that
25        was effective June 12th, 2000, to June 12th, 2001, correct?

1   A.   Right.

2   Q.   Okay.  And you were advising him that Inlet was entitled to a

3        return premium of $2,769.73 as a result of the cancellation?

4   A.   Right.

5   Q.   Where did you come up with the amount of the 2,769.73?

6   A.   That would have been from the cancellation from the company.

7   Q.   Okay.  So am I correct in assuming that Inlet had paid the

8        premium that WQIS charged for the policy that was effective

9        June 12th, 2000, to June 12th, 2001?

10                  MR. MATTHEWS:  Objection, foundation.

11       You can answer.

12  A.   Oh.  Yeah.  I would say so.

13  Q.   (By Mr. Treptow)  Well, if Inlet had not paid WQIS for

14       that -- the premium for that policy year, would they have

15       been entitled to any return premium?

16  A.   No.  They would have probably been billed for an additional

17       -- for a policy term that was in effect.

18  Q.   So if they hadn't paid as of the 28th, is it your opinion

19       that WQIS would have sent them a bill for the period June

20       12th, 2000, to August 28th, 2000?

21  A.   Right.

22  Q.   And is it your recollection that you got the amount of the

23       return premium from WQIS directly?

24  A.   I don't recall.  I might not even have been there then,

25       because usually it takes a long time for those.

1   to Puget Sound, at that point in time, did you have a
2   standard procedure for handling the renewal of existing
3   insurance policies that you would typically go through in
4   filling out applications?
5   A. Yeah. It would -- before the renewals would come up,
6      normally Eric would meet with the insured, especially one
7      like Inlet, and review any changes on it, so, you know, and
8      then I would -- if there were any changes, then I would be
9      aware of that and request renewal based upon any changes or,
10     if not, then I would say "as per expiring."
11  Q. And I think you told us that in connection with filling out
12     this application, that you recalled going to the Inlet files
13     to obtain information; is that correct?
14  A. Yeah.
15  Q. In doing that, do you recall seeing copies of vessel surveys
16     for the vessels that were to be insured?
17  A. Yeah.
18  Q. Okay. Now, do you recall in reviewing the Totem documents
19     relating to the Inlet vessels seeing any applications for
20     insurance that had been filed with WQIS?
21  A. I don't recall, but I would assume there would have been.
22     For that type of policy there normally would be.
23  Q. Okay. Well, I will represent to you in this case that we
24     have seen no applications ever filed with WQIS, as an
25     application per se, so I'm just wondering if you're assuming

Page 62

1  there must have been one or if you have a specific
2  recollection of having seen an application filed on behalf of
3  Inlet with WQIS?
4  A.  I'm just assuming, I don't recall actually seeing one.
5  Q.  Okay.  So in filling out the application, what you would have
6      done was look at what was ever in Totem's file regarding the
7      four Inlet vessels to be insured?
8  A.  Right.
9  Q.  And that would have been your sole source of information with
10     respect to what was contained on the application?
11 A.  Well, that and Eric, yeah.
12 Q.  And when -- do you recall what, if anything, Eric told you
13     that would have ended up in the application?
14 A.  No, maybe that -- what, GRT, thing, but that's about it.  I
15     don't recall if I saw that or whether he had advised me on
16     that.  I don't even know what that is.
17 Q.  Okay.  And sitting here today, you don't have any
18     recollection of talking to Mr. Klier about the application
19     prior to its being filed, do you?
20 A.  No.
21             MR. TREPTOW:  That's all the questions I
22     have.  Thank you very much for coming.
23 A.  Okay, thank you.
24             MR. MATTHEWS:  I just have a few
25     questions I want to followup, and I apologize, my questions

Esquire Deposition Services
(206) 624-9099

EXHIBIT B
Page 16 of 16

c93850ac-6a90-4957-8c0f-9fd1e67e0dce