Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3       _____
 4
   CERTAIN UNDERWRITERS AT LLOYD'S,    )
 5 LONDON, SUBSCRIBING TO              )
   CERTIFICATE OF INSURANCE OP01       ) Case No.
 6 0025, through Puget Sound           )
   Underwriters, Inc.,                 ) A04-0058 CV (JWS)
 7                                     )
               Plaintiffs,             )
 8                                     )
          vs.                          )
 9                                     )
   INLET FISHERIES, INC., an Alaska    )
10 corporation, and INLET FISH         )
   PRODUCERS, INC., an Alaska          )
11 corporation,                        )
                                       )
12        Defendants and               )
          Third-Party Plaintiffs,      )
13                                     )
          vs.                          )
14                                     )
   TOTEM AGENCIES, INC., a             )
15 Washington corporation,             )
                                       )
16        Third-Party Defendant.       )
17 _____
18
        30(b)(6) DEPOSITION OF ERIC ALAN PARTHEMER
19            Thursday, November 17, 2005
                  Seattle, Washington
20
21
22
23
   Reported by:
24 Amy Patricia Rostad
   CCR No. 1901
25 Job No. 75218
```

Page 43

```
 1       WQIS sent out a notice of cancellation and we asked that they
 2       extend the policy because we knew no other coverage is
 3       available for this type of risk at that time.  And I would
 4       have to look at the correspondence in the file to be more
 5       specific.
 6  Q.   Were you aware prior to August 7th, 2000, of WQIS making a
 7       demand that the Inlet vessels be surveyed?
 8  A.   Again, I would have to look at the file.  I believe there was
 9       a notation in there about that, yes.
10  Q.   Were you involved in any of that, the initial requests for
11       surveys, the response, anything of that nature, were you
12       personally involved in that?
13  A.   In what way?
14  Q.   Contacting Inlet, looking for surveys, providing surveys,
15       anything of that nature?
16  A.   Yes.
17  Q.   Okay.  Did you, prior to August 7th, 2000, provide copies of
18       surveys to WQIS for any of the insured vessels under the WQIS
19       policy?
20  A.   Not to my knowledge.
21  Q.   Do you know if someone else at Totem did?
22  A.   Not to my knowledge.
23  Q.   Do you know what prompted WQIS's request for vessel surveys?
24  A.   The speculation I could have would be the MAREN I loss and a
25       surveyor going out there and looking at what's out there.
```

Page 53

1  Q. Do you recall discussing in June, July, and August of 2000
2     with Mr. Klier, any efforts that he had made to secure a
3     surveyor for those vessels?
4  A. Yes, I do.
5  Q. And what do you recall about your conversations?
6  A. I believe he said he intended to give them a call and see if
7     he could set something up, but, you know, I don't recall
8     exactly what dates. My assumption it was prior to this memo
9     of Jan's and her conversation with Tony Gerone.
10 Q. Now, did you ever discuss with anybody at WQIS substituting
11    the surveys that had been done in 1998 of those vessels,
12    along with the updates that Mr. Klier had done in January
13    1999 in place of having a survey in 2000?
14 A. No.
15 Q. Is there a reason why you didn't do that?
16 A. Because they requested their specific surveyor.
17 Q. Did you ever learn from Mr. Klier that he was having
18    difficulties having anybody from Alexander Gowe travel to
19    western Alaska to do the surveys?
20 A. I don't recall specifically, no.
21 Q. Back in 2000, are you aware of any marine surveyors who lived
22    and worked in western Alaska?
23 A. Other than what's been given to us in files from various
24    underwriters, no.
25 Q. Well, you've seen in this case, have you not, that the Inlet

Page 54

```
 1        vessels were surveyed in 1998 by Captain David Hamker,
 2        correct?
 3   A.   Yes.
 4   Q.   And isn't he based out of Seattle?
 5   A.   I can't -- I don't recall.  I would have to look at the
 6        survey.
 7   Q.   And isn't Alexander Gowe based out of Seattle?
 8   A.   Don't know.
 9   Q.   Well, did you ever during June, July, and August of 2000,
10        consider whether there were logistical problems involved in
11        even getting a surveyor on site?
12   A.   If Patrick had indicated as such, I would have, you know, I
13        guess I would have forwarded something on to an underwriter,
14        but I wasn't involved with surveyors in any way, never have
15        been.
16   Q.   Well, you knew that unless these vessels were surveyed by a
17        surveyor at WQIS's designation, that Inlet was going to lose
18        its pollution insurance from WQIS, didn't you?
19   A.   That would appear so, yes.
20   Q.   What steps did you take to prevent that from happening?
21   A.   Forwarded it to Pat -- told Patrick what was going on,
22        forwarded to Patrick the name of the surveyor that they were
23        going to require and advised that he talked to them because
24        there was no other coverage available that I knew of at the
25        time for water pollution coverage.
```

Page 55

1  Q. Well, on June 21st, when Ms. Townsend learned that Inlet had
2     not contacted Alexander Gowe, did anyone at Totem go to WQIS
3     and offer the alternative of the '98 surveys with the '99
4     updates?
5  A. I don't believe so.
6  Q. Can you think of any reason why Totem would not have
7     presented that alternative to WQIS?
8  A. Because WQIS was emphatic and so were some hull and machinery
9     underwriters in the past that their surveyor be used.
10 Q. Now, did somebody at WQIS tell you that?
11 A. I believe it was in a memo, was it not?  I can't -- I'm not
12    looking at the file.
13 Q. Well, with respect to the cancellation issue, did you ever
14    discuss cancellation with anybody at WQIS directly by
15    telephone?
16 A. I don't recall by telephone.  I recall that I sent memos back
17    and forth doing my best to extend the policy for a longer
18    period of time.
19 Q. Well, do you know if anybody at Totem informed WQIS these
20    vessels had been, in fact, surveyed in 1998?
21 A. I do not, no.
22 Q. So, as far as you know, WQIS from 1992 up until 2000 had
23    never seen a survey of an Inlet vessel?
24 A. That's correct.
25 Q. And I take it no one with Totem addressed with WQIS whether

Page 69

1  Q. Did you ever learn that starting in 2000 Great American
2     started to write standalone vessel pollution insurance
3     policies?
4  A. No.
5  Q. With respect to discussions you had about alternative
6     insurance, was the only market that you were looking at the
7     standalone vessel pollution policies?
8  A. Yes.
9  Q. Why was that?
10 A. We were having -- we didn't have P&I coverage on the current
11    vessels and P&I is the only other avenue to extend pollution
12    coverage from.
13 Q. And why wasn't there -- as far as you know, in the summer of
14    2000, there was no P&I coverage for the four vessels that
15    were insured on the WQIS policy?
16 A. I can't recall specifically, I would have to look at the
17    file. I know there wasn't on the QP.
18 Q. And do you know why there wasn't P&I insurance on the QP?
19 A. Again, I would have to look back on the file.
20 Q. Did you ever explore the possibility of securing P&I coverage
21    that would have, as part of that coverage, vessel pollution
22    coverage capability?
23 A. Specifically, no.
24 Q. Was there a reason you didn't do that?
25 A. We couldn't get P&I on the vessels anyway.

Page 74

```
 1         assume that that's correct.
 2    Q.   Well, did you ever learn that Roanoke found these surveys
 3         done by Captain Hamker in 1998 to be unacceptable?
 4    A.   I recall a conversation that it was an issue.
 5    Q.   Did Roanoke go ahead and issue coverage after the -- after
 6         receiving those?
 7    A.   I would assume so, yes.
 8    Q.   So there we have an instance of Inlet using surveyors other
 9         than those designated by the underwriter and the underwriter
10         accepting the surveys, don't we?
11    A.   Correct.
12    Q.   Based upon that experience that Totem had in 1998, did you
13         consider doing anything similar when WQIS raised the issue of
14         vessel surveys in 2000?
15    A.   We may have.
16    Q.   Well, do you have any recollection of doing that, sir?
17    A.   I would have to look back at my notes and my discussions with
18         Patrick if there's any in the file.  I recall a conversation
19         about it and Patrick had indicated that he could possibly get
20         a different surveyor out there, but I don't -- I mean, I
21         don't even know if it was on the policy.  I should probably
22         just strike all of that.
23    Q.   Well, let's be absolutely clear on this.  Totem never raised
24         with WQIS the subject of the '98 surveys, the '99 updates as
25         a substitute for surveys being done in 2000, did it?
```

```
                                                              Page 75
 1   A.   That's correct.
 2   Q.   Did that ever occur to anybody at Totem to do that?
 3   A.   Well, when an underwriter asked for a current survey, that
 4        usually means a current survey of their selection, and I
 5        believe that's what they asked for.
 6   Q.   Well, as far as you know, in the marine insurance industry,
 7        is there any rule of thumb, any standard as to what
 8        constitutes a current survey?
 9   A.   I can't answer that.
10   Q.   Okay.  Now, the four vessels that were insured under the WQIS
11        policy, all four of those were nontanked vessels, were they
12        not?
13   A.   To my knowledge, yes, that's correct.
14   Q.   And none of the four were powered vessels, were they?
15   A.   Not as indicated, no.
16   Q.   Now, do you have any experience dealing with vessels over any
17        length of time, how they may change, what have you?
18   A.   Well, I assume a vessel built in 1944 has some -- I mean, has
19        some issues.
20   Q.   Well , let me ask you this:  Are you aware that Totem files
21        contains surveys of the HARVESTER BARGE and the YUKON II done
22        in 1993?
23   A.   I believe so.
24   Q.   After the '98 surveys were done of those two vessels, did you
25        ever sit down and compare the conditions of the vessels as
```

Page 82

1  A.  Possibly.

2          MR. MATTHEWS:  John, just --

3  Q.  (By Mr. Treptow)  Are you aware of any Totem files relating

4     to Inlet pollution issues that have not been provided to your

5     attorney?

6  A.  No.

7          MR. MATTHEWS:  John, can I make one quick

8     statement?

9          MR. TREPTOW:  Sure.

10         MR. MATTHEWS:  A lot of -- many of the

11    original Totem files are now in my office, so if you want to

12    look at those original files, we can certainly make those

13    available.

14         MR. TREPTOW:  I appreciate that, Tom.

15    What I just wanted to make sure that everything relating to

16    Inlet marine insurance issues has been produced in this case.

17  A.  Everything related to Inlet Fisheries, Inc., that we have in

18    our possession has been produced.

19         MR. TREPTOW:  Thank you.

20  Q.  (By Mr. Treptow)  Now, prior to August of 2000 and Totem's

21    submission of an application for vessel pollution insurance

22    to Puget Sound Underwriters, was Totem aware of the marine

23    insurance doctrine of Uberrimae Fidei?

24  A.  No.

25  Q.  Prior to August of 2000, was Totem aware of the doctrine, the

Page 83

1       marine insurance doctrine of Utmost Good Faith?
2   A.  Is that not the same thing, what you just asked me?
3   Q.  It is, but I think it is, but it may be called by another
4       name and you might have known it by another name.
5   A.  No.
6   Q.  Prior to August of 2000, were you aware that certain vessel
7       pollution insurers took the position that it was the
8       insured's duty to disclose all information that the insurers
9       thought was material to the risk before the risk was
10      underwritten?
11  A.  No.
12  Q.  Since August of 2000, has Totem had any dealings with WQIS on
13      behalf of other clients?
14  A.  Black Ball Ferry Lines is the only one.
15  Q.  And as far as you know, does Black Ball Ferry Lines still --
16      are their vessels still insured under WQIS marine pollution
17      policies?
18  A.  It's one vessel, it's the COHO, and I believe so.
19              MR. TREPTOW:  Why don't we take a short
20      break and let me go over my notes.  I think I'm close to
21      being done.
22              (Recess 11:49-12:02 p.m.)
23  Q.  (By Mr. Treptow)  Mr. Parthemer, could you look at Exhibit 10
24      again, please.
25  A.  Yes.

Page 101

```
 1        remember that?
 2   A.   Yes.
 3   Q.   Do you recall in the years that you have worked with Inlet
 4        ever receiving a notice of intent to cancel for nonpayment of
 5        premium?
 6   A.   Yes.
 7   Q.   Were there times when Inlet did have some payment problems?
 8   A.   Yes.
 9   Q.   You were also asked about, I believe, your custom and
10        practice regarding renewals?
11   A.   Yes.
12   Q.   How did you typically deal with renewals with the Inlet
13        account?
14   A.   Well, renewals, delivery of endorsements, and various other
15        things I generally save and for a visit with Patrick Klier in
16        Kenai, Alaska, I generally reviewed them with Patrick.
17   Q.   You would have a sit-down in person?
18   A.   Yes.
19   Q.   And go over the upcoming renewals?
20   A.   Yes, I rarely did anything by mail unless there was a time
21        constraint.
22   Q.   Would you go over the existing coverages at that point?
23   A.   Yes.
24   Q.   And discuss which policies to renew?
25   A.   Which policies were coming up for renewal and which policies
```