Page 1

[1]
[2] IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA
[3] ————————————————X
CERTAIN UNDERWRITERS AT LLOYDS,
[4] LONDON, SUBSCRIBING TO CERTIFICATE
OF INSURANCE OP01 0025, through Puget
[5] Sound Underwriters, Inc.,
    Plaintiffs,
[6]
    vs.
[7]
INLET FISHERIES, INC., an Alaska
[8] Corporation, and INLET FISH PRODUCERS,
INC., an Alaska Corporation,
[9]    Defendants.
————————————————X
[10] INLET FISH PRODUCERS, INC., an Alaskan
Corporation,
[11]    Third-Party Plaintiffs,
[12]    vs.
[13] TOTEM AGENCIES, INC., a Washington
Corporation, and AMERICAN E&S INSURANCE
[14] BROKERS CALIFORNIA, INC., a Washington
Corporation
[15]    Third-Party Defendants.
————————————————X
[16]    292 Madison Avenue
[17]    New York, New York
[18]    December 6, 2005
[19]    2:45 P.M.
[20]
[21]    EXAMINATION BEFORE TRIAL of RUSSELL
[22] BROWN, taken pursuant to Notice, held at the
[23] above mentioned time and place before Keith
[24] Rudolph, a Notary Public of the State of New
[25] York

Page 2

[1]
[2] APPEARANCES:
[3]
[4]    (Telephonically present)
[5]    DORSEY & WHITNEY LLP
[6]       Attorneys for Inlet Fisheries
[7]       1031 West Fourth Avenue
[8]       Suite 600
[9]       Anchorage, Alaska 99501
[10]   BY: JOHN A. TREPTOW, ESQ.
[11]
[12]
[13]   MATTHEWS & ZAHARE, P.C.
[14]      Attorneys for Totem Agencies, Inc.
[15]      431 West 7th Avenue
[16]      Suite 207
[17]      Anchorage, Alaska 99501
[18]   BY: THOMAS A. MATTHEWS, ESQ.
[19]
[20]   RUBIN, FIORELLA & FRIEDMAN LLP
[21]      Attorneys for Witness
[22]      292 Madison Avenue
[23]      New York, New York 10017
[24]   BY: ALAN R. SACKS, ESQ.
[25]

Page 3

[1]
[2]    IT IS HEREBY STIPULATED AND AGREED
[3] by and among counsel for the respective
[4] parties hereto, that the sealing and
[5] certification of the within deposition
[6] shall be and the same are hereby waived;
[7]
[8]    IT IS FURTHER STIPULATED AND AGREED
[9] that all objections, except to the form of
[10] the question, shall be reserved to the
[11] time of trial;
[12]
[13]   IT IS FURTHER STIPULATED AND AGREED
[14] that the within deposition may be signed
[15] before any Notary Public with the same
[16] force and effect as if signed and sworn to
[17] before the Court.
[18]
[19]   IT IS FURTHER STIPULATED AND AGREED
[20] that counsel for the witness examined
[21] herein shall be furnished with a copy of
[22] the within deposition without charge.
[23]
[24]
[25]

Page 4

[1]             R. Brown
[2] RUSSELL BROWN, having first
[3] been duly sworn by a Notary Public of the
[4] State of New York, was examined and testified
[5] as follows:
[6]             EXAMINATION BY
[7]             MR. MATTHEWS:
[8]    Q: Will you state your name for the
[9] record, please?
[10]   A: Russell Brown.
[11]   Q: Spell the last name for me.
[12]   A: B-R-O-W-N.
[13]   Q: By whom are you employed,
[14] Mr. Brown?
[15]   A: Water Quality Insurance Syndicate.
[16]   Q: How long have you been employed by
[17] that company?
[18]   A: Just over eight years.
[19]   Q: Before you there is a document
[20] which has been marked as Exhibit 1. That's a
[21] copy of a notice of deposition for today.
[22]   (Document marked as Defendant's
[23] Exhibit 1 for identification; 12/06/05,
[24] K. R.)
[25]   Have you seen that document

EXHIBIT L
Page 1 of 5

Page 5

R. Brown

[2] before?
[3] A: Yes.
[4] Q: That is a notice which asks Water
[5] Quality Insurance Syndicate to designate a
[6] witness to testify on its behalf concerning
[7] four different subject areas. Do you
[8] understand that?
[9] A: Yes.
[10] Q: Are you the witness who has been
[11] designated to testify on behalf of WQIS
[12] today?
[13] A: Yes, I am.
[14] Q: The notice also asks for the
[15] production of certain documents and records.
[16] Do you understand that?
[17] A: Yes.
[18] Q: Have certain records been brought
[19] for us?
[20] A: Yes, they have.
[21] Q: Are those what have been placed in
[22] front of us in the file folders each marked
[23] Inlet Fisheries with a number of different
[24] policy numbers on them?
[25] A: Yes.

Page 6

R. Brown

[2] Q: Do I correctly understand that
[3] each of these files is the underwriting file
[4] for Inlet Fisheries for a particular policy
[5] year?
[6] A: Yes.
[7] Q: For example, the file marked Inlet
[8] Fisheries policy number 21-09047, is that the
[9] underwriting file for the 1992 to 1993 policy
[10] year?
[11] A: Yes, it is.
[12] MR. MATTHEWS: Let me ask the
[13] court reporter to mark each of these
[14] file folders, if we can, separately as
[15] an exhibit so that we know what we are
[16] talking about.
[17] (File folders marked as
[18] Defendant's Exhibits 2 through 10 for
[19] identification; 12/06/05, K.R.)
[20] Q: Mr. Brown, we've now marked as
[21] exhibits 2 through 10 to this deposition
[22] copies of the underwriting files which you
[23] brought with you today, is that right?
[24] A: Yes.
[25] Q: Do I correctly understand that

Page 7

R. Brown

[2] each of these files is a true and correct
[3] copy of the WQIS underwriting files for each
[4] of the years previously mentioned?
[5] A: Yes.
[6] Q: Exhibit 2 is the underwriting file
[7] for '92-'93. Exhibit 3 is '93-'94. Exhibit
[8] 4 is '94-'95. Exhibit 5 is '95-'96. Exhibit
[9] 6 is '96-'97. Exhibit 7 is '97-'98. Exhibit
[10] 8 is '98-'99. Exhibit 9 is '99-2000 and
[11] Exhibit 10 is 2000 to 2001. Is that correct?
[12] A: Correct.
[13] Q: Each of those files are maintained
[14] in the ordinary course of business for WQIS?
[15] A: Yes.
[16] Q: Let me ask you this, if I can, are
[17] the documents for underwriting purposes at
[18] WQIS maintained electronically?
[19] A: They are now, yes.
[20] Q: Is the office paperless?
[21] A: Yes.
[22] Q: I noticed in looking through some
[23] of the file materials that there are dates.
[24] For example, in Exhibit 2, on the top
[25] left-hand corner of the policy itself there

Page 8

R. Brown

[2] is a date stamp. In this case it's 3/13/2004
[3] and a time, 10:39 A.M. Do you see that?
[4] A: Yes.
[5] Q: Do you know whether or not that's
[6] a scanning mark of some kind or an
[7] identifier?
[8] A: I'm not sure, but I believe it's a
[9] scanning — when it was scanned, but I'm not
[10] positive. That would make sense in that time
[11] period.
[12] Q: It appears, for instance, that
[13] each of the documents in this file, Exhibit
[14] 2, has the same date and time stamp of March
[15] 13, 2004, 10:39 A.M. Is that right?
[16] A: Yes.
[17] Q: Does that suggest to you at least
[18] that all of these documents were scanned in
[19] to the WQIS computer system on that day?
[20] A: Yes.
[21] Q: I started to ask you some
[22] questions about your background, but let me
[23] go back to that, if I can. What is your
[24] current job position with WQIS?
[25] A: I'm the Vice President

EXHIBIT L
Page 2 of 5

Page 25

R. Brown

Mr. Ondrejcik?
A: Yes.
Q: What was your specific involvement in that renewal?
A: Primarily assigning the renewals to Mr. Ondrejcik and making sure in due course that the renewal quotation was out at the proper time.
Q: Was a renewal offered for the year 2000?
A: Yes.
Q: Was it accepted by Inlet?
A: Yes.
Q: WQIS did renew the policy for the year 2000, at least initially, right?
A: Yes.
Q: The vessels to be insured included what we call the QP, the Quanirtuuk Princess; that was one of the vessels, right?
A: Yes.
Q: And potentially the Harvester Barge as well?
A: Yes.
Q: The policy would have renewed

Page 26

R. Brown

effective June 12, 2000, right?
A: Correct.
Q: Shortly before the renewal there was a claim involving one of the insured vessels. Are you aware of that?
A: Yes.
Q: That was the Maren I?
A: Yes.
Q: Did you have any involvement at all in the claim side of that?
A: No.
Q: Does WQIS have a separate Claims Department?
A: Yes.
Q: Do Underwriting and Claims communicate from time to time?
A: Yes.
Q: About the nature of the risk?
A: Yes.
Q: Why would Claims be involved in communicating directly with Underwriting?
A: For informed underwriting of certain losses and particularly the amount of the loss and how the loss arose could affect

Page 27

R. Brown

next year's renewal or rating or certain terms and conditions of the policy.
Q: Do you know whether or not the Maren I claim impacted WQIS's decision to cancel the policy?
A: Yes. It did have influence on it, yes.
Q: Explain please.
A: Shortly after renewing the policy it had become aware to the Underwriting Department that there was a claim on this particular insured and by doing so it drew attention to the policy itself and looking back upon the policy themselves we had not had a survey. We asked for a survey through the broker and upon that we did additionally learn that we were not paid for the previous year's policy or the current renewal policy.
Q: Were you involved in determining whether or not you had been paid for the previous year's policy?
A: At that time, yes.
Q: Is it possible that what you haven't been paid for was an endorsement

Page 28

R. Brown

policy as opposed to the policy itself?
A: For the previous year, no.
Q: Are there records within what we have here showing the payment history for this account?
A: For that particular year, I'm not sure.
Q: In any event, you became concerned about the nature of the risk, is that fair to say, because of the Maren I incident?
A: Yes.
Q: You mentioned that you did not have a survey. Had you had a survey on any of these vessels at any point prior to year 2000?
A: No, it did not appear so.
Q: Had you asked for one?
A: Not to my knowledge.
Q: After the Maren I incident, did WQIS ask for the vessels to be surveyed?
A: Yes.
Q: Who was involved in making that request?
A: It was from the Underwriting

EXHIBIT L
Page 3 of 5

Page 29

R. Brown

[1]
[2] Department to the broker.
[3]   Q: Was that done in your direction?
[4]   A: Yes, along with the president of
[5] the company.
[6]   Q: Who is the president of the
[7] company?
[8]   A: Richard Hobbie.
[9]   Q: In looking through the materials
[10] that we have here, Exhibit 10, I believe, is
[11] the 2001 renewal. I didn't see a written
[12] letter to the broker asking for those
[13] surveys. Are you aware of one?
[14]   A: I'm not sure if it was written or
[15] verbally communicated.
[16]   Q: I also didn't see in the files
[17] that there was ever a survey of any kind or a
[18] report concerning the Maren I in your files
[19] which would have triggered the request for
[20] surveys. Are you aware if you ever obtained
[21] an actual survey?
[22]   A: No, not to my knowledge.
[23]   Q: Let me show you a series of
[24] documents, if I can. I want to make sure I
[25] understand the chronology of the

Page 30

R. Brown

[1]
[2] cancellation.
[3]      Before we go on, I should let you
[4] know that, as I understand it, these files
[5] were previously subpoenaed when this case was
[6] pending in Washington by counsel for Lloyds.
[7] I have some records here that have Bates
[8] numbers on them. Some of them have a WQIS
[9] designator which indicates, at least to me,
[10] that they were obtained from WQIS previously.
[11] Some of these documents are contained within
[12] the underwriting files which you have
[13] produced here today. It's easier for our
[14] records because the ones that I have have
[15] numbers on the bottom if you look through
[16] those. Okay?
[17]   A: Yes.
[18]   Q: First of all, let me show you a
[19] letter that bears the Bates number TOT 1326.
[20] Is that a letter that you're familiar with?
[21]   A: Yes, I've seen it before.
[22]   Q: That is a part of your
[23] underwriting file for the 2000 policy year,
[24] correct?
[25]   A: Yes.

Page 31

R. Brown

[1]
[2]   Q: This is a letter dated June 6,
[3] 2000, addressed to Inlet Fisheries from
[4] Jan Townsend of Totem Agencies, correct?
[5]   A: Yes.
[6]   MR. TREPTOW: Is that Exhibit 12?
[7]   MR. MATTHEWS: I haven't marked it
[8] yet. Let's go ahead and mark this
[9] letter as Exhibit 12.
[10]      (Letter marked as Defendant's
[11] Exhibit 12 for identification; 12/6/05,
[12] K.R.)
[13]   Q: We have now marked as Exhibit 12
[14] the letter that we were just looking at,
[15] correct?
[16]   A: Yes.
[17]   Q: What I wanted to ask you about was
[18] the substance of the first paragraph in this
[19] letter. Beginning with, "Water Quality
[20] Insurance Syndicate recently received a
[21] survey regarding the condition of your
[22] vessels," do you see that?
[23]   A: Yes.
[24]   Q: What I wanted to ask you is
[25] whether that paragraph accurately sets forth

Page 32

R. Brown

[1]
[2] WQIS's position as of June 6, 2000?
[3]   A: Not that I'm aware. I wasn't
[4] aware that we received the survey.
[5]   Q: The second sentence says that they
[6] are wanting to send cancellation notice on
[7] your policy because of the age and condition
[8] of the vessels. Is that accurate?
[9]   A: That's the interpretation from
[10] Jan. I'm not sure that we necessarily
[11] relayed that.
[12]   Q: Let me show you another document
[13] marked as Exhibit 13.
[14]      (Document marked as Defendant's
[15] Exhibit 13 for identification; 12/6/05,
[16] K.R.)
[17]      Let me know when you've had a
[18] chance to review both of these exhibits.
[19]   A: Okay.
[20]   Q: Exhibit 13, handwritten note. It
[21] has a Bates number WQIS 0471 on the lower
[22] right. I'll represent to you this was a
[23] document that came from the files that we got
[24] from Lloyds from the Washington case. I did
[25] not see this note in the records that were

EXHIBIT C
Page 4 of 5

Page 37

R. Brown

[2] Q: Take a look at Exhibit 15, if you
[3] will.
[4] I'll look through this as Exhibit
[5] 16.
[6] This is TOT 1327, John.
[7] MR. TREPTOW: Thank you.
[8] (Handwritten notes marked as
[9] Defendant's Exhibits 15 and 16 for
[10] identification; 12/6/05, K.R.)
[11] Q: Let me draw your attention to the
[12] two exhibits that we've put in front of you.
[13] Exhibit 15 is a handwritten note with a Bates
[14] number on the bottom of WQIS 470, correct?
[15] A: Yes.
[16] Q: Exhibit 16 is a handwritten note
[17] with a Bates number TOT 1327 on the bottom,
[18] correct?
[19] A: Correct.
[20] Q: Do you recognize the handwriting
[21] on Exhibit 15?
[22] A: No.
[23] Q: Does it appear to be same as the
[24] person who wrote Exhibit 13?
[25] A: I don't know.

Page 38

R. Brown

[2] Q: Exhibit 16, I will represent to
[3] you, is a handwritten note from the files of
[4] Totem Agencies again reflecting Totem's half
[5] of a conversation between Totem and Tony at
[6] WQIS concerning the identification of a
[7] specific surveyor.
[8] A: Yes.
[9] Q: The surveyor was Alexander Gowe,
[10] Inc.?
[11] A: Correct.
[12] Q: That's also reflected in the
[13] handwritten note we see from WQIS on the top
[14] of the page, right?
[15] A: Correct.
[16] Q: Was Alexander Gowe the surveyor
[17] that WQIS asked to do the surveys for the
[18] Inlet vessels in 2000?
[19] A: Correct.
[20] Q: That is reflected in the letter
[21] that we previously looked at in Exhibit 12,
[22] right?
[23] A: Yes.
[24] Q: Why did WQIS want Alexander Gowe
[25] to do the survey?

Page 39

R. Brown

[2] A: From my understanding, it was a
[3] surveyor that the Claims Department was
[4] comfortable with doing the surveys and the
[5] conditional surveys of these vessels.
[6] Q: Why not simply ask Inlet to go get
[7] a survey done by a surveyor of its choosing?
[8] A: Typically when we do surveys we
[9] want to know who the surveyor is and make
[10] sure they are reputable and somebody that we
[11] know and trust and did business with before.
[12] Q: Mr. Gowe was such a surveyor?
[13] A: I believe so, yes.
[14] Q: Do you know whether or not Inlet
[15] ever attained a survey?
[16] A: No, I do not.
[17] Q: Did you see a survey from Inlet in
[18] any of the files that you looked at earlier?
[19] A: No, I have not.
[20] Q: Did WQIS eventually decide to
[21] cancel the policy?
[22] A: Yes.
[23] Q: Because Inlet had not obtained
[24] surveys?
[25] A: Yes, that's part of it.

Page 40

R. Brown

[2] Q: What was the rest of it?
[3] A: They never paid us.
[4] Q: Are you sure about the "they never
[5] paid" you part?
[6] A: To my knowledge.
[7] Q: If the policy had been paid, would
[8] it have made a difference to the
[9] cancellation?
[10] A: I think we would have eventually
[11] cancelled without a survey.
[12] Q: It is a survey that is a critical
[13] component of the cancellation or the lack of
[14] a survey?
[15] A: Yes.
[16] MR. MATTHEWS: John, this is TOT
[17] 1312.
[18] (Copy of facsimile marked as
[19] Defendant's Exhibit 17 for
[20] identification; 12/6/05, K.R.)
[21] Q: Is that a fax that you recognize,
[22] Mr. Brown?
[23] A: Yes.
[24] Q: Was that WQIS's initial effort to
[25] cancel the policy?

EXHIBIT L
Page 5 of 5