```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3    CERTAIN UNDERWRITERS AT LLOYDS, )
      LONDON, SUBSCRIBING TO          )
 4    CERTIFICATE OF INSURANCE        )
      OP01 0025, through Puget Sound  )
 5    Underwriters, Inc.,             )
                                      )
 6                  Plaintiffs,       )
                                      )
 7    vs.                             )
                                      )
 8    INLET FISHERIES, INC., an       )
      Alaska Corporation, and         )
 9    INLET FISH PRODUCERS, INC.,     )
      an Alaska Corporation,          )
10                                    )
                    Defendants,       )
11    _____)
                                      )
12    INLET FISH PRODUCERS, INC.,     )
      an Alaskan Corporation,         )
13                                    )
            Third-Party Plaintiffs,   )
14                                    )
      vs.                             )
15                                    )
      TOTEM AGENCIES, INC., a         )
16    Washington Corporation, and     )
      AMERICAN E&S INSURANCE BROKERS  )
17    CALIFORNIA, INC., a Washington  )
      Corporation,                    )
18                                    )
            Third-Party Defendants.   )
19    _____)
      IN ADMIRALTY
20    USDC Alaska No.:  A04-0058 CV
21
            VIDEOTAPE DEPOSITION OF VINCENT L. GODDARD
22
23                        November 9, 2005
24
25
```

COPY

RECEIVED
MATTHEWS & ZAHARE
NOV 23 2005
File No. 3500-13
Atty  TPM
Approved to File

COPY

Exhibit A
Page 1 of 24

VINCENT L. GODDARD
Vol. 1

11/9/2005

LLOYDS LONDON v. INLET FISHERIES
A04-0058 Civil

Page 17

```
1    Q    In the Bering Sea?

2    A    No.  In the mouth of the Quinhagak or the Kanetok River

3         near Quinhagak.

4    Q    How long did IFI continue to operate the QP in any

5         capacity?

6    A    Basically through direct operations and ownership through

7         the time it was scuttled.

8    Q    The QP was brought to Bethel then in -- did you say 1988,

9         '89, somewhere in that time frame?

10   A    Yes.

11   Q    And it was moored to the dock where it was used as a

12        processor, correct?

13   A    Yes.  Actually, I'm not sure that that was -- it may have

14        been the Maren I that went there first in '88 because I

15        think the QP was actually involved in the oil spill.  I

16        don't really remember exactly which one was brought out

17        there first, the Maren I and the QP.

18   Q    When you say the Q -- the Maren I was actually involved in

19        the oil spill, you're talking about the Exxon Valdez?

20   A    The Exxon Valdez oil spill.  And the Motor Vessel Trident

21        carried it out to Bethel afterwards.  I'm not sure whether

22        it was brought back -- to tell you the truth, I don't

23        remember which vessel got in there first.  Ultimately both

24        the Maren I and the QP were in Bethel and used as support

25        facilities for the shore operation there.
```

Exhibit _A_

Page _2_ of _24_

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

jpk@gci.net
sahile@gci.net

VINCENT L. GODDARD          11/9/2005          LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                        A04-0058 Civil

Page 24

1     through 2001 you had an actual physical shore-based plant

2     for processing salmon in Bethel that was operated by IFP

3     or Arctic Salmon.

4  A  Yes.  Actually, that started in 1996.  Prior to that it

5     was leased and operated by IFI from 1990 through 1995.

6  Q  Okay.  After 2001 you have not actually processed fish in

7     Bethel.

8  A  No.

9  Q  That's true?

10 A  Yes, it is true.

11 Q  At some point in time IFI and IFP began working with Totem

12    Agencies, true?

13 A  Yes.

14 Q  Do you remember when that was?

15 A  No.

16 Q  Do you know who made the decision to start working with

17    Totem?

18 A  No.

19 Q  I understand that you have overall managerial

20    responsibility for both of those companies.  Focusing for

21    a moment on IFI, was there a person to whom you delegated

22    responsibility for dealing with insurance matters in let's

23    say the '95 to 2000 time period?

24 A  Yes.

25 Q  Who would that person be?

Exhibit ____A____
Page__3_ of _24_

VINCENT L. GODDARD                    11/9/2005                    LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                                                        A04-0058 Civil

Page 25

1   A   Patrick Clear.

2   Q   What was Patrick's title?

3   A   He and Wayne Romigo were basically co-controllers but they

4       had pretty different functions.  Wayne was very strictly

5       involved in the accounting end of things and Patrick was

6       more involved in administrative and tax items.

7   Q   Were both of them involved in insurance matters or would

8       that have been.....

9   A   To a degree but the actual nitty-gritty of it was

10      virtually 100 percent Patrick.

11  Q   Were there circumstances in that time period, 1995 through

12      2000, where you personally got involved in the

13      nitty-gritty of insurance matters?

14  A   Generally not.  I would generally get involved when there

15      was a problem, like a large claim or some kind of a new

16      policy that we might decide to get, something like that.

17      The general, day-to-day work, it was mostly Patrick.

18  Q   How about for Inlet Fish Producers?

19  A   Same thing.

20  Q   Patrick was the same person for that company?

21  A   Yeah.

22  Q   And he would have been delegated the primary

23      responsibility for dealing with insurance matters?

24  A   Yes.

25  Q   And Wayne Romigo might get involved periodically basically

Page 26

```
 1        on a payment basis?

 2   A    Yes.

 3   Q    And you would get involved for Inlet Fish Producers,

 4        again, only if there were a problem or some new reason to

 5        get involved?

 6   A    Yes.  And just to explain Patrick's relationship with

 7        that, he was employed during that time period by Inlet

 8        Fisheries and Inlet Fisheries had a management services

 9        contract with IFP to provide those kind of administrative

10        functions.

11   Q    When you talk about Inlet Fisheries, you're talking about

12        IFI?

13   A    IFI.

14   Q    So Patrick was actually employed by IFI and contracted

15        over as part of that management contract.

16   A    No, I wouldn't say he was contracted over.  The company,

17        in other words IFI, provided those services on behalf of

18        IFP and Patrick was part of that.

19   Q    Was there a written contract?

20   A    Yes.

21        MR. MATTHEWS:  Go off record for just a minute.

22        (Off record)

23        (On record)

24   Q    Going back then to the service contract that IFI had with

25        IFP, under which Patrick Clear provided essentially
```

VINCENT L. GODDARD                          11/9/2005                    LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                                                    A04-0058 Civil

Page 55

1   A   I have no idea.

2   Q   Any reason to believe it was not an accurate answer at

3       this time?

4   A   No.  No idea.  No reason to believe it was not an accurate

5       answer.

6   Q   The vessels proposed for insurance on this application,

7       Exhibit D, included two other vessels, the Fort Yukon and

8       the QP, correct?

9   A   Yes.

10  Q   Do you know whether or not the QP had protection and

11      indemnity insurance on it in September of 2002?

12  A   I do not know, but I believe that it did not.

13  Q   Why do you believe it did not?

14  A   It's my recollection that it expired in the spring of

15      2002.

16  Q   Was an effort made to your knowledge to renew the

17      protection and indemnity coverage on the QP in the spring

18      of 2002?

19  A   I don't recall.

20  Q   Was that something you were involved in anyway?

21  A   I may have been peripherally involved, but I don't recall.

22  Q   You have a personal memory that the coverage expired.

23  A   Yes.

24  Q   And you have a personal memory that the coverage was not

25      replaced as of the spring of 2002.

Computer Matrix, LLC                Phone - 907-243-0668          Exhibit _____
310 K Street, Suite 200             Fax    907-243-1473           Page _62_ of _24_          jpk@gci.net
                                                                                            sahile@gci.net

VINCENT L. GODDARD                    11/9/2005              LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                                        A04-0058 Civil

Page 56

```
 1    A    That's what I believe.

 2    Q    Do you have a memory at all of why that transpired?

 3    A    No.

 4    Q    Do you know whether or not in September of 2002 the QP had

 5         hull and machinery coverage?

 6    A    No, I don't know.

 7    Q    Do you have a belief?

 8    A    Yes.

 9    Q    What's your belief?

10    A    That it didn't.

11    Q    Did not?

12    A    Yeah.

13    Q    Do you know when it last had had hull and machinery

14         coverage?

15    A    I believe it would have been coincident with the P&I

16         coverage.

17    Q    So it would have expired then in the spring of '02, the

18         same time the P&I coverage expired?

19    A    That would be my guess.

20    Q    Do you personally have any understanding why hull and

21         machinery coverage was not maintained after the spring of

22         2002 on the QP?

23    A    No.

24    Q    Do you know whether or not the lack of P&I coverage or

25         hull and machinery coverage on the QP following the spring
```

VINCENT L. GODDARD
Vol. 1                              11/9/2005                LLOYDS LONDON v. INLET FISHERIES
                                                                            A04-0058 Civil

Page 57

1       of 2002 had anything to do with the lack of current

2       surveys?

3   A   I don't recall, but there could be a connection.

4   Q   You say there could be a connection because you have a

5       vague memory that there was a connection or.....

6   A   No.  Just based on experience that that's sometimes a

7       reason.  In other words, insurance carriers will request

8       from time to time new surveys.

9   Q   And failing new surveys, insurance carriers from time to

10      time will refuse to renew policies.

11  A   Yeah.  And if that occurred on that one, I'm not sure what

12      -- I don't really recall.  They may have been requiring an

13      out-of-water survey or something like that, which would

14      have been virtually impossible for that vessel.

15  Q   For the QP?

16  A   Yeah.

17  Q   Why would that be virtually impossible?

18  A   You'd have to haul it very long distance to somewhere

19      where it could be done.

20  Q   No such facilities exist in Bethel, right?

21  A   Or anywhere near.

22  Q   What's the closest place you could do that?  Seward?

23  A   Seward or Kodiak, probably.

24  Q   Over the years that you have been in the salmon processing

25      business, is that an experience that you have had before

Computer Matrix, LLC                    Phone - 907-243-0668          Exhibit
310 K Street, Suite 200                 Fax    907-243-1473           Page 8 of 24
                                                                     jpk@gci.net
                                                                     sahile@gci.net

Page 72

1    A    No.

2    Q    Do you have an understanding as to whether or not IFI has

3         made any payments of any kind to any of the fishermen

4         claimants?

5    A    Not specifically, no.

6    Q    Same question with respect to IFP.

7    A    Well, I know that IFP has made payments to the claimants

8         but for fish purchased.

9    Q    Okay.  I wasn't very clear in my question.  I apologize.

10   A    That's why I thought I'd finish out the answer for you.

11   Q    Do you know whether or not IFP has made payments to any of

12        the claimants for spill-related damages?

13   A    To my knowledge, no.

14   Q    And the same question with respect to IFI.

15   A    Once again, no.

16   Q    To your knowledge, have either IFI or IFP made any

17        payments with respect to damages claimed by the claimants

18        in Bethel for.....

19        MR. TREPTOW:  I'm sorry.

20   A    I think it's the same question that you asked before.  I

21        don't see the difference.

22   Q    I just wanted to expand it a little bit instead of saying

23        spill-related.  I mean there are additional -- other than

24        direct oil damage claims, they're claiming some.....

25   A    We have made no -- both IFI and IFP have made no payments

Page 73

1      as to any claims related to that lawsuit.

2    Q    You answered it much better than I asked it.  Thank you.

3         MR. TREPTOW:  Can we go off the record for a second.  I'd

4    like to talk to the witness.

5         MR. MATTHEWS:  Sure.  Actually, what I was.....

6         (Off record)

7         (On record)

8         (Court reporter Nathaniel Hile returns)

9         REPORTER:  Back on record.  The time is 1:34 p.m.

10   Counsel, you may proceed.

11   Q    Mr. Goddard, we've now had a lunch break over the course

12        of the last hour and I wanted to ask you generally is

13        there anything at this point in time that you need to

14        correct based upon our discussions this morning?

15   A    I don't have anything to correct based on our discussions

16        this morning, but a discussion I had with Eric just in the

17        anteroom suggests that my scenario when we started

18        business was inaccurate.

19   Q    You're talking about a conversation you and he just

20        had.....

21   A    Yeah.

22   Q    .....moments ago?

23   A    Yeah.

24   Q    Okay.  And how would you correct that?

25   A    He leads me to believe, and I think that he's correct,

VINCENT L. GODDARD
Vol. 1
11/9/2005
LLOYDS LONDON v. INLET FISHERIES
A04-0058 Civil

Page 75

1    hall here moments ago, anything else that you feel the

2    need to correct at this point?

3    A    Once again, there may -- some of my renditions related to

4    time, you know, scenarios and everything may be incorrect,

5    but I don't know of any others besides that that need to

6    be corrected at this point.

7    Q    Okay.  We were discussing just before we broke -- I

8    believe that you said you had not -- neither IFP nor IFI

9    have made any payments to any of the fisherman claimants

10   in the Bethel litigation specifically related to damages

11   that they claim in those lawsuits.

12   A    That's correct.

13   Q    Have you made -- strike that.  Has IFP or IFI made

14   payments of any kind relating to the QP incident to any

15   other entity?

16   MR. TREPTOW:  Objection in the sense it assumes payments

17   have been made to anyone.

18   Q    That's the question.  Have any payments been made to

19   anyone relating to the QP incident?

20   A    Well, in the sense that we sent Steve Sather out there to

21   represent Inlet Fisheries interest, he was paid.

22   Q    Steve was an employee?

23   A    Yes.

24   Q    On the payroll at the time?

25   A    No.  He was sent out specifically for that project.

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax   907-243-1473

jpk@gci.net
sahile@gci.net

Exhibit  A
Page  11 of 24

Page 76

```
 1   Q   Was he not otherwise on the payroll before that incident?

 2   A   He was off the payroll by that point in time.  He's a

 3       seasonal employee.

 4   Q   Any other payments you can think of?

 5   A   Other than anything that would have been directly related

 6       to what he was doing up there, for instance skiff rental

 7       or something like that.  That would be it.  Maybe lodging,

 8       you know.

 9   Q   So expenses related particularly to his stay up in Bethel.

10   A   Yes.

11   Q   Let me see -- I may be leading into tomorrow's questioning

12       a little bit, but let me ask this just to clarify who the

13       right person to ask some of these questions is.  Would

14       questions relating to specific payments like that to Steve

15       Sather or such things, would those be better directed to

16       you or to Laura Herr?

17   A   Regarding specific payments, she would know more about

18       things than I would.

19   Q   Was Laura on the payroll before Patrick Clear departed?

20   A   Yes.

21   Q   So there was some period of overlap?

22   A   She was on the payroll before Patrick Clear arrived.

23   Q   Okay.  So she's worked for you for 20 years or so, maybe

24       longer?

25   A   Who's counting?  I don't know.  No, the longest time she
```

Computer Matrix, LLC                    Phone - 907-243-0668         Exhibit ____ A
310 K Street, Suite 200                 Fax    907-243-1473          Page 12 of 24          jpk@gci.net
                                                                                            sahile@gci.net

VINCENT L. GODDARD                    11/9/2005                    LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                                                A04-0058 Civil

Page 79

1    Q    Is it fair to say the Coast Guard federalized that spill

2         within 48 hours?

3    A    I don't know.  I mean I'm sure there's records that would

4         indicate it, so I don't know if there's any reason to

5         respond.

6    Q    It was pretty quick though?

7    A    Yes.

8    Q    As a result of that federalization, the national NFP sent

9         a bill to Inlet Fisheries for its spill-related expenses,

10        correct?

11   A    Yes.

12   Q    And that bill is in the amount of roughly $460,000, 465,

13        something like that?

14   A    Yes, it is.

15   Q    Has any portion of that bill been paid?

16   A    No.

17   Q    Have arrangements been made of any kind to pay that bill?

18   A    No.

19   Q    Do you have any agreement with the NFP for repayment of

20        that bill?

21   A    What do you mean by repayment?

22   Q    For payment of any kind.

23   A    Oh.  No.

24   Q    Is there any settlement of any kind relating to that bill?

25   A    No.

Computer Matrix, LLC                 Phone - 907-243-0668          Exhibit  A              jpk@gci.net
310 K Street, Suite 200              Fax    907-243-1473                                   sahile@gci.net
                                                                  Page  13 of  24

Page 85

1                                                          (Deposition Exhibit E marked)

2     Q     Have you had a chance to look at.....

3     A     Yes.

4     Q     .....what we've marked as Exhibit E?

5     A     Yes.

6     Q     What I want to draw your attention to -- well, first of

7           all, is that an affidavit that you signed on October 10,

8           2003?

9     A     I have every reason to believe it is.

10    Q     That's your signature on the third page?

11    A     Yes.

12    Q     And it appears to have been notarized in front of an

13          Alaska notary public.

14    A     Yes, at BGO.

15    Q     Take a look at paragraph four of that affidavit.

16    A     Yes.

17    Q     Does that help refresh your memory as to what vessels

18          which entity had?

19    A     I believe that this statement is coincident with the one I

20          gave you.

21    Q     It wasn't clear from the affidavit what the relevant times

22          were that they were talking about, so let me just see if I

23          can't make sure that we're clear for purposes of our

24          record.  So in May of '03 you said that Inlet Fish

25          Producers had the Fort Yukon.

VINCENT L. GODDARD
Vol. 1

11/9/2005

LLOYDS LONDON v. INLET FISHERIES
A04-0058 Civil

Page 86

1   A   Fort Yukon.

2   Q   The Harvester Barge.

3   A   Harvester Barge.

4   Q   Mr. Alexie, Barge I.

5   A   And that was it.

6   Q   And that was it.  The Inlet Harvester was owned by.....

7   A   Inlet Harvester isn't on here.

8   Q   It's not listed in the affidavit.

9   A   Yeah.  It should have been listed as IFP as the owner.

10  Q   Okay.

11  A   And by May of 2003 the Schenk's Arc had been sold and the

12      Maren I and the Quanirtuuq Princess were no longer in

13      evidence.  There's another vessel that was left out of

14      here, too.  The Casco Bay was owned by Inlet Fisheries,

15      Inc.  Of course, I might also add that paragraph four

16      doesn't say that this is necessarily a complete and

17      exhausted list.  It merely says that these vessels were

18      owned.

19  Q   Okay.  Working through -- let me just make sure that we're

20      clear on this list then.  May of '03 you had -- excuse me,

21      IFP owned the Fort Yukon, Harvester Barge, Mr. Alexie,

22      Barge I and Inlet Harvester.

23  A   Yes.

24  Q   At that point in time, the QP was no longer in existence,

25      true?

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

Exhibit  B
Page  15 of  24

jpk@gci.net
sahile@gci.net

VINCENT L. GODDARD                    11/9/2005                    LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                                              A04-0058 Civil

Page 87

1    A    Yes.

2    Q    Maren I was no longer in existence.

3    A    Yeah.

4    Q    The Yukon II was owned by IFI?

5    A    Yes.

6    Q    Schenk's Arc was owned by.....

7    A    Schenk's Arc had been sold.

8    Q    Okay.  Casco Bay, was that still part of the fleet?

9    A    It was owned by Inlet Fisheries.

10   Q    If we drop back a year to August of 2002, we're still

11        dealing with the same total universe of vessels, right?

12        No other names to add to the list?

13   A    Right, except the QP would be back on the list.

14   Q    And the Maren I had been scuttled by that point.....

15   A    Yes.

16   Q    .....but the QP was on the list.

17   A    Yeah.

18   Q    Schenk's Arc was still owned?

19   A    I believe the Schenk's Arc was sold in 2002 in the spring.

20   Q    Did IFP in August of 2002 still have the Fort Yukon,

21        Harvester Barge, Mr. Alexie, Barge I?

22   A    Yes.

23   Q    And the Inlet Harvester was owned at that point in time

24        by.....

25   A    I believe IFP.

VINCENT L. GODDARD                    11/9/2005                    LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                                         A04-0058 Civil

Page 88

1   Q    Okay.  How about in 2001, working through the list.

2   A    This is a mental memory game?

3   Q    To the best of your memory.  I understand that we're.....

4   A    You mean what changes might be.

5   Q    Well, let me try it this way.

6   A    It's beginning to be like the 12 Days of Christmas song.

7   Q    In the time period 2000 to 2003, does the list we've just

8        gone through, Fort Yukon, Harvester Barge, Mr. Alexie,

9        Barge I, Inlet Harvester, Yukon II, QP, Maren I, Schenk's

10       Arc and Casco Bay, does that represent the Inlet fleet if

11       you will?

12  A    I'm not sure.  I've gone over this before and there's

13       always a boat or two that pop up and I go, oh, that one,

14       too.  For instance, the Barge Ranger we sold to a

15       gentleman in Kodiak and I believe the time of that sale

16       was probably 2001, so if you go back to 2000 that was one

17       of the owned vessels.

18  Q    Is it fair to say that in the summer of 2000 you owned

19       more vessels than you had insured for pollution liability?

20  A    Yes.

21  Q    The same thing would be true for 2001?

22  A    Yes.

23  Q    The same thing would be true for 2002?

24  A    Yes.

25  Q    And does that continue to be true for today?

Computer Matrix, LLC                Phone - 907-243-0668          Exhibit ___ ___ ___ jpk@gci.net
310 K Street, Suite 200             Fax   907-243-1473           Page _17_ of _24_   sahile@gci.net

Page 89

1    A    Yes.  As it turned out, we didn't have insurance.

2    Q    During the years that you had purchased insurance there

3         were nonetheless vessels that you did not choose to

4         insure, correct?

5    A    That's correct.

6    Q    And that was true for pollution liability.

7    A    Yes.

8    Q    Also true at different times for P&I coverage.

9    A    Yes.

10   Q    Also true at different times for hull and machinery

11        coverage.

12   A    Yes.

13   Q    So for the assets that were part of the Inlet fleet, if I

14        can call it that, at various different points in time

15        you've had insurance coverage on them or not.....

16   A    Yes.

17   Q    .....depending upon circumstances.

18   A    Yes.

19   Q    As a matter of choice.

20   A    Generally, yes.

21   Q    Is it fair to say that you would choose to insure those

22        vessels as a business decision depending upon

23        circumstances then prevailing?

24   A    Yes.

25   Q    Sometimes it's a matter of money?

Computer Matrix, LLC
310 K Street, Suite 200                Phone - 907-243-0668                      jpk@gci.net
                                       Fax   907-243-1473                        sahile@gci.net

Exhibit _____
Page __18_ of _24_

Page 90

1    A    Also a matter of size and attendant risk.

2    Q    Would you agree with me that insurance is simply a way of

3         spreading risk?

4    A    Certainly one way to describe it.

5    Q    Sometimes it is worth it to your business to pay insurance

6         premiums for a particular risk and other times it's not,

7         true?

8    A    Right.

9    Q    And that's a calculated business risk that you take as a

10        business owner.

11   A    Yes.

12                              (Deposition Exhibit F marked)

13   Q    Take a look at that one if you would, please, Exhibit F, I

14        believe.  (Pause)  Have you had a chance to look at

15        Exhibit F?

16   A    Yes.

17   Q    That's a declaration that apparently you signed in June of

18        2004?

19   A    Yes.

20   Q    And it contains your signature on the fourth page?

21   A    Yes.

22   Q    Was the declaration accurate when you made it?

23   A    Well, apparently not.  In paragraph two it says since

24        approximately 1993.  If you use a broad definition of

25        approximately, it's correct.

Computer Matrix, LLC                Phone - 907-243-0668                        jpk@gci.net
310 K Street, Suite 200             Fax    907-243-1473              Exhibit  A    sahile@gci.net
                                                                    Page  19  of  24

VINCENT L. GODDARD                    11/9/2005          LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                              A04-0058 Civil

Page 92

1      to have them step in to pay for the cleanup.

2   Q   You had been involved in the cleanup of the Maren I in the

3      year 2000, true?

4   A   I wasn't personally involved.

5   Q   That was going to be my next question.  Did you have any

6      personal involvement in that?

7   A   Other than to hear what was going on from time to time,

8      no.

9   Q   That cleanup was not federalized, true?

10  A   No, it was not.

11  Q   Inlet maintained overall responsibility for the cleanup of

12     that spill, correct?

13  A   No.  Arctic Salmon, Inc.

14  Q   Arctic Salmon had.  Did Arctic Salmon actually pay the

15     contractors involved in conducting the cleanup operations

16     relating to the Maren I?

17  A   It was sort of a split picture.  Some of the bills were

18     paid directly by Arctic Salmon, Inc. and then submitted to

19     WQIS.  Other bills were presented directly to WQIS and

20     then they paid.

21  Q   Is it fair to say that both Arctic Salmon and WQIS were

22     paying spill-related cleanup bills?

23  A   Yeah.

24  Q   The majority of them being paid by Arctic Salmon and then

25     seeking reimbursement?

VINCENT L. GODDARD                    11/9/2005        LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                          A04-0058 Civil

Page 93

```
 1    A    I don't know.

 2    Q    Let me go back to something that we were talking about

 3         this morning on a related subject.  I asked you about the

 4         merits of the fishermen's claims involving the QP

 5         incident.  I want to ask you about the merits of their

 6         claims involving the Harvester Barge incident.  Do you

 7         have a personal view as to whether or not there is any

 8         merit to those claims?

 9    A    I think there is very little merit to their claims

10         relative to the QP and virtually no merit whatsoever on

11         the Harvester Barge.

12    Q    Explain, please.

13    A    The apparent volume of oil that was in the water before

14         containment was a little bit larger with the QP.  It was

15         virtually non-existent with the Harvester Barge.  In other

16         words, there was nothing that happened that impacted the

17         local property owners at all with the Harvester Barge.  In

18         fact, they didn't even get around to adding it to the

19         lawsuit for like at least a year afterwards or something.

20    Q    The Harvester Barge incident occurred in, what, the middle

21         of May 2003.....

22    A    Uh-huh.  (Affirmative)

23    Q    .....is that right?  What fishing operations to your

24         knowledge would have been under way in Bethel at that

25         point in time?
```

Computer Matrix, LLC          Phone - 907-243-0668              jpk@gci.net
310 K Street, Suite 200        Fax   907-243-1473    Exhibit _____    sahile@gci.net
                                                     Page __ of __

Page 104

1        have just been that I called them and left messages for

2        them to call me back.

3    Q   Okay.  It looks like at 9:15 you had a call to Bob C.

4    A   Yes.

5    Q   Was that the state representative?

6    A   Yeah, he's from DEC.

7    Q   Bob Carlson?

8    A   Bob Carlson.

9    Q   And he had heard at that point that the Coast Guard was

10       going to federalize the project if you didn't do something

11       by noon?

12   A   Yeah.

13   Q   And then it looks like about 10:00 o'clock you started

14       speaking with D.W.  Dave Willoughby, I assume.

15   A   Yes.

16   Q   It looks like you contemplated using Faulkner Walsh to

17       assist with the cleanup at that point.

18   A   Yes.

19   Q   And F.W. refers to Faulkner Walsh?

20   A   Yes.  These were in conversations with Dave Willoughby

21       during which time we were both assuming that Lloyds would

22       respond positively and give us the support we needed to

23       actually be in charge of the spill response ourselves.

24   Q   Did you expect at that point in time that you would run

25       this spill response much as you had the Maren I?

310 K Street, Suite 200                 Fax    907-243-1473                          sahile@gci.net

                                        Exhibit  A
                                        Page  22 of 24

VINCENT L. GODDARD                    11/9/2005              LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                                                        A04-0058 Civil

Page 105

1   A   That's what we were assuming, yeah, that we wanted to
2       avoid federalization.
3   Q   In which case Inlet would retain overall responsibility
4       for the cleanup itself.....
5   A   Right.
6   Q   .....and work with Underwriters to seek repayment of its
7       expenses?
8   A   Well, no.  We needed them to step forward and take an
9       active responsibility with it.
10  Q   Did you expect at that point in time that Inlet would
11      continue to have an active role in managing the spill
12      itself?
13  A   We didn't know.  I didn't know.  That's what we were
14      trying to put together.
15  Q   That had been your experience with the Maren I though.
16  A   Right.
17  Q   It looks like on August 28th you had a call from Eric,
18      bottom of the third page.
19  A   Yeah.
20  Q   And that's Eric Parthemer again?
21  A   Yes.
22  Q   And you discussed each other's view of the policy?
23  A   It looked good to both of us at the time.
24  Q   You each reached the same conclusion that based upon what
25      you could see you thought coverage should be there?

Computer Matrix, LLC                Phone - 907-243-0668
310 K Street, Suite 200             Fax    907-243-1473        Exhibit  A
                                                              jpk@gci.net
                                                              sahile@gci.net
                                                              Page 23 of 24

VINCENT L. GODDARD           11/9/2005          LLOYDS LONDON v. INLET FISHERIES
Vol. 1                                              A04-0058 Civil

Page 134

```
 1              C E R T I F I C A T E

 2    UNITED STATES OF AMERICA        )

                                      ) ss

 3    STATE OF ALASKA                 )

 4        I, Joseph P. Kolasinski, Notary Public in and for the

 5    state of Alaska, residing in Anchorage in said state, do hereby

 6    certify that the deponent in the foregoing matter was duly

 7    sworn to testify to the truth, and nothing but the truth;

 8        That said testimony was taken at the time and place

 9    therein stated;

10        That the testimony of said witness was recorded by

11    videotape and electronically and thereafter transcribed under

12    my direction and reduced to print;

13        That the foregoing is a full, complete, and true record of

14    said testimony.

15        I further certify that I am not a relative, nor employee,

16    nor attorney, nor of counsel of any of the parties to the

17    foregoing matter, nor in any way interested in the outcome of

18    the matter therein named.

19        IN WITNESS WHEREOF I have hereunto set my hand and affixed

20    my seal this 22nd day of November, 2005.

21

22

      Joseph P. Kolasinski, Notary Public

23    in and for the State of Alaska.

      My Commission Expires:  03/12/2008

24

25
```

Computer Matrix, LLC                Phone - 907-243-0668              Exhibit    A        jpk@gci.net
310 K Street, Suite 200             Fax   907-243-1473           Page  24 of 24        sahile@gci.net