1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ALASKA

3    _____

4    CERTAIN UNDERWRITERS AT      ) IN ADMIRALTY

5    LLOYDS, LONDON, SUBSCRIBING  )

6    TO CERTIFICATE OF INSURANCE  )

7    OPO1 0025, through Puget     ) NO. C03-00889A

8    Sound Underwriters, Inc.,    ) (Washington)

9                 Plaintiffs,     )

10        vs.                     )

11   INLET FISHERIES, INC., an   ) USDC Alaska No.:

12   Alaska Corporation, and     ) A 04-0058 CV (JWS)

13   INLET FISH PRODUCERS, INC., )

14      (Continued Next Page)    )                    COPY

15   _____

16       VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

17                         OF

18                   PATRICK KLIER

19   _____

20             9:14 a.m. to 1:56 p.m.

21              November 16, 2005

22         1420 Fifth Avenue, Suite 3400

23             Seattle, Washington

24   Barbara L. Nelson, CCR

25   Court Reporter

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit       5
Page    1    of   24

```
 1    an Alaska Corporation,          )

 2              Defendants.           )

 3    _____)

 4    INLET FISH PRODUCERS, INC.,     )

 5    an Alaskan Corporation,         )

 6       Third-Party Plaintiffs,      )

 7              vs.                    )

 8    TOTEM AGENCIES, INC., a         )

 9    Washington Corporation, and     )

10    AMERICAN E&S INSURANCE          )

11    BROKERS CALIFORNIA, INC., a     )

12    Washington Corporation,         )

13       Third-Party Defendants.      )

14    _____)

15

16

17

18

19

20

21

22

23

24

25
```

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit    S
Page    2  of  24

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE THIRD-PARTY        JOHN A. TREPTOW

 4    PLAINTIFFS:                Attorney at Law

 5    (Via Videoconference)      Dorsey & Whitney, LLP

 6                               1031 W. Fourth Avenue

 7                               Suite 600

 8                               Anchorage, Alaska 99502

 9

10    FOR THE THIRD-PARTY        THOMAS A. MATTHEWS

11    DEFENDANTS TOTEM           Attorney at Law

12    AGENCIES:                  Matthews & Zahare

13                               431 W. Seventh Avenue, #207

14                               Anchorage, Alaska 99501

15

16    ALSO PRESENT:              VINCE GODDARD

17                               ERIC PARTHEMER

18                               TODD LICEA, Videographer

19

20

21

22

23

24

25
```

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit  S
Page  3  of  24

WITNESS: PATRICK KLIER  11/16/05                    11

1    housing projects.  We manage commercial real estate

2    buildings, office buildings.

3        Q.    Is all of your work in the state of Montana?

4        A.    Yes.

5        Q.    How long have you lived in Montana?

6        A.    Three years.

7        Q.    All of it in Missoula?

8        A.    Yes.

9        Q.    Prior to moving to Montana, did you live in

10   Alaska?

11       A.    Yes.

12       Q.    In Kenai?

13       A.    Yes.

14       Q.    And you were employed by one of the Inlet

15   entities, if I can call it that?

16       A.    Yes.

17       Q.    Which company?

18       A.    Inlet Salmon, which was the business name

19   for Inlet Fisheries, Inc.

20       Q.    How long were you employed by Inlet Salmon?

21       A.    About 13 years.

22       Q.    What was the last position you held?

23       A.    Controller and safety director.

24       Q.    Tell me generally what your responsibilities

25   were for Inlet Salmon?

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit    5
Page   4  of  24

1      A.    As controller, provided accounting services,

2   insurance-related work, packaging supply control,

3   special projects as called upon.  As safety director,

4   I was in charge of the safety department and its

5   operations for the employees.

6      Q.    How much of your time was spent in your

7   controller duties, as opposed to working on safety

8   issues?

9      A.    Maybe three-quarters.  Seventy-five, 80

10  percent was controller duties, maybe a little higher.

11     Q.    You mentioned in a previous answer back in

12  your public accounting days.  I take it you have an

13  accounting degree?

14     A.    Yes.

15     Q.    Are you a CPA?

16     A.    Yes.

17     Q.    Licensed in what states?

18     A.    Alaska and Wyoming.

19     Q.    When did you get your Alaska license?

20     A.    I believe 1978.

21     Q.    And the Wyoming license?

22     A.    2001.

23     Q.    Did you spend some time in Wyoming after

24  leaving Alaska?

25     A.    Yes.

Exhibit    S
Page  5  of  24

1      Q.   What did you do there?

2      A.   I was the controller for a oil and gas

3  development company, a private company.

4      Q.   What was the name of that company?

5      A.   Kennedy Oil.

6      Q.   How long did you remain in that position?

7      A.   About six months.

8      Q.   And then moved on to Montana?

9      A.   Yes.

10     Q.   Do you hold any other professional licenses?

11     A.   A few related to property management.  I

12  don't know if they're fully professional licenses,

13  but --

14     Q.   Do you have a real estate license?

15     A.   No, these are housing certified credit

16  compliance and certified credit compliance.  It's

17  related to property management for tax credit

18  projects, low-income housing.

19     Q.   You said you were first licensed as a CPA in

20  Alaska in approximately 1978; correct?

21     A.   Yes.

22     Q.   Who did you first go to work for?

23     A.   Boyer Dewhurst Whitten & Company.

24     Q.   Is that an accounting firm?

25     A.   Yes.

Exhibit    5
Page  6  of  24

1      Q.    And where was that located?

2      A.    In Anchorage.  Dewhurst Egan Root & Company.

3    It underwent numerous partner changes.  So the first

4    one was Boyer Dewhurst Egan Root & Company.  That was

5    it.

6      Q.    How long did you work in that firm, in its

7    various --

8      A.    Approximately six years.

9      Q.    I take it the name changed along the way?

10     A.    Yes.

11     Q.    But your position remained the same?

12     A.    Yes, staff accountant, and progressed up.

13     Q.    And you started there in roughly 1978?

14     A.    1976.

15     Q.    What did you do after working for Boyer

16   Dewhurst?

17     A.    I went out to Galena, Alaska, and worked for

18   Gana-a'Yoo, Limited, a village native corporation.

19     Q.    Was that the village corporation for the

20   Galena area?

21     A.    Galena, Koyukuk, Nulato and Kaltag.  It was

22   a consolidated corporation.

23     Q.    How long did you stay in Galena?

24     A.    About six years.

25     Q.    And your position with Gana-a'Yoo, Limited

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit   S
Page  7  of  24

1   was?

2        A.    General manager.

3        Q.    That brings us to about 1988, '87, '88?

4        A.    Eighty-eight, I believe.

5        Q.    Is that when you went to work for Inlet?

6        A.    Oh, I had a break there while searching for

7   employment, a few months break, and then I went to

8   work for Inlet.

9        Q.    Your position for Inlet, was that always in

10  Kenai?

11       A.    I started out initially doing some work in

12  the Seattle office to wrap up remaining work for that

13  year, spent maybe a month or so, six weeks there, and

14  then I was up in Kenai after that.

15       Q.    So the balance of your 13 years with Inlet

16  were all in Kenai?

17       A.    Yes.

18       Q.    Was Kenai the headquarters, if you will, for

19  Inlet?

20       A.    Yes.

21       Q.    Who did you report to during your work for

22  Inlet?

23       A.    Vincent Goddard.

24       Q.    Throughout your tenure?

25       A.    Yes.

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit   5
Page   8   of   24

1    whatever licensing that was involved with that

2    specific vessel.  The insurance files may have been

3    just for types of coverage, and then that would have

4    covered numerous vessels within that coverage type.

5        Q.    So for example, on the QP, you might have a

6    vessel file for that particular boat?

7        A.    Yes.

8        Q.    And you might have one for the Maren I?

9        A.    Yes.

10       Q.    Or the other vessels that are listed on

11   Exhibit 1?

12       A.    Yes.

13       Q.    Would insurance information be kept in those

14   specific files?

15       A.    No, that generally would have been in a

16   file, say, I believe a -- like a P&I insurance file

17   or pollution insurance file or hull and machinery

18   file that would have covered the numerous vessels

19   covered under those policies.  It was more, I

20   believe, on a policy type file.

21       Q.    Okay.  During your tenure at Inlet, the

22   person that you dealt primarily with for insurance

23   was Eric Parthemer?

24       A.    Yes.

25       Q.    Explain for me how you and Eric would handle

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit    S
Page   9   of   24

WITNESS: PATRICK KLIER  11/16/05                          29

1    your relationship.  Was it by telephone, fax, in

2    person, how did it work?

3         A.   All.  Dealing on the phone, by faxes, in

4    person, all three methods.  Written correspondence.

5         Q.   Did you have a typical way of dealing with

6    Eric for renewals on insurance?

7         A.   Nothing special.  If it was coming up for a

8    renewal, either he would have brought it up generally

9    about the renewal coming up or I would have asked

10   about it.

11        Q.   Did you have a way of docketing the renewals

12   yourself in some way?

13        A.   Noting it?

14        Q.   Yeah, did you keep a calendar or anything

15   like that?

16        A.   I'm trying to think on how I maintained that

17   to know when things would renew.  I don't recall

18   right off how that would have been set up.  We had an

19   insurance summary that the Totem Agency would prepare

20   that was a summary of all the different policies we

21   had, and I had that for reference, and then I don't

22   recall if I had -- would make notes on a calendar

23   about that at times or just checking the files.

24             MR. MATTHEWS:  Mark that as Exhibit 2.

25             (Marked Deposition Exhibit Number 2.)

Exhibit ___S___
Page _10_ of _24_

1     Q.   Take a look at what we've marked as Exhibit

2     2.

3           MR. MATTHEWS:  John, this is an insurance

4     summary dated February 17.  It's TOT 911 through TOT

5     927.  It looks like TOT 910 is attached to the back.

6           MR. TREPTOW:  Thank you.

7     Q.   Do you recognize the document we've marked

8     as Exhibit 2?

9     A.   Yes, the type.

10    Q.   Is this the type of insurance summary that

11    you're talking about?

12    A.   Yes.

13    Q.   And this was a summary that you would use

14    with Eric to go over the various different insurances

15    that Inlet had?

16    A.   As a summary, yes.

17    Q.   And did you use this type of a summary on an

18    annual basis?

19    A.   Starting at some point in time, which I

20    can't remember when, and then through the rest of the

21    time we worked together.

22    Q.   How would this document typically be used?

23    Was it starting point?

24    A.   For what?

25    Q.   For renewal of your insurance?

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit ___S___
Page __11__ of _24_

1      A.   This provided just the general summary

2   information of the policy so that I could have it or

3   provide it to Mr. Goddard so he could see what we had

4   in a condensed version.  It would just help to lay

5   the general guidelines for what we had and for

6   renewals to review on our renewal basis.

7      Q.   Would you typically have a meeting with Eric

8   in person where he would deliver this summary?

9      A.   I think, generally, I received it personally

10  from him.

11     Q.   And those meetings would take place in

12  Kenai?

13     A.   Generally, I believe so, they did.

14     Q.   And you and Eric would sit down and go

15  through the summary of your existing coverages?

16     A.   Well, we would address the policy we were

17  dealing with, not necessarily reviewing this specific

18  document.

19     Q.   Okay.  Would you typically review this type

20  of document to make sure the different locations that

21  you had property were properly covered?

22     A.   Clarify that just once more.

23     Q.   Okay.  What I want to try and understand is

24  how you used this type of a document.  Was it kind of

25  a cheat sheet, if you will, of the different

Exhibit   S
Page 12 of 24

1      A.    No.

2            MR. MATTHEWS:  Next one.

3            (Marked Deposition Exhibit Number 10.)

4      Q.    Take a look at Exhibit 10, please.

5            MR. MATTHEWS:  John, this is TOT 389 to 392.

6            THE WITNESS:  Okay.

7      Q.    Do you have a memory of receiving this

8   document in August of 2003?

9            THE REPORTER:  2003?

10     Q.    Sorry, excuse me.  August of 2000?

11     A.    Somewhat.  I have my notes on it, so I

12  received it.

13     Q.    Okay.  That's your handwriting on the

14  document?

15     A.    Yes, it is.

16     Q.    Does this appear to be a proposal for

17  pollution insurance through underwriters at Lloyd's

18  London?

19     A.    Yes.

20     Q.    Proposing two different quotations for

21  pollution insurance?

22     A.    Yes.

23     Q.    For four different vessels?

24     A.    Yes.

25     Q.    The QP, the Yukon II, the Fort Yukon, and

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

WITNESS: PATRICK KLIER  11/16/05                    68

```
 1    the Harvester Barge?

 2         A.    Yes.

 3         Q.    And there were optional quotes there for a

 4    million dollars in coverage or five million in

 5    coverage?

 6         A.    Yes.

 7         Q.    And that's your handwritten note on the

 8    upper right?

 9         A.    Yes.

10         Q.    Dated 8/26/2000?

11         A.    Yes.

12         Q.    Eric, book insurance on QP, Yukon II and

13    Fort Yukon?

14         A.    Yes.

15         Q.    None on Harvester Barge?

16         A.    Yes.

17         Q.    And that's your initials just below that?

18         A.    Yes.

19         Q.    Is that your handwriting just below, where

20    it says, Limit of 150,000 insurance company

21    liability?

22         A.    The insurance company liability is mine, I

23    can recognize that.  I can't say for sure about where

24    that fuzzy limit of 150, if that's mine or not.  I

25    kind of don't think it is.  I don't make a double
```

Exhibit  S
Page 14 of 24

1    would have to delay making an insurance payment?

2        A.   I believe I -- that's possible.

3        Q.   Do you recall having discussions with Eric

4    Parthemer in which you told him that you would not be

5    able to do a survey at a particular time because you

6    didn't have the money?

7        A.   Don't recall on that one.

8        Q.   During your employment with Inlet the 13

9    years you were there, it went through how many

10   bankruptcies?

11       A.   I think two of the companies went through

12   one bankruptcy each, but I don't recall.  Let's see.

13   Harvester Fisheries and -- is it Inlet Fisheries?  I

14   don't recall.  I think two out of the three companies

15   may have done it while I was there.

16       Q.   Okay.  Shortly before you departed Inlet's

17   employment, did Inlet Fisheries, Inc. file for

18   bankruptcy a second time?

19       A.   I don't recall the timing of that, if it was

20   before or after.

21       Q.   After your departure?

22       A.   Right.

23       Q.   Do you recall that, towards the end of your

24   tenure with Inlet, that it was losing money?

25       A.   Yes.

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit ___S___
Page __15_ of _24_

WITNESS: PATRICK KLIER   11/16/05                    147

1     Q.   Do you recall that, toward the end of your

2   tenure with Inlet, it was more difficult to pay the

3   bills?

4     A.   Yes.

5     Q.   And were certain payments delayed because of

6   that?

7     A.   Likely.  I can't specifically recall.

8     Q.   You were asked at the beginning of

9   questioning by Mr. Treptow whether you relied on

10   Totem to tell you what insurance you needed.  Do you

11   recall that?

12     A.   Yes.

13     Q.   Would you agree, Mr. Klier, that the

14   procurement of insurance is a matter of choice?  You

15   make choices between available coverages; right?

16     A.   Yes.

17     Q.   And you make choices as to what level of

18   coverage to obtain; right?

19     A.   Yes.

20     Q.   And you made those choices at various times

21   on behalf of Inlet; right?

22     A.   Yes.

23     Q.   As we looked at earlier, you chose

24   particular levels of liability coverage for pollution

25   insurance; right?

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit  5
Page  16 of 24

WITNESS: PATRICK KLIER  11/16/05                    148

1        A.    Yes.

2        Q.    Not always the maximum coverage?

3        A.    Correct.

4        Q.    And not always to cover all vessels; right?

5        A.    Correct.

6        Q.    In fact, you did not provide pollution

7    insurance on -- excuse me, you did not select

8    pollution insurance on the tender fleet; correct?

9        A.    Yes.

10       Q.    And those vessels do carry pollutants;

11   right?

12       A.    Fuels and oils.  Yes, I believe they're

13   defined as pollutants.

14       Q.    Those are operating vessels that are

15   carrying fuel oil; right?

16       A.    Yes.

17       Q.    The barges were not operational in the sense

18   that their engines were being used; right?

19       A.    Some mechanical was used, yes, depending on

20   what vessel, if it was running its own or shore

21   power.

22       Q.    Would you agree with me that an operating

23   tender carries more pollutants on it than the barges

24   that were operating shoreside?

25       A.    I don't know, in general, an answer to that.

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit    5
Page  17  of  24

WITNESS: PATRICK KLIER  11/16/05                    149

1      Q.    Would you agree with me that the tenders

2  presented a pollution risk to Inlet?

3      A.    Yes.

4      Q.    And you would agree with me that Inlet

5  consciously chose not to insure that risk?

6      A.    Yes.

7      Q.    Okay.  You would agree with me that the

8  purchase of insurance depends, for each individual,

9  upon their tolerance for risk, wouldn't you?

10      A.    Yes.

11      Q.    And different companies have different

12  levels of risk tolerance; right?

13      A.    Yes.

14      Q.    Thank you, Mr. Klier.  That's all.

15          MR. TREPTOW:  I have a couple more questions

16  in follow-up to what Mr. Matthews asked you.

17

18              E X A M I N A T I O N

19  BY MR. TREPTOW:

20      Q.    Looking at Exhibit 9 and the four vessels

21  that pollution insurance was sought for in 2000, do

22  you know why Inlet wanted to insure the Fort Yukon,

23  the Yukon II, the Harvester Barge and the QP in

24  August of 2000?

25      A.    I can't recall.

Exhibit ___5___
Page _18_ of _24_

1                   C E R T I F I C A T E

2    STATE OF WASHINGTON )

3                        )

4    COUNTY OF KING       )

5              I, the undersigned Notary Public in and

6    for the State of Washington, do hereby certify:

7              That the annexed and foregoing deposition

8    of each witness named herein was taken

9    stenographically before me and reduced to typewriting

10   under my direction;

11             I further certify that the deposition was

12   submitted to each said witness for examination,

13   reading and signature after the same was transcribed,

14   unless indicated in the record that the parties and

15   each witness waive the signing;

16             I further certify that all objections made

17   at the time of said examination to my qualifications

18   or the manner of taking the deposition, or to the

19   conduct of any party, have been noted by me upon said

20   deposition;

21             I further certify that I am not a relative,

22   employee, attorney or counsel of any of the parties

23   to said action, or a relative or employee of any such

24   attorney or counsel;

25             I further testify that I am not in any way

CONTINENTAL REPORTING SERVICE, INC.
SEATTLE, WASHINGTON
(800) 308 - 3377

Exhibit  5
Page 19 of 24

1  financially interested in the said action of the

2  outcome thereof;

3        I further certify that each witness before

4  examination was by me duly sworn to testify the

5  truth, the whole truth and nothing but the truth;

6        I further certify that the deposition; as

7  transcribed, is a full, true and correct transcript

8  of the testimony, including questions and answers,

9  and all objections, motions, and exceptions of

10 counsel made and taken at the time of the foregoing

11 examination.

12

13        IN WITNESS WHEREOF, I have hereunto set my

14 hand and affixed my official seal this _____ day of

15 _____, 2005.

16

17

18        _____

19        Barbara L. Nelson

20        Notary Public in and for the State

21        of Washington, residing in Seattle.

22        CCR #1998

23

24

25


                CONTINENTAL REPORTING SERVICE, INC.
                     SEATTLE, WASHINGTON
                      (800) 308 - 3377


Exhibit ____S____
Page 20 of 24

AUG 28 '00  02:31PM INLET SALMON  907 283-4897                    P.1

Insurance Co.:       Underwriters at Lloyd's, London
Policy Number:       TBD
Policy Period:       TBD
Policy Type:         **Pollution Liability**

                                              Premium:   $ 3,157.00
                                              Policy fee:    250.00
                                              State tax:      25.55
                                              Total:      $3,432.55

Limit of Liability:       $1,000,000  Each Incident/Each Vessel
                          $1,000,000  Aggregate

                                        *8/26/00 Eric*
                                        *Book Ins on Q.P, Yukon II*
Deductible:               None          *+ Fort Yukon*
                                        *none on*
                                        *Harvester*
                                        *Ag.*

| Vessels Covered: | GRT | Limit: | Premium: |
|---|---|---|---|
| "Quanirtuuq Princess" | 1,403 FY | $1,000,000 | $ 956.00 |
| "Yukon II" | 564 | $1,000,000 | $ 853.00 |
| "Fort Yukon" | 670 HB | $1,000,000 | $ 853.00 |
| "Harvester Barge" | 276 QP | $1,000,000 | $ 485.00 |

*wher grt from*

Conditions:       Includes OPA Administrative Penalties - Limited to 80% of
                  Administrative penalties levied not to exceed ~~above limits~~
                                        *limit of $150,000 Ins. Co.*
                  C.E.R.C.L.A. Endorsement            *Liability*
                  Extension for Waters Other than U.S. Waters
                  BI/Third Party Cargo Buyback

Subject to:       $250 Fully Earned Premium
                  P&I Insurance maintained during full period of pollution
                  policy.

**OPTIONAL QUOTE:**    $5,000,000 LIMIT   -   $4,545.84 including taxes & fees

| Vessels Covered: | GRT | Limit: | Premium: |
|---|---|---|---|
| "Quanirtuuq Princess" | 1,403 | $5,000,000 | $1,304.00 |
| "Yukon II" | 564 | $5,000,000 | $1,152.00 |
| "Fort Yukon" | 670 | $5,000,000 | $1,152.00 |
| "Harvester Barge" | 276 | $5,000,000 | $ 654.00 |

TOT 00389

Exhibit _____S_____
Page ___21__ of __24__



EXHIBIT
Klier #10
BLN 11·16·05
PENGAD 800-631-6989

# INSURANCE PROPOSAL

## For

## Inlet Fisheries, Inc.  et al
## PO Box 530
## Kenai, AK  99611



THIS SUMMARY NEITHER AFFIRMATIVELY OR NEGATIVELY AMENDS, EXTENDS OR ALTERS THE COVERAGE AFFORDED BY THE CAPTIONED POLICY AND IS SUBJECT TO CUSTOMARY FORMS USED BY THE ISSUING COMPANY.  PLEASE READ YOUR POLICY CAREFULLY AND DON'T HESITATE TO CALL OUR OFFICE IF YOU HAVE ANY QUESTIONS OR CONCERNS.

TOT 00390

Exhibit  S
Page  22 of  24

## NAMED INSUREDS'

Inlet Fisheries, Inc.

Inlet Fish Producers, Inc.

Arctic Salmon, Inc.

Insurance Co.:   Underwriters at Lloyd's, London
Policy Number:   TBD
Policy Period:   TBD
Policy Type:     **Pollution Liability**

|  |  |
|---|---|
| Premium: | $ 3,157.00 |
| Policy fee: | 250.00 |
| State tax: | 25.55 |
| Total: | $3,432.55 |

Limit of Liability:        $1,000,000  Each Incident/Each Vessel
                           $1,000,000  Aggregate

Deductible:                None

| Vessels Covered: | GRT | Limit: | Premium: |
|---|---|---|---|
| "Fort Yukon" | 1,403 | $1,000,000 | $   966.00 |
| "Yukon II" | 564 | $1,000,000 | $   853.00 |
| "Harvester Barge" | 670 | $1,000,000 | $   853.00 |
| "Quanirtuuq Princess" | 276 | $1,000,000 | $   485.00 |

Conditions:                Includes OPA Administrative Penalties - Limited to 80% of
                           Administrative penalties levied not to exceed above limits.

                           C.E.R.C.L.A. Endorsement
                           Extension for Waters Other than U.S. Waters
                           BI/Third Party Cargo Buyback

Subject to:                $250 Fully Earned Premium
                           P&I Insurance maintained during full period of pollution
                           policy.

**OPTIONAL QUOTE:**        $5,000,000 LIMIT   -   $4,545.84 including taxes & fees

| Vessels Covered: | GRT | Limit: | Premium: |
|---|---|---|---|
| "Fort Yukon" | 1,403 | $5,000,000 | $1,304.00 |
| "Yukon II" | 564 | $5,000,000 | $1,152.00 |
| "Harvester Barge" | 670 | $5,000,000 | $1,152.00 |
| "Quanirtuuq Princess" | 276 | $5,000,000 | $   654.00 |

TOT 00392

Exhibit  S
Page  24  of  24