**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RECEIVED

CERTAIN UNDERWRITERS AT LLOYDS,
LONDON,
                    *Plaintiff-Appellee,*

          v.

INLET FISHERIES INCORPORATED;
INLET FISH PRODUCERS
INCORPORATED,
                    *Defendants-Appellants,*

          v.

TOTEM AGENCIES INCORPORATED;
AMERICAN E&S INSURANCE
BROKERS CALIFORNIA INCORPORATED,
     *Third-party-defendants-Appellees.*

MAR 1 1 2008

CLERK, U.S. DISTRICT COURT
ANCHORAGE, ALASKA

No. 06-35383

D.C. No.
CV-04-00058-JWS

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted
December 5, 2007—Seattle, Washington

Filed February 11, 2008

Before: M. Margaret McKeown and Richard R. Clifton,
Circuit Judges, and William W Schwarzer,* District Judge.

Opinion by Judge McKeown

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

## SUMMARY

### Admiralty and Marine/Insurance

The court of appeals affirmed a judgment of the district court. The court held that the doctrine of *uberrimae fidei*, rather than state law, applies to marine insurance contracts.

Appellee underwriters at Lloyds, London, which had agreed to underwrite a stand-alone pollution insurance policy issued to appellant Inlet Fisheries Inc., brought suit in district court in Alaska seeking a declaratory judgment that it had the right to void the policy *ab initio* under the doctrine of *uberrimae fidei*, based on Inlet's refusal to cooperate with Lloyds' investigation, and Inlet's failure to disclose that one of its vessels sank with oil on board, another docked vessel was in danger of sinking, the poor condition of its vessels, its pending bankruptcy, and the reasons for the cancellation of Inlet's previous policy. Inlet counterclaimed and argued that Alaska state law, rather than federal maritime law, applied, and that Lloyds never asked for the allegedly material information. On cross-motions for summary judgment, the district court granted Lloyds' motion, and ruled that *uberrimae fidei* applied and that Lloyds was entitled to void the policy.

Inlet appealed.

[1] The doctrine of *uberrimae fidei* imposes a duty of utmost good faith, and requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk. [2] Marine insurance has always occupied a unique place in the legal universe, straddling federal and state regulatory jurisdiction. [3] If extant federal admiralty law does not contain an applicable rule, courts are instructed to look to state law, rather than fashioning a new federal admiralty rule or adopting one from British law. [4] In looking to federal law, the question was whether *uberrimae*

*fidei* is a judicially established federal admiralty rule governing this policy.

[5] State law will control the interpretation of a marine insurance policy only in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice. The rule must be sufficiently longstanding and accepted within admiralty law that it can be said to be "established." [6] *Uberrimae fidei* was incorporated into American maritime insurance law in 1828. The roots of the *uberrimae fidei* doctrine, then, were deeply embedded in American law, having had almost 200 years to take hold. [7] The Ninth Circuit has repeatedly acknowledged *uberrimae fidei* as part of admiralty law. [8] Although the Fifth Circuit has held that *uberrimae fidei* was not an entrenched federal precedent, no other circuit has followed it. [9] It had to be held that the longstanding federal maritime doctrine of *uberrimae fidei*, rather than state law, applies to marine insurance contracts.

[10] Marine insurance is, simply, insurance against the losses incident to the marine adventure. [11] One type of insurance typifying marine insurance is protection and indemnity (P&I) insurance, which insures the ship-owner against claims by third parties. [12] Like traditional P&I insurance, vessel pollution insurance, or at least the policy in Inlet's case, covers vessel owners' liabilities to third parties for marine incidents, namely pollution. [13] It had to be held that the vessel pollution insurance policy issued to Inlet was appropriately characterized as marine insurance.

[14] The doctrine of *uberrimae fidei* requires a marine insurance applicant, even if not asked, to reveal every fact within his/her knowledge that is material to the risk. An insurer may rescind an insurance contract if it can show either intentional misrepresentation of a fact, regardless of materiality, or nondisclosure of a fact material to the risk, regardless of intent. [15] Lloyds produced overwhelming and unrefuted

evidence that undisclosed facts—including the poor condition of Inlet's vessels and the reasons for the cancellation of its previous policy—would have affected its decision to offer the policy were it known. [16] Lloyds' uncontested evidence demonstrated that it was concerned that by refusing to renew the policy based on unsubstantiated rumors, it would expose itself to allegations that it had violated its duty of *uberrimae fidei*. The facts undisclosed by Inlet were material to the insurance risk undertaken by Lloyds and these circumstances warranted voiding of the insurance contract by Lloyds. The judgment of the district court had to be affirmed.

## COUNSEL

John A. Treptow, Dorsey & Whitney LLP, Anchorage, Alaska, for the defendant-appellants.

Christopher W. Nicoll, Nicoll Black Misenti & Feig PLLC, Seattle, Washington, for the plaintiff-appellee.

## OPINION

McKEOWN, Circuit Judge:

This case involves the interplay between an ancient legal doctrine and contemporary vessel pollution insurance. Historically, all insurance policies were contracts *uberrimae fidei*, meaning that both parties were held to the highest standard of good faith in the transaction. The doctrine of *uberrimae fidei* was grounded both in morality and efficiency; insureds were considered morally obligated to disclose all information material to the risk the insurer was asked to shoulder, but such a principle was also an economic necessity where insurers had no reasonable means of obtaining this information efficiently, without the ubiquity of telephones, email, digital

photography, and air travel. *See, e.g., Stecker v. Am. Home Fire Assurance Co.*, 84 N.E.2d 797, 799 (N.Y. 1949) ("The reasons which brought into being the strict marine insurance law doctrine as to disclosures, go far back into the early days of marine insurance, when sailing ships in faraway seas were insured in London by underwriters who could get no information except from the shipowners."); *McLanahan v. Universal Ins. Co.*, 26 U.S. 170, 176 (1828) ("The contract of insurance, is one of mutual good faith; and the principles which govern it, are those of an enlightened moral policy."). Today, *uberrimae fidei* has been displaced in most insurance contexts. Nevertheless, the doctrine enjoys continuing vitality in the world of marine insurance.

Although maritime insurance has its roots in pre-Roman times, its modern incarnation can be traced to a sixteenth-century coffee shop. The mariners who gathered there became tired of individually shouldering the plethora of risks inherent in their trade, and decided to band together to share those risks. The coffee shop was owned by the eponymous Edward Lloyd. Out of the coffee shop conversation grew the development of the modern marine insurance market, with Lloyd's of London at its helm. THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 17-1 (4th ed. 2004) (Hornbook Series) ("SCHOENBAUM").

Lloyd's of London became a force not only in the traditional maritime insurance industry but also in emerging and specialized marine insurance markets. With the advent of significant environmental legislation in the 1970s, coupled with a number of high profile disasters involving oil tankers, liability of shipowners for environmental damages was expanded, culminating, at the federal level, with the Oil Pollution Act of 1990 ("the OPA"). SCHOENBAUM § 16-2. The "OPA increase[d] substantially both the regulation and pollution liabilities of entities engaged in the transportation and production of oil within the . . . United States." *Id.* "[I]n part because of the enactment of the [OPA]," "[p]ollution insurance, which

traditionally had been part of P&I coverage, has emerged as a separate coverage in the United States." ADMIRALTY & MARITIME LAW 185, 187, Federal Judicial Center (2004). This stand-alone pollution coverage is often referred to as 'vessel pollution insurance,' and Lloyd's of London is currently the second-largest provider of such policies. The question we consider is whether the doctrine of *uberrimae fidei* applies to vessel pollution insurance policies covering statutory environmental liabilities. We answer that query in the affirmative, and affirm the district court's grant of summary judgment in favor of the Lloyds' underwriters.

## BACKGROUND

Inlet Fisheries, Inc. and Inlet Fish Producers, Inc. (together "Inlet") are Alaska-based fish buying and processing businesses, both owned by Vincent Goddard. Inlet owns a number of vessels, including the YUKON II, FORT YUKON, MAREN I, HARVESTER BARGE ("HB"), and the QANIR-TUUQ PRINCESS ("QP").

The underwriters that are parties to this case are those syndicates at Lloyd's of London that agreed to underwrite a stand-alone pollution insurance policy issued to Inlet in August 2000.[1] For convenience, we refer to both these underwriters and Lloyd's of London as simply "Lloyds."

In August of 2000, Water Quality Insurance Syndicate ("WQIS"), Inlet's then-provider of stand-alone vessel pollution insurance, sent notice that it was cancelling Inlet's policy. The stated and most immediate reasons for the cancellation

---

[1] Lloyd's of London itself does not actively underwrite insurance. Instead, it oversees a market in which individual agencies, known as "syndicates," compete to underwrite individual policies. Each syndicate is managed by an agent, and individual members of the syndicate, called "names," provide the capital. *See Richards v. Lloyd's of London*, 135 F.3d 1289, 1291-92 (9th Cir. 1998).

were Inlet's failures to conduct a survey of its vessels as requested by WQIS and to pay its premiums. WQIS's request for a survey arose after the MAREN I, a vessel owned by Inlet and insured by WQIS, hit a sandbar in Steamboat Slough in Alaska and sank, with 3000 gallons of diesel oil on board. The same vessel had been involved in a "pollution incident" the week before, and the QP, another vessel owned by Inlet, was at the time reportedly listing at the city dock "with the potential of turning turtle."

The day after WQIS sent notice of the cancellation, another of Inlet's vessels, the HB, spilled approximately 55 gallons of oil at the city pier in Bethel, Alaska. Because that oil came originally from the MAREN I, Inlet included the cost of cleaning up this spill in its claim to WQIS for the sinking of the MAREN I.

After receiving WQIS's notice of cancellation, but before its effective date, Inlet, through its broker, sought vessel pollution insurance from Lloyds for the FORT YUKON, YUKON II, HB, and QP. The information Inlet provided on this application forms the basis of the current dispute. In the space calling for Inlet's current pollution insurance carrier, Inlet put "Water Quality Ins. Syndicate." In response to a request for "pollution loss history," Inlet wrote "None." Inlet did not supply, and the application did not request, information about the condition of Inlet's vessels, Inlet's financial status, or the fact of, or reason for, WQIS's cancellation of Inlet's previous policy.

In August 2002, one of Inlet's vessels, the QP, spilled oil and pollutants when it sank in Steamboat Slough, near Bethel, Alaska. After salvage attempts were unsuccessful, the vessel was eventually towed out to sea and scuttled. Inlet made a claim to Lloyds under its vessel pollution policy, at which point Lloyds commenced an investigation into both that incident and Inlet generally.

Upon learning additional information about Inlet, including its failure to disclose the MAREN I and HB incidents, the poor condition of its vessels, and its pending bankruptcy, and after Inlet refused to cooperate with Lloyds' investigation, Lloyds filed suit seeking a declaratory judgment that it had the right to void the policy *ab initio* under the doctrine of *uberrimae fidei*. Inlet counterclaimed and argued that Alaska state law, rather than federal maritime law, applied, and that Lloyds never asked for the allegedly material information. On cross-motions for summary judgment, the district court granted Lloyds' motion, and ruled that *uberrimae fidei* applied and that Lloyds was entitled to void the policy.

## ANALYSIS

[1] The doctrine of *uberrimae fidei* imposes a duty of utmost good faith, SCHOENBAUM § 17-14, and "requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000). Whether the doctrine applies here is particularly important, because Lloyds claims that Inlet failed to disclose material information, and Inlet argues that Lloyds never asked for the information it now regards as material. Under *uberrimae fidei*, however, Inlet would have been obligated to disclose all material information, regardless of a request by Lloyds. SCHOENBAUM § 17-14.

The application of the doctrine can have dramatic consequences. For example, in *Cohen, Friedlander & Martin Co. v. Massachusetts Mutual Life Insurance Co.*, 166 F.2d 63 (6th Cir. 1948), the court held a life insurance policy void under the doctrine of *uberrimae fidei* because the insured failed to disclose two heart attacks that occurred between the date of his application and the effective date of the policy. *Id.* at 66. The court reasoned that even though the representations in the application were correct when it was submitted, *uberrimae fidei* required the insured to disclose any material facts of

which he became aware before the policy became effective. *Id.*

Similarly, in the maritime context, the Fifth Circuit invalidated an insurance policy under *uberrimae fidei* for the insured's failure to disclose the poor condition of his boat. *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 983 (5th Cir. 1969). There, the insured notified the insurance company that his boat was undergoing repairs, but failed to disclose the full extent of the problems with the vessel. *Id.* at 978. In fact, the boat was literally falling apart. *Id.* The shipowner argued he had given the company sufficient notice of the repairs and that it could have inquired about their extent, had it found that fact material. *Id.* at 981-82. The court disagreed, reasoning that while the insurance company was aware that repairs were taking place, it had no reason to expect the vessel was unseaworthy. *Id.* at 982. Under *uberrimae fidei*, the court held the insured was required to advise the insurance company of this material information. *Id.*

[2] Marine insurance has always occupied a unique place in the legal universe, straddling federal and state regulatory jurisdiction. *See Red Cross Line v. Atl. Fruit Co.*, 264 U.S. 109, 124-25 (1924) (holding that states can regulate marine insurance provided the regulations do not "conflict with any essential feature of the general maritime law"). It was not until 1870 that the Supreme Court even recognized marine insurance contracts as within the federal courts' maritime jurisdiction. *See New Eng. Mut. Marine Ins. v. Dunham*, 78 U.S. 1 (1870); *see also Md. Cas. Co. v. Cushing*, 347 U.S. 409, 430 (1954) (Black, J., dissenting). In the years between *Dunham* and the Court's watershed decision in 1955 in *Wilburn Boat*, both states and the federal government, through statutes and judicial decisions, regulated marine insurance, with state laws yielding to federal laws whenever they were deemed to "enter an area of maritime jurisdiction withdrawn from the States[.]" *Cushing*, 347 U.S. at 413.

[3] In *Wilburn Boat*, the Supreme Court signaled a major shift in the approach to marine insurance cases. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955). Before *Wilburn Boat*, we would have simply looked to our admiralty precedent; absent a clear rule, the Supreme Court directed us to look to English law, because of "special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business." *Queen Ins. Co. of Am. v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487, 493 (1924); *Gen. Ins. Co. of Am. v. Link*, 173 F.2d 955, 956 (9th Cir. 1949); SCHOENBAUM § 17-6. Following *Wilburn Boat*, if extant federal admiralty law does not contain an applicable rule, courts are instructed to look to state law, rather than fashioning a new federal admiralty rule or adopting one from British law. Thus, the Supreme Court acknowledged the leading role of states in governing insurance policies, including marine insurance policies.

*Wilburn Boat* arose when fire consumed a small houseboat used for commercial carriage of passengers on Lake Texoma, an artificial inland lake between Texas and Oklahoma. *Wilburn Boat*, 348 U.S. at 311. The insurer of the boat refused to pay for the damage, because title to the boat had been transferred without the insurer's permission, contrary to a provision of the policy. The insured argued that Texas state law should apply, which would void the policy only if the breach contributed to the loss. *Id.* at 311-12. The Supreme Court agreed with the insured, reasoning that, while state law cannot override federal statutory or common law admiralty rules, in the absence of an established federal maritime rule, state law controls. Because the only case establishing the rule championed by the insurance company did not involve marine insurance and pre-dated *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), the rule could not be considered an established part of federal admiralty law. *Id.* at 314-16.

The Supreme Court reiterated that courts should look first to federal admiralty law: "*Wilburn Boat* does not change the

initial inquiry of the courts in interpreting a policy of marine insurance to determine whether there is an established federal maritime law rule." SCHOENBAUM § 17-6. Accordingly, in determining whether federal admiralty law or Alaska state law is applicable to the current dispute, we consider as a threshold matter whether federal admiralty law contains an established, applicable rule.

It is tempting to look to state law to see if, in the end, the outcome of the case turns on which law is chosen. For instance, here, each party has argued that it should prevail, whether federal maritime law or Alaska state law applies. We are reluctant, however, to construe Alaska state law unnecessarily where Alaska's own courts are much better suited to the task. Just as significantly, *Wilburn Boat* directs us to look to federal law first, as does precedent in our circuit. *Wilburn Boat*, 348 U.S. at 314; *Bohemia, Inc. v. Home Ins. Co.*, 725 F.2d 506, 509-10 (9th Cir. 1984). Finally, such an approach perpetuates uncertainty within our circuit about whether federal or state law applies. *See* Mitchell J. Popham & Chau Vo, *Misrepresentation and Concealment in Marine Insurance Contracts: An Analysis of Federal and State Law within the Ninth Circuit*, 11 U.S.F. MAR. L.J. 99, 124 (1998-1999) ("Popham"). Accordingly, we first examine federal admiralty law.

## I. THE ENTRENCHMENT OF *UBERRIMAE FIDEI*

[4] In looking to federal law, we ask whether *uberrimae fidei* is "a judicially established federal admiralty rule governing [this policy]." *Wilburn Boat*, 348 U.S. at 314. Inlet argues both that *uberrimae fidei* is not an established admiralty rule, and that even if it were, it does not apply to this vessel pollution issuance policy. We disagree on both counts.

### A. *UBERRIMAE FIDEI* AS AN ESTABLISHED FEDERAL ADMIRALTY RULE

[5] *Wilburn Boat* itself provides limited direction on how we are to determine whether a rule is "judicially established."

In *Bohemia*, we fleshed out our approach, explaining that "state law will control the interpretation of a marine insurance policy only in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice." 725 F.2d at 510. In the Ninth Circuit, we require that the rule be sufficiently longstanding and accepted within admiralty law that it can be said to be "established." Putting a slightly different spin on *Wilburn Boat*, the Fifth Circuit requires an admiralty rule be "entrenched federal precedent." *See Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991). Under either gloss, however, we have little doubt that the application of *uberrimae fidei* to marine insurance fits the bill.

[6] *Uberrimae fidei* was first recognized in 1766 by Lord Mansfield, and was codified in English law in 1906. SCHOEN-BAUM § 17-14, n.1; English Mar. Ins. Act 1906. Writing for the Court, Justice Story incorporated the rule into American maritime insurance law in 1828: "The contract of insurance, is one of mutual good faith; and the principles which govern it, are those of an enlightened moral policy. The underwriter must be presumed to act upon the belief, that the party procuring insurance, is not, at the time, in possession of any fact material to the risk, which he does not disclose." *McLanahan*, 26 U.S. at 176. The roots of the *uberrimae fidei* doctrine, then, are deeply embedded in American law, having had almost 200 years to take hold.

Not only is *uberrimae fidei* longstanding, but at the time *Wilburn Boat* was decided, few maritime insurance doctrines were more uniformly accepted in admiralty law. *Wilburn Boat* did nothing to change the standing of this doctrine. Notably, the Supreme Court in *Wilburn Boat* expressed a reluctance for federal courts to fashion *new* admiralty rules, not a desire to do away with existing ones.

[7] Following *Wilburn Boat*, we have never directly addressed whether *uberrimae fidei* or state insurance law

applies in marine insurance cases. Nonetheless, we have repeatedly acknowledged *uberrimae fidei* as part of admiralty law. *See, e.g., Sentry Select Ins. Co. v. Royal Ins. Co. of Am.*, 481 F.3d 1208, 1220 (9th Cir. 2007) ("Because admiralty jurisdiction does not extend to [this case] . . . . we do not apply the federal maritime doctrine of *uberrimae fidei*."); *Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 420, n.3 (9th Cir. 1998) ("*[U]berrimae fidei* exists under both California insurance law, and federal admiralty law.") (internal citation omitted). Indeed, because *uberrimae fidei* has been incorporated into the laws of several of the states within this circuit, whether to apply federal or state law often makes no difference. For example, as noted in *Cigna Property*, California has codified the doctrine. *See Cigna Prop.*, 159 F.3d at 420, n.3. Oregon and Alaska also have enacted provisions exempting most traditional marine insurance from their statutes governing standards for other types of insurance. *See* OR. REV. STAT. § 742.001; ALASKA STAT. § 21.42.010.

Other circuits have noted the continuing vitality of *uberrimae fidei* following *Wilburn Boat*.[2] For example, the Second Circuit has repeatedly applied the doctrine. In *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293 (2d Cir. 1987), the court considered whether an insurance policy was voidable under *uberrimae fidei* where the shipper hired by the insured breached his contract by improperly stowing the insured cargo. The court held that under *uberrimae fidei*, there

---

[2]The First Circuit has considered and twice declined to formally decide whether *uberrimae fidei* applies in light of *Wilburn Boat. See Commercial Union Ins. Co. v. Pesante*, 459 F.3d 34, 38 (1st Cir. 2006) (declining to formally decide whether *uberrimae fidei* was an established admiralty rule, because even under state law, the facts of the case made the policy voidable); *Windsor Mt. Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995) (concluding it was not necessary to decide whether *uberrimae fidei* is "an established rule of maritime law . . . applicable to the dispute at bar," because even under that doctrine, given the facts of the case, the insurer would have had no basis for voiding the policy).

was no duty for the insured to notify the insurer, because there was no change to the circumstances affecting the risk. *Id.* at 308. In voiding a marine insurance policy for failure to disclose the cancellation of a prior policy, the court in *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9 (2d Cir. 1986), said "[i]t is well-established under the doctrine of *uberrimae fidei* that the parties to a marine insurance policy must accord each other the highest degree of good faith." *Id.* at 13; *see also Puritan Ins. Co. v. Eagle S.S. Co.*, 779 F.2d 866 (2d Cir. 1985) (holding *uberrimae fidei* applicable to marine insurance policies).

The Eleventh Circuit is in accord and has succinctly stated that "[i]t is well-settled that the marine insurance doctrine of *uberrimae fidei* is the controlling law of this circuit." *HIH Mar. Serv.*, 211 F.3d at 1362; *see also King v. Allstate Ins. Co.*, 906 F.2d 1537 (11th Cir. 1990) (holding that parties can contract around *uberrimae fidei*).

Until 1991, the Fifth Circuit, too, fit neatly within this pattern. On remand in *Wilburn Boat*, the court of appeals — although not using the term *uberrimae fidei* — held that "[n]othing is better established in the law of marine insurance than that 'a mistake or commission material to a marine risk, whether it be wilful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy. And the same rule obtains, even though the insured did not suppose the fact to be [*sic*] material.' " *Fireman's Fund Ins. Co. v. Wilburn Boat Co.*, 300 F.2d 631, 646 (5th Cir. 1962) ("*Wilburn Boat II*") (citing 3 Couch Insurance at 2568). Because Texas law also appeared to embrace the principle, the court assumed that the doctrine applied without formally deciding the choice of law question, but noted:

> [t]here is good reason behind appellant's argument that federal maritime law, rather than state law, governs [the] issue. Appellant contends, and we agree, that [*Wilburn Boat*] merely held that state law is to

> be applied in the field of marine insurance only
> where 'entrenched federal precedent is lacking' with
> respect to a specific issue. . . . Since the above stated
> rule of concealment in marine insurance is solidly
> entrenched in our body of federal maritime law [cit-
> ing *McLanahan*], it would seem that this rule should
> apply in the instant case.

*Id.* at 647 n.12.

The Fifth Circuit came to the same conclusion just seven
years later in *Gulfstream*. Again, declining to decide the issue,
because Florida state law embraced the same rule, the court
held "[w]ith much ground for echoing the Court's conclusion
. . . expressed [in *Wilburn Boat II*], we again find it unneces-
sary to resolve the point further." *Gulfstream*, 409 F.2d at
981. The court went on to observe that "[a]ll the precedents
agree with the general rule as stated above." *Id.* (citing Corpus
Juris Secundum, Black's Law Dictionary, and numerous trea-
tises).

Then, in 1991, the Fifth Circuit abruptly changed course,
disclaiming this overwhelming body of precedent both within
and without its own circuit. In *Anh Thi Kieu*, the court con-
cluded, "albeit with some hesitation, that the *uberrimae fidei*
doctrine is not 'entrenched federal precedent' " and held that
while "[p]erhaps the doctrine was 'entrenched federal prece-
dent' at the time of the [*Wilburn Boat II*] and [*Gulfstream*]
decisions, . . . the *uberrimae fidei* doctrine is entrenched no
more." *Anh Thi Kieu*, 927 F.2d at 889-90. Ironically, were it
not for the *Anh Thi Kieu* decision itself, there would be little
cause at all to doubt that *uberrimae fidei* is indeed firmly
entrenched maritime law.

To determine whether *uberrimae fidei* controlled, the Fifth
Circuit applied a three-factor test of its own creation: "(1)
whether the federal maritime rule [in that case, *uberrimae
fidei*] constitutes 'entrenched federal precedent'; (2) whether

the state has a substantial and legitimate interest in the application of its law; [and] (3) whether the state's rule is materially different from the federal maritime rule." *Id.* at 886. After determining that Texas state insurance law was not materially different from *uberrimae fidei*[3] and finding that Texas had a material interest in application of its law,[4] the court finally turned to whether *uberrimae fidei* was an entrenched federal precedent, and held it was not. *Id.* at 887-890. With all three

---

[3]Unlike the doctrine of *uberrimae fidei*, Texas law required the insurer to show the insured's misrepresentations and omissions were intended to deceive. Nonetheless, the court decided "[t]he fundamental nature of both laws . . . is the same," because "Texas insurance law shares the concern of federal maritime law that an assured should not profit from her material misrepresentations to the underwriter." *Anh Thi Kieu*, 927 F.2d at 887. While both laws do share this concern — as do most, if not all, insurance laws — the ways in which they address it are materially different, and the Fifth Circuit has been criticized for not acknowledging this point. Popham at 110-11 ("With regard to the third factor, the Fifth Circuit erroneously equated the standards of 'materially different' and 'reasonably similar' in finding that Texas law applied.").

[4]By explicitly taking the state's interest in applying its own law into account in determining whether federal law is entrenched, the Fifth Circuit's test inevitably tips the scales in favor of applying state law, as this factor almost always weighs in favor of state law. This factor appears to be derived from *Kossick v. United Fruit Co.*, in which the Supreme Court held that state law ought to be applied to maritime contracts where its application "would not disturb the uniformity of maritime law." 365 U.S. 731, 738 (1961). In that case, however, the Supreme Court specifically distinguished the inquiry from that under *Wilburn Boat*, saying "[n]or is [*Wilburn Boat*] apposite. The application of state law in that case was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented." *Id.* at 742. At most, then, *Kossick* sets forth an exception to *Wilburn Boat*'s general rule for instances where an application of a peculiarly local rule would have no effect on the uniformity of maritime law in general. *See Bohemia*, 725 F.2d at 510 ("Our decisions rely on *Wilburn Boat* and *Kossick* which, when read together, hold that state law will control . . . only in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice.") (citations omitted). Notably, in *Kossick*, the Supreme Court decided that New York's statute of frauds was not such a rule and that admiralty law applied.

factors weighing in favor of state law, the court applied Texas law. *Id.* at 890.

The Fifth Circuit's analysis of whether *uberrimae fidei* is widely entrenched federal precedent is not persuasive. First, the court admitted that the question of entrenchment "is troublesome." *Id.* at 888. The court went on to state that "the sole remaining substantial vestige of the doctrine is in maritime insurance law," recited that the doctrine "is a rule which this Court has *recognized* but never applied," noted that there were few cases discussing the availability of the doctrine post-*Wilburn Boat*, but acknowledged that those few confidently asserted the doctrine to be "well-recognized" in federal law, and then with "some hesitation" concluded "the *uberrimae fidei* doctrine is not 'entrenched federal precedent.' " *Id.* at 888-89 (emphasis changed). This recitation of the long history of the rule of *uberrimae fidei* in maritime law bears out why the Fifth Circuit's conclusion is indeed more than "troublesome."

The logic chain is not a comfortable fit. Despite nearly universal acceptance in maritime insurance law, the Fifth Circuit threw the doctrine overboard because of its "spotty application" in recent years. At least one commentator has suggested that this void in the case law reflected "[*uberrimae fidei*'s] unquestioned acceptance, rather than its abandonment." Popham at 111. It does violence to the meaning of the term 'entrenched' to reason that because few cases have disputed the application of *uberrimae fidei*, it has somehow become unmoored or "unentrenched." And, even the Fifth Circuit did not think its new rule should necessarily apply outside the context of that particular case. *Anh Thi Kieu*, 927 F.2d at 890, n.7 ("We need not at this time explore all of the situations in which application of the *uberrimae fidei* doctrine might be proper.").

[8] Not surprisingly, no other circuit has followed *Anh Thi Kieu* in the sixteen years since it was decided. In our view, in

the face of 200 years of precedent, it takes more than a single circuit case and spotty citation in recent years to uproot an entrenched doctrine.

**[9]** Whatever traction it might have, *Anh Thi Kieu* does not undermine our conclusion that "no rule of marine insurance is better established tha[n] the utmost good faith rule." Thomas J. Schoenbaum, *The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law*, 29 J. MAR. L. & COM. 1, 11 (1998). Following the framework of *Wilburn Boat*, we hold that the long-standing federal maritime doctrine of *uberrimae fidei*, rather than state law, applies to marine insurance contracts.

The parties offer a number of policy arguments for and against application of *uberrimae fidei* to marine insurance. Our role is not, however, to decide on the "best" rule for efficient and fair administration of marine insurance markets. In fact, it was precisely to avoid this sort of federal judicial policy-making that the Supreme Court in *Wilburn Boat* cautioned against the creation of new maritime rules by the courts. Our only task is to determine whether *uberrimae fidei* is already an established rule of federal maritime law or not. Because we hold that it is, we now look at its application in the context of this case.

**B.    VESSEL POLLUTION INSURANCE AS MARINE INSURANCE**

**[10]** We next address whether marine insurance includes vessel pollution insurance and this policy in particular. Marine insurance is, simply, insurance against "the losses incident to the marine adventure." SCHOENBAUM § 17-1 (quoting the British Marine Insurance Act, Edw. 7, ch. 41 § 1); *see also Dunham*, 78 U.S. at 30. Marine insurance generally has three "central conceptual elements:" (1) "it is a contract of *indemnity* against loss;" (2) "the indemnity . . . is only triggered by an accident or fortuity;" and (3) "the 'adventure' or

peril insured against must be specifically *maritime* in character." SCHOENBAUM § 17-2.

[11] One type of insurance typifying marine insurance is protection and indemnity ("P&I") insurance, which insures the shipowner against claims by third parties. *Id.* P&I insurance historically included pollution liability, but the expansion of such liability by modern statutes led many P&I insurers to exclude coverage for pollution damages and the Coast Guard to demand more insurance than P&I policies can provide. 9A COUCH ON INSURANCE 3D § 137:101 (Lee R. Russ & Thomas F. Segalla eds., 2005) (1995); Robert T. Lemon, *Allocation of Marine Risks: An Overview of the Marine Insurance Package*, 81 TUL. L. REV. 1467, 1486 (2007).

[12] Vessel pollution policies mirror P&I policies in their general terms, but cover liability under the OPA and other environmental statutes. *Id.* at 1486-87. That vessel pollution insurance covers new statutory liabilities, occasioned by modern environmental legislation, does not alter the fact that the risks of incurring that liability stem from the same vagaries of marine life that have shaped maritime insurance law for centuries. Like traditional P&I insurance, vessel pollution insurance, or at least the policy in this case, covers vessel owners' liabilities to third parties for marine incidents, namely pollution.

Finally, it bears noting that vessel pollution insurance fits well within the general conception of marine insurance, as it is a contract of indemnity triggered by an event that is maritime in character. The policy language in this case best illustrates the maritime nature of the coverage. Coverage under the policy extends to "[l]iability . . . [under the OPA, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), and similar statutes] for a discharge of oil . . . into or upon the navigable waters or adjoining shorelines . . . of the United States," provided that "the discharge, substantial threat of discharge, or release . . . was

[among other requirements] sudden and was unintended and unexpected by the Assured . . . ."

Inlet attempts to distinguish vessel pollution insurance from marine insurance by reference to *Port of Portland v. WQIS*, 796 F.2d 1188 (9th Cir. 1986). That case dealt with whether a policy offering "coverage tailored to liabilities created by the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. §§ 1251-1376 (1982)," qualified as "wet marine" or "general marine" insurance under an Oregon statute. *Port of Portland*, 796 F.2d at 1191, 1195-96. Although the categories overlap, generally speaking, wet marine insurance relates to marine vessels, whereas general marine insurance, as defined in the statute and despite its name, covers losses associated with transportation generally, whether over land or water. *Id.* at 1196; *see also* OR. REV. STAT. § 731.194 (1985); OR. REV. STAT. § 731.174 (1985).

**[13]** Inlet's argument fails for two reasons. Significantly, our case does not concern the statutory classification of vessel pollution insurance under state law. Rather, the issue here is whether vessel pollution insurance falls within the boundaries of marine insurance in federal admiralty law, a question not resolved by reference to a state statutory scheme. Second, the policy Inlet purchased is very different from the one at issue in *Port of Portland*, where we made a point of distinguishing the specific policy from traditional P&I insurance, noting that "[t]raditional P&I policies cover oil pollution damage to third persons. [This] policy contains that coverage but the Port did not purchase it." *Port of Portland*, 796 F.2d at 1196, n.4. That distinction is not, of course, an issue in Inlet's coverage. For purposes of applying *uberrimae fidei*, we hold that the vessel pollution insurance policy issued to Inlet is appropriately characterized as marine insurance.

## II. APPLICATION OF *UBERRIMAE FIDEI* TO THIS POLICY

**[14]** Finally, we turn to the application of *uberrimae fidei* to the policy at hand. "The doctrine of *uberrimae fidei*

requires a marine insurance applicant *even if not asked*, to reveal every fact within his/her knowledge that is material to the risk." *Cigna Prop.*, 159 F.3d at 418, n.1 (internal quotations omitted). "An insurer may rescind an insurance contract if it can show either intentional misrepresentation of a fact, regardless of materiality, or nondisclosure of a fact material to the risk, regardless of intent." *Id.* at 420 (internal quotations omitted). Although the parties dispute what information the Lloyds application solicited from Inlet, that disagreement obscures the real issue, because *uberrimae fidei* rests on disclosure, not solicitation. What continues to be relevant, however, is whether Inlet knew of material information that it failed to disclose. "A non-disclosed fact is material if it would have affected the insurer's decision to insure at all or at a particular premium." *N.Y. Mar. & Gen. Ins. Co. v. Tradeline*, 266 F.3d 112, 123 (2d Cir. 2001) (citation omitted).

Lloyds claims that a number of facts not disclosed by Inlet were material to its decision: the MAREN I sinking; the HB spill; the fact of, and reason for, WQIS's cancellation of Inlet's previous policy; the condition of the QP, which three months before Inlet applied for insurance had been "listing at the city dock with the potential of turning turtle;" and Inlet's financial troubles.

[15] Lloyds produced overwhelming and unrefuted evidence that any of these undisclosed facts would have affected its decision to offer the policy were it known.[5] Case law also supports Lloyds' position that loss history is relevant. *See Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222 (9th Cir. 1995).

Despite this evidence, Inlet argues that Lloyds' behavior in renewing Inlet's policy demonstrates the opposite. The facts

---

[5]Inlet's effort to contest this point rests solely on a declaration that was excluded by the district court in a ruling that was not appealed.

are not in dispute. Instead we consider the legal significance of Lloyds' actions.

The QP sank two days before the renewal deadline on Inlet's policy. Lloyds' agent was informed the next day, but because of the time difference, Lloyds did not receive notice of the spill until the day Inlet's policy was due to be renewed. Lloyds had quoted a renewal price to Inlet weeks before. On the day it learned of the QP sinking, some of the employees of Lloyds' agent were reporting — in their words, unsubstantiated hearsay — that the Coast Guard had received numerous complaints about Inlet, that Inlet had had a previous spill, and that Inlet had filed for bankruptcy. It is unclear what, if any, confirmed information Lloyds possessed when it decided to honor its quoted price and renew the policy.

While Inlet argues that this sequence of events demonstrates Lloyds considered this information immaterial, Inlet overlooks a few important facts: First, Lloyds conditioned its renewal on Inlet providing accurate information on a newly requested application. In addition, Lloyds immediately commenced an investigation into Inlet's history and the condition of its vessels. Finally, once Lloyds obtained sufficiently sound information, despite considerable stonewalling by Inlet, it filed this suit.

[16] Inlet's argument also overlooks that *uberrimae fidei* is a duty applicable to marine insurance generally, not just to the party seeking marine insurance. SCHOENBAUM § 17-14 ("Marine insurance is a contract '*uberrimae fidei*', requiring the utmost good faith by both parties to the contract."). As such, Lloyds was also bound by the duty of utmost good faith toward its insured. Lloyds' uncontested evidence demonstrates that it was concerned that by refusing to renew the policy based on unsubstantiated rumors, it would expose itself to allegations that it had violated its duty of *uberrimae fidei*. The facts undisclosed by Inlet were material to the insurance risk

CERTAIN UNDERWRITERS v. INLET FISHERIES    1879

undertaken by Lloyds and these circumstances warrant void-
ing of the insurance contract by Lloyds.

**AFFIRMED.**

A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

MAR 3 - 2008

by: _____
Deputy Clerk